# EXHIBIT 1

CONFIDENTIAL

Page 1

1            UNITED STATES DISTRICT COURT

             SOUTHERN DISTRICT OF FLORIDA

2                   MIAMI DIVISION

3    - - - - - - - - - - - - - -x

         KENNETH C. GRIFFIN,        :

4                                   :

             Plaintiff,             :

5                                   : Case No.

         v.                         : 1:22-cv-24023-Scola/Goodman

6                                   :

         INTERNAL REVENUE           :

7        SERVICE and                :

         U.S. DEPARTMENT OF THE     :

8        TREASURY,                  :

                                    :

9            Defendants.            :

     - - - - - - - - - - - - - -x

10                                  Tuesday, March 19, 2024

                                    Washington, D.C.

11

12

13   Confidential Videotaped Deposition of:

14                  CHARLES E. LITTLEJOHN,

15   called for oral examination by counsel for the Plaintiff,

16   pursuant to notice, at the law offices of Quinn Emanuel

17   Urquhart & Sullivan, LLP, 1300 I Street, Northwest,

18   Suite 900, Washington, D.C. 20005, before Christina S.

19   Hotsko, RPR, CRR, of Veritext Legal Solutions, a Notary

20   Public in and for the District of Columbia, beginning at

21   9:10 a.m., when were present on behalf of the respective

22   parties:

CONFIDENTIAL

Page 2

```
1                  A P P E A R A N C E S
2    On behalf of Plaintiff:
         WILLIAM A. BURCK, ESQUIRE
3        ALEXANDER J. MERTON, ESQUIRE
         KAYLEE OTTERBACHER, ESQUIRE
4        Quinn Emanuel Urquhart & Sullivan, LLP
         1300 I Street, Northwest, Suite 900
5        Washington, D.C. 20005
         (202) 538-8000
6        williamburck@quinnemanuel.com
7
     On behalf of the Witness:
8        LISA MANNING, ESQUIRE
         Schertler Onorato Mead & Sears
9        555 13th Street, Northwest, Suite 500 West
         Washington, D.C. 20004
10       (202) 628-4199
         lmanning@schertlerlaw.com
11
12   On behalf of the Defendants:
         MARY BETH SMITH, ESQUIRE
13       Department of Justice, Tax Division
         Civil Trial Section, Southern Region
14       1275 First Street, Northeast, Suite 10238
         Washington, D.C. 20044
15       mary.e.smith@usdoj.gov
16       BEATRIZ SAIZ, ESQUIRE
         Department of Justice, Tax Division
17       Civil Trial Section, Eastern Region
         555 Fourth Street, Northwest, Sixth Floor
18       Washington, D.C. 20001
         beatriz.t.saiz@usdoj.gov
19
         BART D. JEFFRESS, ESQUIRE
20       Department of Justice, Tax Division
         Court of Federal Claims
21       Section 1275 First Street, Northeast, Ninth Floor
         Washington, D.C. 20002
22       bart.d.jeffress@usdoj.gov
```

CONFIDENTIAL

Page 3

1        A P P E A R A N C E S   C O N T I N U E D

2    On behalf of Defendants:

         TERESA DONDLINGER TRISSELL, ESQUIRE

3        IRS Office of Chief Counsel

         1111 Constitution Avenue, Northwest

4        Washington, D.C. 20224

         (202) 317-7158

5        teresa.d.trissell@irscounsel.treas.gov

6

     Also Present:

7        Orson Braithwaite, Video Technician

         Brooke Cucinella, Citadel

8        Tom McDonald, Citadel

9

10

11

12

13

14

15

16

17

18

19

20

21

22

CONFIDENTIAL

Page 4

1                       C O N T E N T S

2    EXAMINATION BY:                                    PAGE

3       Counsel for Plaintiff                           12

4       Counsel for Defendants                          306

5

6

7    LITTLEJOHN DEPOSITION EXHIBITS:   *                PAGE

8    Exhibit 1  Littlejohn CV                           16

9    Exhibit 2  Littlejohn Internal Booz Allen Resume   59

10   Exhibit 3  Factual Basis for Plea, 12 October 2023 73

11   Exhibit 4  Government Sentencing Memorandum        125

12   Exhibit 5  Transcript of Sentencing               80

13   Exhibit 6  Booz Allen Offer Letter                314

14   Exhibit 7  Booz Allen Time Reporting Document      316

15   Exhibit 8  Integrated Talent Management Learning   317
                History

16

17

18

19

20

21            *   (Exhibits attached to transcript.)

22

CONFIDENTIAL

Page 5

1                    P R O C E E D I N G S

2              VIDEO TECHNICIAN:  Good morning.  We are

3    going on the record at 9:10 a.m. on March 19th,

4    2024.

5              Please note that the microphones are

6    sensitive and may pick up whispering and private

7    conversations.  Please mute your phones at this

8    time.

9              Audio and video recording will continue

10   to take place unless all parties agree to go off

11   the record.

12             This is media unit 1 of the

13   video-recorded deposition of Mr. Charles Edward

14   Littlejohn, in the matter of Kenneth C. Griffin

15   versus Internal Revenue Service, et al., filed in

16   the United States District Court, Southern

17   District of Florida, Miami Division, case

18   number 1:22-cv-24023-Scola/Goodman.

19             My name is Orson Braithwaite representing

20   Veritext Legal Solutions, and I am the

21   videographer.  The court reporter is Christina

22   Hotsko from the firm Veritext Legal Solutions.

CONFIDENTIAL

Page 6

1          Counsel will now state their appearances

2   and affiliations for the record.

3          MR. BURCK:  Good morning.  William Burck

4   from Quinn Emanuel representing the plaintiff, Ken

5   Griffin.

6          MS. SMITH:  Good morning.  Mary Beth

7   Smith representing defendant United States of

8   America.

9          MS. MANNING:  Good morning.  Lisa Manning

10  of Schertler Onorato Mead & Sears, on behalf of

11  the witness, Charles Littlejohn.

12         VIDEO TECHNICIAN:  Thank you.  Will the

13  court reporter please swear in the witness.

14  Whereupon,

15              CHARLES LITTLEJOHN,

16  being first duly sworn or affirmed to testify to

17  the truth, the whole truth, and nothing but the

18  truth, was examined and testified as follows:

19         MS. SMITH:  Mr. Burck, just before you

20  begin, pursuant to the stipulated protective order

21  entered in this case, the United States is

22  designating Mr. Littlejohn's deposition transcript

CONFIDENTIAL

Page 7

1  as confidential.

2          MR. BURCK:  We certainly can agree to

3  certain parts of it being confidential.  Others

4  we'll have to take up separately.

5          MS. SMITH:  Okay.

6          MR. BURCK:  Would -- the

7  witness' attorney would like to start with the

8  Touhy -- the alleged Touhy authorization?

9          MS. MANNING:  Yes, Mr. Burck.  As the

10  parties are aware, Mr. Littlejohn is present today

11  and providing testimony on subject matter related

12  to his employment as a federal contractor for the

13  United States government.  As such, his testimony

14  is limited by a February 2024 Touhy letter, or

15  testimony authorization.  And I would like to

16  read, in relevant part, so that everyone is on the

17  same page, as to what he is authorized and not

18  authorized to provide testimony.

19          So the letter states that, Pursuant to

20  delegation order 11-2 and 26 CFR 301.9000-1,

21  3301.9000-6, you are authorized to appear and give

22  testimony in the above-captioned matter,

CONFIDENTIAL

Page 8

```
 1    Griffin v. IRS and the United States Department of

 2    Treasury, subject to the limitations listed below.

 3    Additionally, this testimony authorization is a

 4    limited release from your nondisclosure agreements

 5    with the IRS to allow your testimony in this

 6    matter.  The nondisclosure agreements remain valid

 7    and in effect for all other purposes.

 8             And specifically the letter states that,

 9    Unless prohibited in the next section, you may

10    testify about the following enumerated topics.

11             One, your educational and occupational

12    background; two, your work as an employee of

13    Booz Allen on contracts that it had with the IRS;

14    three, your collection and disclosure of returns

15    or return information to ProPublica generally and

16    without reference to any taxpayer; four, your

17    collection of the returns or return information of

18    plaintiff Kenneth C. Griffin and your disclosure

19    of his returns and return information to

20    ProPublica; and five, your communications with the

21    New York Times that do not disclose the returns or

22    return information of any third-party taxpayer,
```

CONFIDENTIAL

Page 9

1    i.e., a taxpayer not party to this proceeding.

2             The letter further states that

3    Mr. Littlejohn is not authorized to testify about

4    the following subject matters:  One, you may -- or

5    you may not, one, discuss or otherwise disclose

6    the returns or return information of any

7    third-party taxpayer, i.e., taxpayer not a party

8    to this proceeding, including the returns or

9    return information of any third-party taxpayer

10   that you collected and disclosed to news

11   organizations; two, disclose any information in

12   response to a question which the United States

13   asserts the attorney-client privilege, law

14   enforcement investigative privilege, i.e., law

15   enforcement techniques and procedures, or the

16   deliberative process privilege; three, testify as

17   to other cases or other matters of official

18   business not relevant to the proceeding or not

19   proportional to the needs of this case; four,

20   testify in response to general questions

21   concerning the positions, policies, procedures, or

22   records of the Internal Revenue Service that are

CONFIDENTIAL

Page 10

1    not relevant to the proceeding or not proportional

2    to the needs of the case; five, produce any

3    privileged documents or records of the Internal

4    Revenue Service; six, testify as to facts of which

5    you have no personal knowledge; seven, render

6    opinion testimony; eight, testify regarding the

7    thought processes of agency personnel or answer

8    hypothetical questions; and nine, speculate as to

9    matters of which you have no sure knowledge.

10           MR. BURCK:  Thank you, Ms. Manning.  The

11   plaintiff, as the government is aware, has

12   disputed and objects to the Touhy characterization

13   of the authorization.  And the government has also

14   informed us that they could not instruct

15   Mr. Littlejohn not to answer any questions based

16   on the testimony authorization alone.

17           The testimony authorization does not

18   create a separate privilege or basis to withhold

19   IRS information.  That is what the government has

20   represented to the defense -- or excuse me, to the

21   plaintiff.

22           Mr. Littlejohn is free to answer your

CONFIDENTIAL

Page 11

1   questions -- our questions at will with whatever

2   guidance he receives from you, Ms. Manning,

3   subject to section 6103 or privilege asserted by

4   the government.  That is what the government has

5   represented to the plaintiff, and they've also

6   further confirmed that they cannot instruct

7   Mr. Littlejohn not to answer any questions during

8   his deposition unless there is a 6103 issue or the

9   answer would require Mr. Littlejohn to disclose

10  privileged information.

11          MS. MANNING:  Understood.  And I will

12  further note for the record that it is my

13  understanding, at least reading this letter, that

14  Mr. Littlejohn continues to be bound by the

15  nondisclosure agreements that he signed as part of

16  his work with the Internal Revenue Service, of

17  which we do not have complete copies, but that we

18  are mindful that those obligations exist, as

19  modified by the February 2024 letter.

20          MR. BURCK:  Understood.  And of course,

21  the government has designated -- or attempted to

22  designated the entire transcript as confidential,

CONFIDENTIAL

Page 12

1   as you have heard.  So our position is that the

2   confidentiality agreements would not prevent him

3   and he would not be permitted to not answer those

4   questions unless, again, the government asserts a

5   privilege that is specific to the -- to their

6   prerogatives.

7              All right.  With that, I will begin,

8   unless there is anything further, Ms. Manning.

9              MS. MANNING:  No.

10             EXAMINATION BY COUNSEL FOR PLAINTIFF

11  BY MR. BURCK:

12       Q.  Good morning, Mr. Littlejohn.  Thank you

13  for being here this morning.  My name is Bill

14  Burck.  I am an attorney for Mr. Griffin, who is

15  the plaintiff in this case.  I'll just do some

16  preliminary questions for you.

17             Do you understand that you're under oath?

18       A.  I do.  Yes.

19       Q.  And you understand that means you are

20  required to tell the truth and to testify

21  truthfully?

22       A.  Yes.

CONFIDENTIAL

Page 13

1      Q.  Are you currently taking any medications

2  or other substances that would prevent you from

3  testifying truthfully or accurately?

4      A.  No.

5      Q.  Is there any other reason you cannot

6  provide full and truthful answers today other than

7  what Ms. Manning had laid out?

8      A.  No.

9      Q.  Have you ever been deposed before?

10     A.  No.

11     Q.  I'm going to go through some basic ground

12 rules just so that -- and you've probably gone

13 through this with Ms. Manning, but just so that

14 we're on the same page.

15          So I will be asking you questions for the

16 plaintiff.  Your counsel may object.  But unless

17 she instructs you not to answer, you're required

18 to answer my questions.

19          Do you understand that?

20     A.  Yes.

21     Q.  I need verbal responses because there is

22 a court reporter transcribing your testimony.  So

CONFIDENTIAL

Page 14

1    a nod or a "hmm" is not going to be enough.  So I

2    may have to -- if you do something like that, I

3    may have to ask you to say yes or no or answer the

4    question verbally.

5           Do you understand that?

6       A.  Understood.  Yes.

7       Q.  Please wait until I finish my question

8    before you reply so you'll hear the entire

9    question.  I'll wait until you're finished with

10   your reply before I ask another question.

11          If you don't understand a question,

12   please tell me and I will try to rephrase.  If you

13   answer, I'll assume you understood.

14          Do you understand that?

15      A.  Yes.

16      Q.  If you need a break, please let us know

17   and we will try to accommodate you, although I

18   will ask that you answer any question that might

19   be pending before we take a break.

20      A.  Understood.

21      Q.  Thank you.

22          I'm going to start with just some

CONFIDENTIAL

Page 15

1    background, Mr. Littlejohn.

2              Can you tell us a little bit about your

3    personal history, where you grew up, your family

4    history, just briefly.

5         A.  Sure.  I grew up in St. Louis, Missouri.

6    Born in 1985.  My parents, Steven and Juanita,

7    were born in Hawaii and North Carolina,

8    respectively, and moved to St. Louis a few years

9    before I was born.

10             They separated when I was five years old

11   and remarried shortly thereafter.

12             I attended school in St. Louis until I

13   graduated from high school and then attended

14   University of North Carolina, Chapel Hill, for

15   college, studying economics and physics.

16             And I have no full siblings but two

17   half-siblings and several step-siblings.

18        Q.  Are you a basketball fan, by any chance?

19        A.  Yes, yes.

20        Q.  Congratulations on the number 1 seed --

21        A.  Yeah.

22        Q.  -- of whatever region.

CONFIDENTIAL

Page 16

1      A.  Thank you.

2      Q.  All right.  So I'm going to -- you've

3  prepared in the past resumes, CVs?

4      A.  Certainly.

5      Q.  I'm going to mark as Exhibit 1 a CV that

6  we believe you prepared.

7          (Littlejohn Deposition Exhibit 1 marked

8          for identification and attached to the

9          transcript.)

10         MR. BURCK:  I'm handing the witness

11  Exhibit 1.

12  BY MR. BURCK:

13      Q.  Mr. Littlejohn, do you recognize that?

14      A.  Yeah.

15      Q.  And --

16      A.  I do.

17      Q.  -- what is this?

18      A.  This is a CV.

19      Q.  Did you prepare it?

20      A.  I did.  Yes.

21      Q.  Do you remember roughly when you prepared

22  it?

CONFIDENTIAL

Page 17

1          A.  Must have been after November 2013.  I

2    would say -- could have been in preparation for

3    rejoining Booz Allen.  Maybe it's 2017.

4          Q.  Do you see at the bottom of the document

5    BAH.Griffin, and then a series of numbers?

6          A.  I do, yes.

7          Q.  Do you have an understanding what BAH

8    means?

9          A.  Booz Allen Hamilton.

10         Q.  Okay.  And do you believe that this is a

11   resume that you prepared for Booz Allen Hamilton?

12         A.  It appears to be.

13         Q.  Okay.  So let's go through some of the

14   information that you put in this CV.

15             You mentioned that you graduated from

16   Carolina in 2007 with a bachelor of arts in

17   economics and physics.

18         A.  Correct.

19         Q.  Sum laude.

20         A.  Yes.

21         Q.  Congratulations.

22         A.  Thanks.

CONFIDENTIAL

Page 18

1          Q.  Very good.

2               I want to focus on your time at

3     Booz Allen.

4          A.  Okay.

5          Q.  And that will be in the second set of

6     bullets in the document.

7               Do you see that?

8          A.  I see it.  Yes.

9          Q.  And it says that you were an associate at

10    Booz Allen Hamilton, right?

11         A.  That's correct.

12         Q.  And what is an associate at Booz Allen

13    Hamilton?  What does that person do?

14         A.  That's the third level of consultant.

15         Q.  And what are the first two levels?

16         A.  Consultant and senior consultant.

17         Q.  So associate is senior to consultant and

18    senior consultant?

19         A.  Correct.

20         Q.  It says you were there from January 2008

21    through July 2010.

22         A.  Yes.

CONFIDENTIAL

Page 19

1      Q.  And then it says you were there from

2   June 2012 to November 2013.

3      A.  Correct.

4      Q.  So there was a gap of about two years

5   between your tenure as an associate; is that

6   correct?

7      A.  I wasn't an associate at that time.  I

8   became an associate at the end of my second stint

9   of tenure.

10     Q.  Okay.  So at the beginning, you were a

11  consultant?

12     A.  Yes.  I was a consultant and then senior

13  consultant during that first couple years of

14  tenure.

15     Q.  Okay.  Now, when you -- let's look at the

16  first bullet.

17         And again, you wrote these --

18     A.  Yes.  These --

19     Q.  -- words --

20     A.  -- are my words.

21     Q.  And it says -- the first bullet says,

22  Responsible for data analysis, communication

CONFIDENTIAL

Page 20

1    initiatives developed in Python, SAS, and R for an

2    IRS identity theft program that protected over

3    a million taxpayer accounts and stopped plus

4    $4 billion in fraudulent tax returns.

5             Did I read that correctly?

6        A.  Yes.

7        Q.  Can you tell what Python is?

8        A.  It's a programming language.

9        Q.  And what does it do?

10       A.  It does what most programming languages

11   do:  Manipulates computers, math and analysis.

12       Q.  What is the purpose of it, with respect

13   to how you described it in this sentence?

14       A.  I was -- I'm skilled at using this

15   language, and I used it during this task, this

16   project that I was on to basically conduct my

17   work, do data analysis, create programs to satisfy

18   the requirements of my contract.

19       Q.  And what is SAS?

20       A.  It's another -- it's like a scripting

21   language, so a little bit different than a

22   programming language.  It is specific to data

CONFIDENTIAL

Page 21

```
 1    analysis.
 2         Q.  And what about R?  What does R mean?
 3         A.  R is also specific to data analysis.
 4    Similar program, open source.
 5         Q.  So these are data analysis programs that
 6    you were skilled at.
 7         A.  Uh-huh.
 8         Q.  And you said that you were doing this for
 9    an IRS identity theft program.
10         A.  That's correct.
11         Q.  Can you tell us about that identity theft
12    program?
13         A.  Certainly.  So one of the problems that
14    had arisen during this time in the IRS' history
15    was people were -- fraudsters, criminals were
16    creating fraudulent tax returns and submitting
17    them to the IRS to receive, you know, several
18    thousand dollars in illicit gains, refunds, then
19    they'd abscond with the money.
20            So this program that I was assigned to
21    set up rules and filters to help prevent that from
22    happening before refunds were issued.
```

CONFIDENTIAL

1        Q.   So your role was to assist the IRS in

2    preventing identity theft?

3        A.   From stealing money from Treasury,

4    essentially.

5        Q.   Through identity theft in particular?

6        A.   Yes.

7        Q.   And you said that it protected over

8    a million taxpayer accounts.

9        A.   Uh-huh.

10       Q.   How did you come to a million taxpayer

11   accounts?

12       A.   This is the number of accounts that were

13   flagged.

14       Q.   Flagged by whom?

15       A.   By the IRS to prevent the refund from

16   going out.

17       Q.   And you knew this because of what

18   information?

19       A.   I was involved in the creation of these

20   filters and reporting on their effectiveness and

21   statistics related to the program.

22       Q.   So you had personal knowledge of the

CONFIDENTIAL

Page 23

1   number --

2        A.  Yes.

3        Q.  -- of taxpayer accounts.

4            Okay.  And you also said that it stopped

5   over $4 billion in fraudulent tax returns?

6        A.  That's right.

7        Q.  And is that also because you had personal

8   knowledge of the amount of money that was saved by

9   the -- for the IRS through these programs?

10       A.  Yes.

11       Q.  And again, you were personally involved

12  in this program to protect taxpayer accounts and

13  to stop over $4 billion in fraudulent tax returns.

14       A.  Correct.

15       Q.  The next bullet says that you built the

16  MS Access database that tracked 130,000 ID cards,

17  managed program invoicing and forecasted costs for

18  Treasury Department's HSPD-12 identity and access

19  management program.

20           Can you just tell us, what is the MS

21  Access database?

22       A.  I have a question about this.

CONFIDENTIAL

1         THE WITNESS:  This is not an IRS contract

2    that this is related to.

3         MS. MANNING:  Oh.

4         THE WITNESS:  Is that going to be --

5    preclude me from answering --

6         MS. MANNING:  Then I would direct you not

7    to answer because it's not relevant to the --

8         THE WITNESS:  Then that's what I'm going

9    to do.

10   BY MR. BURCK:

11        Q.  Are you aware that the IRS is part of the

12   Treasury Department?

13        A.  Certainly.

14        MR. BURCK:  Just to be clear,

15   Ms. Manning, you're instructing him not to answer

16   that question.

17        MS. MANNING:  May I confer with my

18   client?

19        MR. BURCK:  Sure.  Of course.  Do you

20   want to go off the record?  I think we have to.

21        MS. MANNING:  I think we have to.

22        VIDEO TECHNICIAN:  The time is 9:29 a.m.

CONFIDENTIAL

Page 25

1    We're off the record.

2              (Discussion off the record.)

3              VIDEO TECHNICIAN:  The time is 9:31 a.m.

4    We're on the record.

5    BY MR. BURCK:

6        Q.  I believe that your counsel -- I was

7    asking about the MS Access database that tracked

8    130,000 ID cards relating to Treasury Department's

9    HSPD-12 identity and access management program.

10       A.  Uh-huh.

11       Q.  And your counsel had instructed you not

12   to answer.  I'm going to re-ask that question,

13   which is, can you tell us what the MS Access

14   database that tracked 130,000 ID cards -- what is

15   the MS Access database?

16             THE WITNESS:  So just to confirm, I can

17   answer this question?

18             MS. MANNING:  Yes.

19             THE WITNESS:  Okay.  MS Access is

20   generally the Microsoft Access tool for creating

21   databases.

22             This particular database was designed to

CONFIDENTIAL

Page 26

1    help manage the program that Treasury was running

2    that was tasked with issuing ID cards, PIV-style

3    ID cards, to all of Treasury's employees and

4    contractors.

5           So this particular database would, on a

6    daily basis, be updated with the status of

7    individual IRS persons, status with getting these

8    new ID cards.

9    BY MR. BURCK:

10        Q.   And you said HI -- PIV?

11        A.   PIV, P-I-V.

12        Q.   PIV.  And what does that stand for?

13        A.   I do not know.

14        Q.   Okay.  And what is HSPD-12?

15        A.   Homeland Security presidential directive

16   12.  It was an order signed by President George W.

17   Bush to upgrade the physical security and digital

18   security for all agencies in the government.  And

19   that would require a new type of personal access

20   card for employees and contractors.

21        Q.   And did these employees and contractors

22   include IRS personnel?

CONFIDENTIAL

Page 27

1          A.   Yes.

2          Q.   So these were identity cards for

3    including, amongst others --

4          A.   Yes.

5          Q.   -- IRS personnel?

6          A.   Correct.

7          Q.   And then the third bullet mentions that

8    you provided data modeling and support for

9    baseline assessment of process flows and work

10   rates at the IRS Fraud Detection Center.

11         A.   Correct.

12         Q.   Do you see that?

13              Can you elaborate on that a bit?  What

14   were you doing exactly?

15         A.   I was brought in to help assemble

16   statistics on the time it takes to do different

17   parts of this whole process, this Fraud Detection

18   Center process, that IRS has set up for handling

19   tax returns that flag some particular filter that

20   they have.

21              And they were moving this -- this

22   process, this whole thing, to a different part of

CONFIDENTIAL

Page 28

1    the IRS.  They needed to know how -- you know, how

2    many FTEs are required to conduct this work.  So I

3    had an Excel spreadsheet of, you know, statistics

4    on how long it takes to do certain things.

5        Q.  Understood.

6            So -- and just to be clear, when you have

7    the dates for your time at Booz Allen as January

8    2008 to July 2010 and then June 2012 to

9    November 2013, the list of bullets here is a

10   summary of what you were doing at that time,

11   correct?

12       A.  Yes.

13       Q.  And the first three bullets reference

14   work for the IRS or for Treasury, correct?

15       A.  Yes.

16       Q.  Would you say that most of the work you

17   did during that period of time was for the IRS or

18   Treasury?

19       A.  Yes.

20       Q.  Would you say most of the work was for

21   the IRS?

22       A.  Yes.  Well, I don't know what -- the

CONFIDENTIAL

Page 29

1    exact amount of dates.  I'd have to do the math

2    because Treasury -- that Treasury product --

3    project lasted a long time.

4         Q.  But it also covered IRS personnel --

5         A.  That's true --

6         Q.  -- in terms of --

7         A.  -- yes.

8         Q.  When I say most, I mean, you know,

9    usual -- over 50 percent of your work was for the

10   IRS.

11        A.  Or Treasury or just IRS?

12        Q.  Let's do first IRS.

13        A.  If you say that IRS is a component of

14   Treasury and that this Treasury product -- project

15   was, you know, 80 percent IRS, then yes.

16        Q.  Okay.  When you were in college, did you

17   study anything relating to income tax or tax

18   issues?

19        A.  Not specifically.  Certainly as part of

20   my economics degree, there were theoretical

21   sections about tax and how it affects economies

22   and personal choices.

CONFIDENTIAL

Page 30

1      Q.  So you started at Booz Allen right after

2  you graduated from college, I believe.

3      A.  Yes.

4      Q.  You graduated in December and then you

5  started.

6          So did you apply to be, I guess, a

7  consultant at Booz Allen while you were a senior?

8      A.  Yes.

9      Q.  And were you offered a job while you were

10 still at Carolina, or was it --

11     A.  Yes.

12     Q.  So your plan at the time was to leave

13 Carolina and go work at Booz Allen?

14     A.  Yes.

15     Q.  And did you know, when you were applying

16 to Booz Allen, that you'd be doing work for the

17 IRS?

18     A.  No.

19     Q.  What was your understanding of what your

20 role would be when you joined Booz Allen?

21     A.  Public sector work in finance, government

22 finance, which I guess is a euphemism for IRS.

CONFIDENTIAL

Page 31

1      Q.  Okay.  So you knew you were going to work

2  for the -- or work for government agencies?

3      A.  Yeah, I did.

4      Q.  And as you just said, government finance,

5  that would be Treasury.

6      A.  Yes.

7      Q.  And IRS is part of Treasury.

8      A.  Yes.

9      Q.  So you had an expectation that the IRS

10  might be part of your portfolio?

11      A.  I -- it was not my understanding when I

12  first applied.  But certainly, when talking to

13  people during my interview, it became clear that

14  IRS was a big source of contracts for Booz Allen

15  and the team that I was interviewing for, but not

16  exclusive.

17      Q.  How soon after you start -- you were out

18  of college and you were now at Booz Allen did you

19  start working on IRS matters?

20      A.  This would have been March.

21      Q.  Okay.  So March.  So a couple months into

22  it?

CONFIDENTIAL

Page 32

1      A.  Yeah.  End of -- end of February,

2  beginning of March.

3      Q.  Okay.  So one or two months.

4          And what were you told your role was

5  going to be for the IRS?

6      A.  Generally or for this specific work?

7      Q.  Why don't we start generally, and then

8  you can give me specifics.

9      A.  Well, my very first project was this FDC

10  transition.  It was essentially data modeling, was

11  what I was told.

12      Q.  This is the third bullet?

13      A.  Yes.

14      Q.  Okay.

15      A.  And that lasted not more than a few

16  weeks, actually.  I was brought in as surge

17  support, as they were finishing up the report they

18  were putting together.

19      Q.  And was it somebody -- a supervisor at

20  Booz Allen who informed you of what your first

21  assignment was going to be?

22      A.  Yes.

CONFIDENTIAL

Page 33

1      Q.  And when you started working on the surge
2  support for the IRS Fraud Detection Center, where
3  did you actually physically work day to day?
4      A.  At the Booz Allen headquarters.
5      Q.  Okay.  Did you visit the IRS facilities?
6      A.  No.
7      Q.  So you worked remotely from the IRS?
8      A.  Yes.
9      Q.  Okay.  And then you said that lasted only
10 for a few weeks.
11         What was the next work you did for the
12 IRS?
13     A.  Several months later I joined the
14 Treasury Department project HSPD-12.
15     Q.  Okay.  And how long did that last?
16     A.  It lasted two years.
17     Q.  Two years.  And during that time, were
18 you working at Booz Allen or were you working at
19 Treasury?
20     A.  The physical location?  I was in the IRS
21 building.
22     Q.  You were in the IRS building?

CONFIDENTIAL

Page 34

1          A.  Yeah.

2          Q.  Okay.  So the Treasury work was actually

3    physically in the IRS?

4          A.  Yes.

5          Q.  Did you have an IRS e-mail account?

6          A.  Yes.

7          Q.  And you got that when you started working

8    on the HSPD-12 program?

9          A.  Not immediately.

10         Q.  Not immediately?  How -- but soon

11   thereafter?

12         A.  Not soon.

13         Q.  Oh, it took a while?

14         A.  Yes.

15         Q.  So you were using a Booz Allen e-mail

16   address?

17         A.  Yes.

18         Q.  And then you were given an IRS e-mail

19   address?

20         A.  Yes.  And computer.

21         Q.  And that was issued to you by the IRS?

22         A.  Correct.

CONFIDENTIAL

Page 35

1      Q.  Okay.  So even though it says here that

2  it was Treasury Department -- of course IRS is

3  part of the Treasury Department -- you were

4  working at the IRS and you received an IRS e-mail

5  address and a computer from the IRS?

6      A.  And -- yes.  And the person who led the

7  project was an IRS person, I guess detailed.

8      Q.  Okay.  And who was that person?  Do you

9  remember?

10     A.  Mary Beth Murphy.

11     Q.  Did you spend all of your time when you

12  were working on this program at the IRS building?

13     A.  Not all.  Fridays, typically, we had --

14  we could work from -- remotely --

15     Q.  Remotely --

16     A.  -- from home.  Yeah.

17     Q.  But roughly four days a week --

18     A.  Uh-huh.

19     Q.  -- you would work at the IRS building and

20  then one day you would work from home?

21     A.  Yeah, that's right.

22     Q.  But you were not working in Booz Allen at

CONFIDENTIAL

Page 36

1    the time when you were doing this program?

2         A.   Occasionally I'm at work at a Booz Allen

3    office.

4         Q.   You might stop by?

5         A.   Yes.

6         Q.   And you say that lasted for about two

7    years?

8         A.   Yes.

9         Q.   And then -- and during that time, were

10   you instructed that, for the Treasury work on the

11   HSPD-12, that you were to use your IRS e-mail

12   account --

13        A.   Yes.

14        Q.   -- for work purposes?

15        A.   Yes.

16        Q.   And they didn't issue you a Treasury.gov

17   e-mail; it was an IRS.gov?

18        A.   Correct.

19        Q.   Okay.  And on this program -- and I'm not

20   asking you to be -- you know, to be specific, but

21   roughly how many people that were working with you

22   were IRS employees versus people who were coming

CONFIDENTIAL

Page 37

1    over from Booz Allen?  Maybe by percentage.

2         A.  A percentage?

3         Q.  Yeah.

4         A.  It was majority Booz Allen.

5         Q.  And the rest were IRS, as far as you

6    know?

7         A.  60/40, probably.

8         Q.  60/40?

9              And roughly how many people?  Again, not

10   specifics.  Are we talking 10 people?  Are we

11   talking 50 people?  A thousand people?

12        A.  30.

13        Q.  And as far as you knew, did the other

14   people who were affiliated with Booz Allen, did

15   they have IRS addresses as well?

16        A.  Only a few.

17        Q.  Only a few?  So why -- did you have an

18   understanding as to why you had one and others did

19   not?

20        A.  Yes.  I was handling IRS internal data

21   and systems for the work that I was doing and the

22   analytics that involved, so that is kept on IRS

Page 38

1  systems.  So they deemed it appropriate for me to

2  have an IRS laptop.

3      Q.  Okay.

4      A.  Now, others that did not need that kind

5  of access also had IRS laptops, but never had the

6  need to use it.  So I was, you know, one of only a

7  few that actually used it.

8      Q.  And did you request an IRS laptop or was

9  it -- somebody said that you needed one?

10     A.  Somebody said that I needed one.

11     Q.  Because of the type of data you were

12 handling?

13     A.  Yes.

14     Q.  And then you mentioned that there were

15 others who had IRS laptops who didn't need them.

16     A.  Yeah.  That's correct.

17     Q.  And that's because you understood that

18 they were not handling internal IRS data.

19     A.  Correct.

20     Q.  Was it your understanding that the reason

21 that the -- well, let me ask you this:  Why did

22 they believe that you should have a laptop, an IRS

CONFIDENTIAL

Page 39

1   laptop?

2        A.  Well, I know that I needed it eventually

3   because one of -- you know, part of this was IRS

4   employees, doing statistics on them.

5        Q.  Right.

6        A.  You know, we're not going to be putting

7   that on a Booz Allen system.

8        Q.  Why is that?

9        A.  Because of IRS', you know, rules and

10  regulations.  It's PII.

11       Q.  PII?

12       A.  Yes.

13       Q.  And PII stands for what?

14       A.  Personal identifiable information.

15       Q.  And that kind of information is protected

16  by the IRS?

17       A.  Yes, it is.

18       Q.  And it's highly sensitive?

19       A.  It's sensitive.

20       Q.  And the IRS, you understood, to have a

21  rule that PII of that sort needed to stay on IRS

22  computers or servers.

CONFIDENTIAL

Page 40

1          A.  Absolutely.

2          Q.  And you mentioned only a few people had

3     this kind of access to internal IRS data --

4          A.  Yes.

5          Q.  -- and PII.

6               And I think you might have addressed this

7     a bit, but why were you selected, to your

8     understanding, to handle this material?

9          A.  Well, I joined as part of the analytics

10    kind of subtask of this whole larger initiative,

11    and my task lead was an analytics person, and he

12    basically was training me to take over from him.

13    So...

14         Q.  And who was that?

15         A.  Haynes Ko.

16         Q.  And he was a Booz Allen --

17         A.  (No verbal response.)

18         Q.  So you were taking over for him?

19         A.  Ultimately, yes.

20         Q.  Ultimately.  And he was training you.

21         A.  Yes.

22         Q.  So you understood that the PII and other

CONFIDENTIAL

Page 41

1    information you were dealing with was

2    confidential.

3         A.  Yes.

4         Q.  Were you authorized to share that

5    information with people at Booz Allen who were not

6    authorized to receive it?

7         A.  No.

8         Q.  Who were the people that you were

9    authorized to share that information with?

10        A.  People that had joined the project,

11   essentially.  People that are on the project and

12   on my -- on my data subteam, basically.

13            But I don't recall specifics about, you

14   know, don't share that this data -- because it

15   really wasn't important to anybody except as a --

16   as a piece to creating the statistics.  You know,

17   it was just like a raw set of data.

18        Q.  Okay.  And when you say it wasn't

19   important to anybody, what do you mean by that?

20        A.  Well, my work involved putting together

21   reports for, you know, the leadership of the

22   program, of the IRS program, and those reports

CONFIDENTIAL

Page 42

```
 1    generally dealt with just numbers, numbers of
 2    people that have gotten badges, numbers of people
 3    that are waiting for their badges, and not --
 4    doesn't have to deal with names of people or
 5    anything like that or their address or anything.
 6         Q.  Okay.  But you had access to that
 7    information if you -- if you -- well, you had
 8    access to that information.
 9         A.  Yes.
10         Q.  Okay.  But the people you were reporting
11    to didn't feel like that specific information was
12    important to what they were trying to achieve.
13         A.  Correct.
14         Q.  Did you have any special training that
15    you received from IRS relating to your handling of
16    PII?
17         A.  Yes.
18         Q.  Tell us a little bit about that.
19         A.  We'd have internal -- we'd have training
20    that IRS would do.  It's, like, a yearly
21    recertification.  And they'd -- it would be
22    typical corporate training online.  You know, you
```

CONFIDENTIAL

1   read the passages, you fill out answers, and then

2   certified for another year.

3        Q.  You completed that training?

4        A.  Uh-huh.

5        Q.  Did you have any disciplinary issues

6   while you were -- during this time frame?

7        A.  No.

8        Q.  And did -- as part of that training, were

9   you told that the PII information was sensitive?

10       A.  Yes.

11       Q.  And that it had to be protected?

12       A.  Yes.

13       Q.  All right.  So you did that program for,

14  I believe, two years you said?

15       A.  Yes.

16       Q.  And then -- I think we're going sort of

17  reverse in time, but -- or we're going

18  chronologically, but reverse order here of the

19  bullets.

20            The first bullet, we talked about,

21  Responsible for data analysis, communication

22  initiatives developed in Python, SAS, and R for an

CONFIDENTIAL

Page 44

```
 1    IRS identity theft program.
 2            When did you get involved in that
 3    initiative?
 4        A.  June 2012.
 5        Q.  Okay.  So before we get to that, from --
 6    July 2010, that's when you stopped working on the
 7    Treasury Department HSPD-12 program?
 8        A.  Yes.
 9        Q.  And so what did you do for those two
10    years?
11        A.  The first section of the experience
12    indicates that I started a company, Pokeit LLC,
13    located in Durham, North Carolina.
14        Q.  Okay.  And when you left IRS, did you
15    have to be offboarded in some official way?
16        A.  I don't recall.
17        Q.  Did you have to give up your laptop?
18        A.  Oh, certainly.  Yes.
19        Q.  Did you -- did your IRS.gov e-mail, was
20    it suspended?
21        A.  Yes.
22        Q.  Were you -- did you get a briefing when
```

CONFIDENTIAL

Page 45

1    you left about maintaining the confidentiality of

2    the work you'd been doing for the IRS?

3        A.  I don't recall a briefing.

4        Q.  Did you have any understanding of whether

5    or not you -- the confidentiality requirements

6    that you had been observing persisted for --

7        A.  Yeah.  I understood that, you know, I

8    wouldn't be sharing that information that I was

9    privileged to.

10       Q.  Did anyone tell you that or was that just

11   something you understood?

12       A.  Nobody -- I don't recall being told that,

13   but -- I'll leave it at that.

14       Q.  Okay.  And when you left the HSPD program

15   at Treasury while you were working at IRS

16   building, it looks that you also stopped your

17   affiliation with Booz Allen.

18       A.  That's right.  Yes.

19       Q.  And was that your decision or was that

20   Booz Allen's decision?

21       A.  That was my decision.

22       Q.  Your decision.  And there was no

CONFIDENTIAL

1    reference or any -- there was no disciplinary

2    issues...

3        A.  No.  They encouraged me to reapply if

4    ever I wanted to.

5        Q.  Okay.  So you did reapply in June -- or

6    sometime before June 2012.

7        A.  Yes.

8        Q.  And when you reapplied, did you know what

9    you were reapplying to do, specifically?

10       A.  I was told, you know, that there was this

11   project they had that I could join.  They had an

12   idea once we started talking about rejoining.

13       Q.  And what was the project?

14       A.  It's this first one, the bullet point

15   that we discussed.

16       Q.  So this is specifically for the IRS?

17       A.  Yes.

18       Q.  And so without -- it doesn't matter who,

19   but someone at Booz told you that there's an

20   initiative we're working on with the IRS.

21       A.  Yes.

22       Q.  And they asked you to apply, or did you

CONFIDENTIAL

Page 47

1    come to them and ask that you'd like to apply for

2    it?

3         A.  For Booz Allen?

4         Q.  Yeah.

5         A.  Yes.  I called them up.

6         Q.  Called them up.  How did you know that

7    this IRS program was in the works?

8         A.  I didn't.

9         Q.  So you just wanted to go back into the

10   consulting world -- the consulting world?

11        A.  Yes.  It paid more.

12        Q.  Paid more.  Always a good reason.

13            And so when you reapplied to Booz Allen,

14   they told you there -- about this program?

15        A.  Yes.

16        Q.  And what did they tell you about it, just

17   in general terms?

18        A.  That they needed somebody to liaison

19   between the engineers and everyone else.

20        Q.  And -- for what?  To do what?

21        A.  Well, I was tasked with basically putting

22   together reports.  Very similar to what I was

CONFIDENTIAL

Page 48

1    doing on Treasury HSPD-12.  So statistics on how

2    well these filters were doing, PowerPoints, giving

3    presentations, that sort of thing.

4         Q.  Okay.  And so when you restarted with

5    Booz Allen in June 2012, did you immediately start

6    working for the IRS?

7         A.  Yes.

8         Q.  And where were you working?

9         A.  I was on 500 North Capitol Street.

10        Q.  And is that an IRS building, or --

11        A.  It was at the time.

12        Q.  At the time it was an IRS building?

13        A.  Well, GSA.  And I think they had a suite

14   or two.

15        Q.  It was a government building --

16        A.  Yes.

17        Q.  And your understanding was that the IRS

18   occupied it?

19        A.  Yes.

20        Q.  Did you have an office at Booz Allen?

21        A.  Not when I returned.

22        Q.  Okay.

CONFIDENTIAL

1      A.  They switched to hot desking.

2      Q.  What is hot desking?

3      A.  It's where you have to reserve a desk

4  whenever you go into the office.

5      Q.  Okay.  Did you have a similar schedule

6  that it was basically four days a week in the IRS

7  building and then --

8      A.  No.  It was, like, two days a week.

9      Q.  Two days a week.  And then where did you

10  work otherwise?

11     A.  Home or at a Booz Allen facility.  But

12  actually, it was -- it wasn't long -- I think it

13  was about in November 2012 that I ended up

14  returning to St. Louis, and I worked remotely

15  pretty much for the majority of the remaining

16  time.

17     Q.  Okay.  And your interaction at work from

18  June 2012 through November 2013 was mainly with

19  the IRS.

20     A.  Yes.

21     Q.  And this initiative that you were working

22  on, same kind of questions I asked earlier:  What

CONFIDENTIAL

Page 50

```
 1    was roughly the size of the team?
 2         A.   Smaller.  I'd say maybe 15 contractors
 3    and government people altogether.
 4         Q.   And government people, you mean IRS
 5    people?
 6         A.   Yeah.  15 to 20.
 7         Q.   And what was roughly the split?  Do you
 8    recall?
 9         A.   I think about 60/40 again.
10         Q.   60/40.  And you got an IRS.gov e-mail
11    address again?
12         A.   I did.  Yes.
13         Q.   Did you get a laptop?
14         A.   Yes.
15         Q.   And what types of data were you handling
16    at this point, or reviewing?
17         A.   Well, this was a bit more involved
18    because it had to do with, you know, tax return
19    information.
20         Q.   And this is tax returns of U.S.
21    taxpayers?
22         A.   Yes.
```

CONFIDENTIAL

Page 51

1        Q.   And can you tell us a little bit about

2    the -- what level of access did you have to tax

3    return information?

4        A.   Well, I had access to the tax return

5    information of people that were flagged.  And this

6    would include all the relevant fields that were in

7    the tax return 1040.

8        Q.   Okay.  So you had access to PII.

9        A.   Yes.  And 6103, protected data.

10       Q.   6103 -- protected data.

11            What is 6103, to your understanding?

12       A.   It's basically data that is related to

13   taxpayer information.

14       Q.   Okay.  And what kinds of databases was

15   this held on?

16       A.   IRS internal databases.

17       Q.   And this is also why you needed a laptop

18   from the IRS.

19       A.   Yes.

20       Q.   Were you permitted to share that tax --

21   tax return information with people who were not on

22   the team you were working on?

CONFIDENTIAL

Page 52

1          A.  No.

2          Q.  Did you share the information with anyone

3     at Booz Allen who was not on the team?

4          A.  No.

5          Q.  Were you permitted to use -- well, let me

6     ask you:  Did you have a Booz Allen e-mail

7     address?

8          A.  Yes.

9          Q.  Were you permitted to use it for the work

10    you were doing for the IRS?

11         A.  Yes.  But it was restricted what I could

12    use the Booz Allen e-mail for.

13         Q.  Okay.  So your prior work for the IRS,

14    you were dealing with PII.  Now you're dealing

15    with PII, but it's also part of tax return

16    information --

17         A.  Yes.

18         Q.  -- correct?

19              Did you have new training on how to

20    handle that information?

21         A.  It was similar training in the sense that

22    the previous training covered tax return

CONFIDENTIAL

Page 53

1    information as well.

2         Q.   Okay.

3         A.   Because most people at the IRS have

4    access to -- you know, most people that deal with

5    this type of, you know, data -- it's typically

6    tax-data at the IRS.  So they have their training

7    set up for the levels that would cover all of

8    that.

9         Q.   And the training you received was from

10   the IRS?

11        A.   Yes.  And there was -- there were also

12   Booz Allen trainings as well that were held.

13   Voluntary, essentially.

14        Q.   Right.  And was this also subject to an

15   annual renewal?

16        A.   Yes.

17        Q.   And you completed the requirements?

18        A.   Yes.

19        Q.   And you understood that tax return

20   information was confidential?

21        A.   Yes.

22        Q.   And did you understand that the IRS

CONFIDENTIAL

Page 54

1    thought that was important, that it maintained

2    confidentiality of tax returns?

3         A.  Yes.

4         Q.  Do you understand there was a legal

5    obligation to do that?

6         A.  Absolutely.

7         Q.  And at that time, did you share any tax

8    return information with anyone that you believed

9    was not authorized to receive it?

10        A.  No.

11        Q.  So during this period, though, you

12   understood that the job you had, you had access to

13   tax return information.

14        A.  Yes.

15        Q.  Did you ever review it in any detail as

16   to any particular taxpayer?

17        A.  Only insofar as the work required it.

18        Q.  The work for detecting fraud.

19        A.  Yes.

20        Q.  Did you have access to tax returns that

21   went beyond fraudulent detections?

22        A.  Yes.

CONFIDENTIAL

1          Q.  Did you have access to tax -- any tax

2     return you wanted to see?

3          A.  Generally, yes.

4          Q.  Did you ever peruse the system, just out

5     of curiosity?

6          A.  No.  I mean, only insofar as the work

7     required it and better understanding --

8          Q.  Right --

9          A.  -- tax --

10          Q.  -- but you were focused on the job at

11     hand, which was fraud -- fraud detection.

12          A.  Yes.

13          Q.  As part of your training, did anyone ever

14     say words to the effect that you should limit your

15     review of tax return information to what is

16     necessary for your job?

17          A.  Yes.

18          Q.  And did you comply with that?

19          A.  Yes.

20          Q.  And so you did that work for roughly a

21     year and a half, maybe a little less, correct?

22          A.  Yes.

CONFIDENTIAL

Page 56

```
 1        Q.  And that brings us to November 2013,

 2   which is when you left working for the IRS --

 3        A.  Yes.

 4        Q.  -- at some point.

 5            And again, it looks like that also is the

 6   same time you left Booz Allen.

 7        A.  Correct.

 8        Q.  And then when you left -- again, that was

 9   your own choice?

10        A.  My sister had died, so I took some time

11   off.

12        Q.  But you were not asked to leave?

13            I'm sorry about your sister.

14        A.  Thanks.  No, I was not.  They wanted to

15   get me back as soon as they could, I guess.

16        Q.  Did you enjoy the work?

17        A.  Yes, I did.  It was good insofar as a

18   9:00 to 5:00 could be.

19        Q.  And what was good about it, from your

20   perspective?

21        A.  Well, I felt like, especially on this

22   project, a connection to the needs of taxpayers
```

CONFIDENTIAL

Page 57

1    and -- you know, the dollar values are huge.  And

2    just imagining that going out to criminals is --

3    it was -- it felt like meaningful work to try to

4    stop that.

5          Q.  It was important work --

6          A.  Yeah.

7          Q.  -- to stop that fraud.

8          A.  Yeah.  Our project actually ended

9    September 2013, so it wasn't really an option to

10   stay on that specific work.

11         Q.  From -- so it ended in September of 2013.

12   And you stayed until November.

13              Were you still -- did you still have your

14   IRS e-mail --

15         A.  No.

16         Q.  -- address?

17              They cut it off in September?

18         A.  Uh-huh.

19         Q.  You were still being paid until November?

20         A.  I was part time at that point.

21         Q.  Okay.

22         A.  So I was just doing marketing work.

CONFIDENTIAL

1      Q.   Okay.  Were you still going to the IRS

2  building at that point or no?

3      A.   No.

4      Q.   All right.  So you left in November of

5  2013.  And just -- it looks like -- I'm going to

6  introduce a new exhibit, which is your second CV.

7           Then you went back to IRS in 2017.

8           Just between those dates, between

9  November 2013 and October of 2017, what were you

10  doing for work?

11      A.   I was working on my startup, Pokeit.

12      Q.   Pokeit.  And that's the poker --

13      A.   Uh-huh.

14      Q.   And during that time, did you have any

15  access to tax return information that you had had

16  access to while you were at the IRS?

17      A.   No.

18      Q.   Did Booz Allen or anyone from the IRS ask

19  you to come back during that period of time,

20  consider coming back?

21      A.   Yes.

22      Q.   Who was it?  Was it Booz Allen or IRS or

CONFIDENTIAL

1    both?

2        A.  Booz Allen.

3        Q.  Booz Allen.  And did they tell you what

4    they wanted you to work on?

5        A.  Yeah.  It was a new project.  I don't

6    recall what it was.

7        Q.  But you decided not to do it?

8        A.  It was really just a month after I had

9    left, so no, I decided it wasn't time yet.  And I

10   wanted to give it another go with my startup.

11       Q.  Okay.

12           (Littlejohn Deposition Exhibit 2 marked

13            for identification and attached to the

14            transcript.)

15   BY MR. BURCK:

16       Q.  So I'm going to show you another exhibit,

17   Exhibit 2.

18           And Mr. Littlejohn, do you recognize this

19   document?

20       A.  I do.

21       Q.  And what is it?

22       A.  It's an internal Booz Allen resume.

CONFIDENTIAL

1       Q.  Did you prepare it?

2       A.  I did.

3       Q.  Do you know roughly when you prepared it?

4   I just think -- the year would be fine.

5       A.  2018, probably.

6       Q.  Okay.  I'm not going to rehash some of

7   the old ground we've gone through with the prior

8   CV, but I'd like to talk about just -- let's start

9   with the employment history.

10          At this point, it says 09/2017 to

11  current.

12          When did you actually stop working for

13  Booz Allen, IRS?

14      A.  March 2021.  March 31st.

15      Q.  March 31st, 2021.  Okay.

16          So you were there roughly

17  three-and-a-half years?

18      A.  That's correct.

19      Q.  Okay.  Let's talk about why you came back

20  to work on the IRS -- the Identity Assurance

21  Office analytics division.

22          So just going down to the experience, you

CONFIDENTIAL

1    say that from -- at the Internal Revenue

2    Service -- you worked at the Internal Revenue

3    Service Identity Assurance Office, analytics,

4    Washington, D.C., 10/2017, right?

5         A.  Correct.

6         Q.  How did you come to work for that

7    division?

8         A.  I reapplied to Booz Allen, and they put

9    me on this workstream.

10        Q.  And when did you reapply to Booz Allen?

11        A.  It must have been July 2017.

12        Q.  And when you reapplied to Booz Allen, did

13   you know that you would be working for the IRS?

14        A.  I didn't.

15        Q.  Would --

16        A.  Well, I could only assume.  I didn't know

17   what the workstream was.

18        Q.  What did you assume?

19        A.  Well, let me put it this way:  The team I

20   was applying to had a lot of IRS work but, you

21   know, they didn't tell me at the time or assure me

22   that I would be joining this particular project,

CONFIDENTIAL

1    or even an IRS project.

2           But my IRS clearance made it a likely

3    situation that I would be hire -- picked up --

4           Q.  Sort of your expectation.

5           A.  Yes.

6           Q.  And so you still had IRS clearance.

7           A.  It was, like, discovered later that it

8    became -- it was, like, interim clearance that

9    never was fully finalized.  And so I had to, like,

10   reapply.  It also was, like, five years after it

11   was initially put in force, so they had to redo

12   it.

13          Q.  So you had interim clearance from your

14   prior work --

15          A.  Yeah.

16          Q.  -- for the IRS and it had never been

17   completed --

18          A.  Uh-huh.

19          Q.  -- or finalized, as you said.

20          A.  Yeah.

21          Q.  Did you believe that you had final

22   clearance when you reapplied to --

CONFIDENTIAL

Page 63

1          A.  I didn't know.  I didn't know.

2          Q.  Okay.  But your expectation was that you

3     would likely be working at the IRS.

4          A.  Yes.

5          Q.  In the description of the job in the CV,

6     you say that you were a senior analyst with the

7     IRS Identity Assurance Office's analytics

8     division, right?

9          A.  Yes.

10         Q.  At Booz at this time, I think you were an

11    associate, correct?

12         A.  Uh-huh.

13         Q.  So the senior analyst title was an IRS

14    title?

15         A.  No.  It was just to -- a descriptive term

16    to try to describe that there were other just --

17    nonsenior analysts that were below me.

18         Q.  Okay.  So this is --

19         A.  It was unofficial --

20         Q.  -- your words --

21         A.  -- term.  My words, yes.

22         Q.  Got it.  Okay.

CONFIDENTIAL

1          And it says that you were responsible for

2    many of the teams' reporting and research efforts

3    related to the Secure Access Authentication

4    System, correct?

5         A.  Correct.

6         Q.  Can you tell us what the Secure Access

7    Authentication System was?

8         A.  It was a system for authenticating

9    individuals, individual taxpayers, who wished to

10   interact with the IRS online.  Its purpose was

11   both to -- basically to authenticate that the

12   person that was, you know, at the computer was

13   actually the person they were saying that they

14   were.

15        Q.  It is similar in some ways to what you

16   were doing before in the sense that you were

17   trying to prevent fraud?

18        A.  Yes.  A necessary component to any type

19   of interaction with a government, you know, you

20   have to prove that you are who you say you are.

21        Q.  Right.

22        A.  It's not just like signing up for a

CONFIDENTIAL

Page 65

```
 1    Google account.  You know, they don't really care
 2    that -- you know, you could say you're a dog or
 3    something like that.
 4         Q.  Right.
 5         A.  It's not pertinent.  But if you're going
 6    to be trying to access information the government
 7    has on you, you have to be who you say you are.
 8         Q.  Right.  And you understood this to be an
 9    important -- important to the IRS.
10         A.  Yes.
11         Q.  And it says that you developed, in
12    response to an online breach of taxpayer records
13    occurring in 2015 -- or sorry, developed, in
14    response to an online breach of taxpayer records
15    occurring in 2015, secure accesses and
16    authentication ID proofing system in compliance
17    with NIST SP 800-63-2 standards on identity and
18    access management.
19              What was your understanding of what the
20    online breach of taxpayer records that occurred in
21    2015 was?
22         A.  Basically, they had an initial version of
```

CONFIDENTIAL

Page 66

```
 1    the system that had insecure processes.  So they
 2    could be attacked and exploited by malicious
 3    actors to overwhelm and gain access to taxpayer
 4    information.
 5         Q.  And there had been a specific incident.
 6         A.  Yes.  It's known as the Git transcript
 7    breach or incident, and I think it affected over
 8    800,000 taxpayers.
 9         Q.  And was it your understanding that the
10    project that you were involved in here was in
11    direct response to that 2015 breach?
12         A.  That's correct.  At least the people --
13    or at least the people that were in charge of this
14    office were -- and the specific system that they
15    were supporting was a new upgraded version that
16    they had hoped would protect taxpayers better.
17         Q.  So was it your understanding the IRS had
18    identified failures in its prior system --
19         A.  That's right.
20         Q.  -- and they wanted your help to -- in
21    addition to others -- to help fix it?
22         A.  So they overcorrected.
```

CONFIDENTIAL

Page 67

1      Q.  And what do you mean by that?

2      A.  Well, part of the hook for this

3   particular -- so I was told about this project

4   when I was talking to former co-workers.  You

5   know, they didn't say that they had an opening,

6   but I had hoped to join because it was -- you

7   know, they had set the system up, you know, in

8   response to this breach, and only about 20,

9   25 percent of people who tried to get access to

10  their information were successful.

11          And that, to me, was -- it seemed like a

12  challenge to try to boost that number up, because

13  it seemed obvious that not all of these people

14  were fraudulent.  You know, these are -- you know,

15  if a fraudster would try and try and try and try

16  again, to no avail.

17          So -- yeah, the system was set up with

18  all the -- all the filters and blocks you could

19  imagine because they were afraid -- certainly

20  afraid, for good reason, that this could happen

21  again if they weren't, you know, making sure it's

22  secure.

CONFIDENTIAL

1      Q.  So if I'm understanding correctly, when

2    you said overcorrect, that they made it too

3    difficult --

4      A.  Yes.

5      Q.  -- for people -- for legitimate people to

6    actually access their information.

7      A.  Yes.

8      Q.  So you were -- was that the task that you

9    were asked to do, to fix the overcorrection?  Or

10   was it -- was that your own initiative?

11     A.  That was stated as the problem.

12     Q.  "That" being the overcorrection?

13     A.  It was a problem, but it was not the --

14   necessarily the purpose of what we were doing.  I

15   mean --

16     Q.  The purpose was to get it right --

17     A.  Yes.

18     Q.  -- as best you could.

19     A.  Yeah.  The purpose was to monitor its --

20   you know, what's going on with it, basically.

21     Q.  Okay.

22     A.  Because we were in service of the

CONFIDENTIAL

Page 69

1    organization, basically, that was an owner, the

2    business owner, of this system.

3        Q.  Got it.

4            In the next paragraph, you say the

5    analytics team -- and you're part of the analytics

6    team.  And you're a senior analyst by your own --

7    I know that's your own --

8        A.  By my own description, yes.

9        Q.  Your own description.  You had people who

10   were working for you.

11       A.  Yes, eventually.

12       Q.  Right.

13           -- is responsible for providing

14   leadership with visibility into the different

15   steps of the process, allowing them to see which

16   populations are passing and which are failing to

17   authenticate, right?

18           And that's part of the -- what you're

19   talking about with both fixing the breach but also

20   the overcorrection.

21       A.  Correct.

22       Q.  And it says that you -- this is what you

CONFIDENTIAL

Page 70

1    write -- Mr. Littlejohn led an initiative which

2    uncovered gaps in the postal notification process

3    and worked with the appropriate stakeholders to

4    develop a solution.  Right?

5         A.  That's right.

6         Q.  And that's part of the same fixes that

7    you were looking for.

8         A.  Yes.  That was one of -- one of the

9    issues.

10        Q.  What were the other issues?

11        A.  Well, the big ones were -- one of the

12   steps was providing a financial account number.

13   And we found out, through our work, that the

14   vendor had a longer number on file than what

15   people actually receive on their bank statements

16   or credit card statements.

17            So we were able to put in adjustments to

18   how they were matching that to allow, you know,

19   millions of more taxpayers to get through.

20        Q.  Okay.  So this is part of the

21   overcorrection issue.

22        A.  That's right.  And this -- yeah.  Not

CONFIDENTIAL

Page 71

1    understanding what they had, you know, set up as

2    filters.

3        Q.  And this relates, then, to your next

4    sentence, which is that you were involved in the

5    planning process for a change in vendor and

6    developed a suite of decks and dashboards

7    delivering insights to the client on day one.

8        A.  That's right.

9        Q.  So your work led to a change in the

10   vendor who had this problem.

11       A.  Well, I wish I knew what date this was.

12   I don't know if you can tell me.

13       Q.  I -- we don't know.  That's why I was

14   asking you.

15       A.  There were two changes in vendor.  One

16   happened pretty much right when I started, and

17   that was from Equifax to Experian.

18           If this is from that time period, then

19   yes, they changed vendors.  There was the Equifax

20   breach in October of 2017, and so we switched to

21   Experian.

22       Q.  Okay.

CONFIDENTIAL

Page 72

```
 1        A.  If this is a little bit later, then there
 2   was a bid by TransUnion that had to be considered,
 3   and we were working to evaluate their
 4   effectiveness.
 5            Ultimately, we did not -- we were not
 6   forced to go with TransUnion because of some of
 7   the work that I was doing.
 8        Q.  So the decision was to go to Experian.
 9        A.  Stay with Experian.
10        Q.  Stay with Experian.
11        A.  Yeah.
12        Q.  Well, switch from -- I'm sorry.  What was
13   the first one?
14        A.  Equifax.
15        Q.  Equifax to Experian and --
16        A.  So we used all -- almost all -- three or
17   four, I guess.
18        Q.  Right.
19        A.  Or considered three or four.
20        Q.  Okay.  And then the last sentence in this
21   paragraph is work by you and the team has been
22   shared with senior IRS leadership, United States
```

CONFIDENTIAL

Page 73

1    Congress, and the GAO, right?

2         A.  That's correct.

3         Q.  So fair to say that this was important

4    work.

5         A.  Yes, I'd say.

6         Q.  And you were proud of this work.

7         A.  Very.

8         Q.  Okay.  I'm going to show you another

9    exhibit.  This will be, I believe, Exhibit 4 --

10   or 3 -- Exhibit 3, excuse me.

11            MS. OTTERBACHER:  Which exhibit?

12            MR. BURCK:  Oh I'm sorry.  It's the

13   factual basis for the plea.

14            (Littlejohn Deposition Exhibit 3 marked

15             for identification and attached to the

16             transcript.)

17   BY MR. BURCK:

18        Q.  So Mr. Littlejohn, if you want to just

19   take a quick look at that and tell me if you

20   recognize it.

21        A.  I recognize it.

22        Q.  What is it?

CONFIDENTIAL

Page 74

1       A.   It is the factual basis for the plea.

2       Q.   And that's your plea?

3       A.   That's my plea.

4       Q.   And that's -- it's dated on October 12th,

5    2023?

6       A.   That's correct.

7       Q.   And the last page is signed by you and by

8    your counsel?

9       A.   That's correct.

10       Q.   I want to start with the beginning of the

11   document.

12            This was not drafted by you, correct?

13       A.   No.

14       Q.   And it was not drafted by your counsel,

15   right?

16       A.   We provided edits.

17       Q.   Provided edits to a document that the

18   government -- the prosecutors drafted, as far as

19   you know?

20       A.   Yes.

21       Q.   The title of this is, obviously, United

22   States of America versus Charles Edward

CONFIDENTIAL

Page 75

1    Littlejohn.

2            In paragraph 2, in the background

3    section, it talks about time periods.

4            And those time periods, which is in

5    paragraph 1, align with the dates that you have in

6    your CVs from when you worked for the IRS while

7    you were affiliated with Booz Allen, correct?

8        A.  Correct.

9        Q.  And it says in paragraph 1 that you

10   served as a contractor to Company A; is that

11   right?

12       A.  I don't know.  It seems like a

13   misstatement.  I was a contractor to the IRS, but

14   I was a contractor for Company A.

15       Q.  Okay.  And the Company A is Booz Allen,

16   as you understood it?

17       A.  Yes.

18       Q.  Second paragraph says, During each of

19   these time periods, defendant primarily worked on

20   contracts Company A had obtained with the United

21   States Department of the Treasury's Internal

22   Revenue Service.  Is that right?

CONFIDENTIAL

Page 76

1         A.   That's correct.

2         Q.   And is that an accurate statement?

3         A.   Well, you know, as we've gone back and

4    forth in this, there was the Treasury Department

5    contract.  But -- that's a detail that is glossed

6    over in this.

7         Q.   Okay.  But -- so are you saying this is

8    inaccurate, or are you saying it's more or less

9    accurate?

10        A.   More or less accurate.

11        Q.   Okay.  The next paragraph says that,

12   During much of this time, and in particular

13   between 2018 and 2021, defendant was authorized,

14   pursuant to 26 USC section 6103(n), to access vast

15   amounts of unmasked taxpayer data, including

16   taxpayer returns and return information, on IRS

17   databases.

18             Did I read that right?

19        A.   That's correct.

20        Q.   Is that an accurate statement?

21        A.   Yes.

22        Q.   Did that -- and that includes the time --

CONFIDENTIAL

Page 77

1   well, as it says in the paragraph, that -- 2018 to

2   2021, right?

3       A.  That's right.

4       Q.  And that was the last period that you

5   were working for the IRS while affiliated with

6   Booz Allen?

7       A.  Yes.

8       Q.  The next paragraph says, The defendant

9   received regular training about protecting

10  taxpayer data and about the potential criminal

11  consequences of expecting or disclosing

12  information -- without authorization, taxpayer

13  returns and return information; is that right?

14      A.  Correct.

15      Q.  And then I'm just going to go to the end

16  of the -- and that, again, is -- the end of the

17  document is where you signed and your counsel

18  signed, right?

19      A.  Correct.

20      Q.  The last paragraph, under the defendant's

21  acceptance, it says, I have read every word of

22  this factual basis for plea pursuant to federal

CONFIDENTIAL

Page 78

1    rule of criminal procedure 11.  After consulting

2    with my attorney, I agree and stipulate to this

3    factual basis for plea and declare under penalty

4    of perjury that is true and correct.  Right?

5         A.  Correct.

6         Q.  Okay.  So let me ask you:  Why did you

7    return to the IRS through Booz Allen in 2017?

8         A.  Well, I'd say there are two reasons.

9    First was the reason I stated to Booz Allen, which

10   was, in fact, true, is that my -- my company, you

11   know, wasn't getting -- wasn't having the success

12   that, you know, I needed in order to stay full

13   time on it, so I needed to go back and, you know,

14   have a salaried job.  And that was true.

15        The second reason, of course, which I did

16   not disclose at the time, was I had hoped to

17   access and disclose the tax returns of Donald J.

18   Trump as part of, you know, my work there.  I knew

19   I had access to that kind of information, but the

20   details of which I did not know if it was going to

21   be possible to do.

22        Q.  Okay.  So you -- you've testified of this

CONFIDENTIAL

1    earlier.  You knew you would have access to tax

2    return information of various individuals --

3        A.  If I rejoined a project -- if I joined a

4    project that -- and I didn't even know that the

5    project that was being described to me would even

6    grant me that kind of information.  I didn't know.

7        Q.  You weren't sure, but that was your

8    expectation?

9        A.  No.  It was just a possibility.

10        Q.  Well, let me ask you this:  It was your

11    expectation that you would have access to taxpayer

12    returns, tax returns.

13        A.  There was not an -- there was an

14    expectation that I would if the project deemed it

15    necessary.

16        Q.  Okay.  And it was deemed necessary?

17        A.  Yes.

18        Q.  And your hope was that you would have

19    access to tax returns.

20        A.  That's accurate.

21        Q.  Okay.  I'm just going to also show you

22    Exhibit 4, which is the government sentencing

CONFIDENTIAL

Page 80

1    memorandum.

2              (Littlejohn Deposition Exhibit 4 marked

3              for identification and attached to the

4              transcript.)

5    BY MR. BURCK:

6         Q.  I'm going to ask you, do you recognize

7    this?

8         A.  I do.

9         Q.  And you read this at the time?

10        A.  Yes.

11        Q.  And this is the government's memorandum

12   for your sentencing?

13        A.  That's correct.

14        Q.  It's dated January 16th, 2024.  It's at

15   the -- it's on page 14.

16        A.  Yes.  Correct.

17        Q.  Okay.  Let me just start in the

18   preliminary statement on page 1, the second full

19   sentence.

20              The government writes that, After

21   applying to work as an IRS consultant with the

22   intention of accessing and disclosing tax returns,

CONFIDENTIAL

1   defendant weaponized his access to unmasked

2   taxpayer data to further his own personal

3   political agenda, believing that he was above the

4   law.

5           Do you agree with that?

6       A.  That's their characterization of it.

7       Q.  I understand that, but I'm asking you, do

8   you agree with that?

9       A.  No, I don't.

10      Q.  Well, which parts do you not agree with?

11      A.  I do not and did not believe that I was

12  above the law.

13      Q.  Okay.  What about the rest of it, though?

14  Do you agree that you had an intention of

15  accessing and disclosing tax returns?

16      A.  That's correct.

17      Q.  Do you believe that you weaponized your

18  access to unmasked taxpayer data to further your

19  own personal political agenda?

20      A.  I think that's strong language, language

21  I would not use.  But...

22      Q.  Do you think --

CONFIDENTIAL

1      A.   They'd like to characterize it that way;

2  you know, that's their right.   That's the

3  government.

4      Q.   But I'm asking you, do you disagree with

5  it?  Do you think it's wrong?

6      A.   I think that's charged language.   Yes.

7      Q.   So yes, you think it's wrong because it's

8  charged language?

9      A.   My own personal political agenda?  I, at

10  the time, felt that people would want to know and

11  people could be forgiven for thinking they had the

12  right to know what the President paid in taxes.

13          And if you want to call that a personal

14  political agenda, you know, that's certainly the

15  government's right to say it.

16      Q.   Okay.  But you're not saying it's

17  inaccurate.  You're saying that's the government's

18  way to -- how they put it.

19      A.   That's how they put it.

20      Q.   On page 2, under 1(a) -- it's under the

21  section called defendant's disclosure of public

22  official A's tax returns and return information --

CONFIDENTIAL

1    public official A is Donald Trump?

2           A.  Yes.  Correct.

3           Q.  In 2017 -- and at that point, Trump was

4    President, right?

5           A.  He was.

6           Q.  In 2017, defendant once again sought work

7    with Company A -- that's Booz Allen?

8           A.  That's correct.

9           Q.  -- with the hope and expectation of

10   accessing and disclosing tax returns and return

11   information associated with the public official A,

12   a high-ranking government official.

13              Is that an accurate statement?

14          A.  Yes.

15          Q.  And when I say accurate, I mean that you

16   agree with the contents of that --

17          A.  I agree --

18          Q.  -- sentence.

19          A.  -- with the contents.

20          Q.  It then says -- and it cites to factual

21   basis at paragraph 5 but also PSR at paragraph 16,

22   right?

CONFIDENTIAL

Page 84

1        A.   Yes.

2        Q.   Do you know what the PSR was?

3        A.   Presentence report.

4        Q.   Okay.  And that's a report that is

5    generated by probation?

6        A.   Yes.

7        Q.   And that, in part, is -- the information

8    they report on is based on an interview with you.

9        A.   It is.

10       Q.   And were you interviewed by probation?

11       A.   I was.

12       Q.   And was your counsel present for that

13   interview?

14       A.   Yes.

15       Q.   And were you truthful with the probation

16   officer?

17       A.   Yes.

18       Q.   And the next sentence says, Defendant

19   viewed public official A as, quote -- as dangerous

20   and a threat to democracy, end quote, and he

21   intended to obtain public official A's taxpayer

22   information from the IRS and provide it to the

Page 85

1    public.  And it cites to the PSR at paragraph 16.

2          Is that an accurate characterization of

3    what you told the probation officer?

4          A.  It is.

5          Q.  So at the time, you believed that

6    President Trump was dangerous and a threat to

7    democracy, right?

8          A.  I did.  Yes.

9          Q.  You said that one of the reasons that you

10   wanted to -- well, let me ask you:  Why did you

11   believe he was dangerous?

12         A.  Well, I felt that -- part of what sent me

13   down this path, you know, began not really with

14   his election, but after, with, you know, the

15   scandal around his firing of James Comey, FBI

16   director, after he, you know, demanded loyalty

17   from James Comey.  And it had echoes of what Nixon

18   had done, at least I felt.

19         So, you know, I thought that it

20   represented a breach of norms -- maybe not a

21   breach of the law, but a breach of norms around,

22   you know, how presidential power should be

CONFIDENTIAL

1    executed.  And part of that triggered a thought in

2    my head about, of course, norms related to

3    releasing, you know, your tax returns during the

4    presidential election -- as something that had

5    been upheld since Nixon, which he violated.  And

6    it came to me that, you know, wow, I used to have

7    access to this type of information.

8            And that's how it all started.

9        Q.  So did President Trump have a legal

10   obligation to release his tax returns?

11       A.  No.  As I said before, he didn't.

12       Q.  So it was your view that he should?

13       A.  I thought that it would be a public

14   benefit if they were something that people could

15   see.

16       Q.  Did you believe that revealing his tax

17   return information would show that he was

18   dangerous and a threat to democracy?

19       A.  No.  It had nothing to do with that.

20       Q.  So is it fair to say that your desire to

21   release his -- or to disclose his tax information

22   was based on your belief that he was, independent

CONFIDENTIAL

Page 87

1    of his tax return, dangerous and a threat to

2    democracy?

3        A.  I thought that it was simply my small

4    ability to help uphold a norm, and that was my

5    motivation.

6        Q.  Okay.  And I think you've already said

7    this, but it wasn't -- there was nothing in the

8    tax return you thought would show that he was

9    dangerous.

10       A.  I didn't know what was in his tax return.

11   I had no idea.

12       Q.  How --

13       A.  That wasn't the motivation --

14       Q.  Okay.

15       A.  -- at the time.

16       Q.  And again, you were accurate with the

17   probation officer that you viewed him as dangerous

18   and a threat to democracy --

19       A.  That's something I said.  Yes.

20       Q.  And that was your motivation for

21   releasing his tax return?

22       A.  That was part of how I felt.

CONFIDENTIAL

Page 88

1          Q.   Okay.   Just turn to page 9 of this

2     memorandum.   At the very bottom of the page the

3     government writes, He executed -- you -- He

4     executed his disclosure scheme over the course of

5     multiple years -- emphasis by the government --

6     plotting and calculating carefully at each step to

7     minimize the risk of detection and maximize the

8     impact of his disclosures.

9               Did I read that correctly?

10         A.   Yes.

11         Q.   Do you agree with that?

12         A.   Yes.

13         Q.   The next sentence is, Indeed, he

14    reorganized his entire life around this crime,

15    reapplying to work at Company A in 2017 with,

16    quote, the goal of getting access to taxpayer

17    information for Donald Trump, right?

18         A.   That's correct.

19         Q.   And that's a quote, at least in this

20    document, to the probation report -- the

21    presentence report.

22         A.   Correct.

CONFIDENTIAL

1    Q.  And is that an accurate reflection of

2    what you told the probation officer?

3    A.  They interpreted my actions as

4    reorganizing my entire life.  I didn't say that

5    specifically, but it is what happened.

6    Q.  Okay.  And -- but you did reapply to work

7    at Booz Allen in 2017, quote, with the goal of

8    getting access to taxpayer information --

9    A.  That was --

10    Q.  -- for Donald J. Trump.

11    A.  -- one goal.

12    Q.  That was one goal?

13    A.  Yeah.

14    Q.  Do you believe that you were politically

15    motivated by your -- to release the tax returns?

16    A.  Not in a partisan way.

17    Q.  Not in a partisan way?  What do you mean

18    by partisan?

19    A.  Well, if Chairman Xi was running for

20    President and didn't release his tax returns, then

21    I would have the same feeling, I think.

22    Q.  Chairman Xi is, of course, the -- I'm not

CONFIDENTIAL

Page 90

1   sure he's the president or premier of China, so

2   he's not really a partisan of the United States.

3       A.  Correct.  But if you'd imagine that he

4   was some sort of left-wing authoritarian.

5       Q.  Okay.  So basically, your view is that

6   Donald Trump was an authoritarian, and so you were

7   looking to do something to cause some kind of harm

8   to him?

9       A.  Less about harm, more just about a

10  statement.  I mean, there's little harm that can

11  actually be done to him, I think.

12      Q.  To him, specifically?

13      A.  He's shown a remarkable resilience.

14      Q.  Okay.  I'm going to show you now --

15          MR. BURCK:  Let's mark it as -- well,

16  actually, let's start with your -- yes, your

17  memorandum in aid of sentencing.

18          MS. MANNING:  Would this be a good time

19  for a quick break?

20          MR. BURCK:  Oh, sure.  Any time.  Off the

21  record.

22          VIDEO TECHNICIAN:  The time is 10:35 a.m.

CONFIDENTIAL

1   This ends unit 1.  Off the record.

2          (A recess was taken.)

3          VIDEO TECHNICIAN:  The time is 10:47 a.m.

4   This begins unit 2.  We're on the record.

5   BY MR. BURCK:

6      Q.  Mr. Littlejohn, we were discussing some

7   elements of the sentencing.  I'm going to move on

8   to the actual work you did from 2017 through

9   2021 --

10     A.  Certainly.

11     Q.  -- at the IRS.

12          So could you tell us, what was your job?

13     A.  My job was to support Identity Assurance

14  in their management ownership of secure access.

15  And it was analytics work, my part of the project,

16  and I started as, you know, a supporting analyst

17  and then later was managing the analytics

18  workstream.

19          And the work, as we discussed, you know,

20  previously, was trying to help IRS Identity

21  Assurance improve secure access in ways that did

22  not mitigate its effectiveness at preventing

CONFIDENTIAL

Page 92

1    fraud, so improve its ability to process good

2    taxpayers, legitimate taxpayers, and increase

3    security around the system.  That involved knowing

4    and understanding the way the system worked, the

5    way that data flowed through the system.

6           And -- so we put together reports.  We

7    did -- investigated potential areas of improvement

8    to the filters, and provided, you know, official

9    numbers of people coming through, success rates

10   and the like, to the associated stakeholders of

11   IRS and other outside stakeholders.

12       Q.  In and this work, you had access to tax

13   return information --

14       A.  That's correct.

15       Q.  -- of taxpayers.

16           Okay.  Similar to your level of access in

17   your prior round with IRS?

18       A.  That's right.

19       Q.  So you could, theoretically, access

20   anyone's tax return in that job?

21       A.  Yes.

22       Q.  Were you able to access anyone's tax

CONFIDENTIAL

Page 93

1    return?

2         A.  I was able to access tax returns at will.

3    Yes.

4         Q.  And unlike before, you actually did

5    target certain people.

6         A.  That's correct.

7         Q.  Okay.  Let's talk a little bit about your

8    team.

9         A.  Sure.

10        Q.  Who was your supervisor?

11        A.  Paul Wight.

12        Q.  And that's W --

13        A.  This is the IRS?

14        Q.  IRS supervisor.

15        A.  Yeah.

16        Q.  And he was your supervisor?

17        A.  That's right.

18        Q.  Paul Wight, W-i-g-h-t?

19        A.  You got it.

20        Q.  And what was his title?  Do you recall?

21        A.  Assistant director, something like that.

22    He was essentially the CO.

CONFIDENTIAL

Page 94

1  Q. Okay. Was he your -- did you directly

2 report to him?

3  A. Yes.

4  Q. Was there anybody else you directly

5 reported to?

6  A. Well, there was other directors of

7 Identity Assurance, and then there were other IRS

8 analysts on the team.

9  Q. Okay. Let me go through a list of names,

10 and you tell me if you know who they are and what

11 they did.

12  A. Yeah. Sure.

13  Q. Nanette Downing.

14  A. She was the director, Identity Assurance.

15  Q. Was she an IRS employee?

16  A. That's right.

17  Q. And what was her job, as far as you

18 understood it?

19  A. She ran Identity Assurance.

20  Q. Did you communicate with her?

21  A. Yes.

22  Q. Was it regular?

Veritext Legal Solutions

800-726-7007                       305-376-8800

CONFIDENTIAL

Page 95

1      A.  It was regular enough.  Certainly not on

2    a day-to-day basis.  But...

3      Q.  Okay.  How did you communicate with

4    people, before we go through other names?  Was it

5    through e-mail?

6      A.  E-mail, Skype --

7      Q.  Skype?

8      A.  -- in person, phone.

9      Q.  E-mail, Skype, and in person.  Okay.

10          And when you say the phone, you're saying

11    text messages?

12      A.  Typically not text messages.  It would be

13    phone calls.

14      Q.  And did you have a personal cell phone

15    that you used, or was it an IRS-issued cell phone?

16      A.  I didn't have an IRS-issued cell phone,

17    no, it was personal.

18      Q.  Your own cell phone?

19      A.  Yeah.

20      Q.  Did you have apps on the cell phone, like

21    WhatsApp, Signal, things like that?

22      A.  I did, yes.

CONFIDENTIAL

Page 96

1        Q.  Did you use those for your work with the

2    IRS team?

3        A.  No.

4        Q.  So you used Skype, e-mail, in person.

5    And then cell, you would talk to people?

6        A.  Yes.

7        Q.  Were there any security protocols around

8    the use of the cell phone to talk to people?

9        A.  You mean like eavesdropping or --

10       Q.  No.  I mean, like, were you allowed to

11   talk about tax return information with people on

12   the IRS team by cell?

13       A.  Yes.  That was fine.  I mean, you

14   wouldn't do that in a crowded cafe.

15       Q.  But you could call them from home, for

16   example, and say, hey, I want to talk about this

17   tax return, for example, if you wanted to?

18       A.  No, it wasn't about that.  It wasn't

19   about tax returns, typically.  Because the data

20   that we got was data from a system, an online

21   system, that people, you know, provided PII or

22   matching information that would authenticate them.

CONFIDENTIAL

Page 97

1          So that aspect was not tax return

2     information.  The only aspect of tax return

3     information that would be brought in to this type

4     of work was typically trying to understand

5     demographics and then filing status-type stuff.

6          Q.  And that information would appear on the

7     tax return, or that would appear in a different

8     database?  The demographics?

9          A.  Database of tax return information it

10    would appear in.

11         Q.  So it would collate that information into

12    a separate database?

13         A.  Yes.  And it would -- it's -- in an

14    analytics database, yes, that the IRS maintains.

15         Q.  Okay.  So just -- and forgive my lack of

16    technical precision --

17         A.  Certainly.

18         Q.  -- or knowledge, but there would be tax

19    returns that are available, and then there would

20    be some kind of program that would pull

21    information for those tax returns and collate

22    them?

CONFIDENTIAL

1      A.  Yeah.  You could say that.

2      Q.  Okay.  But you had access to the

3  underlying tax returns itself --

4      A.  Uh-huh.

5      Q.  -- including the names, the addresses,

6  the amount that -- capital gains, the capital

7  losses income, all that.

8      A.  That's right, yes.

9      Q.  Is there any reason why the specific

10  information that you needed for your purpose was

11  not on a separate database, that it was just

12  collated with the information you needed?

13      A.  Well, it's hard to know ahead of time

14  what you need, and --

15      Q.  Did you need to know the income tax of

16  individuals?

17      A.  Absolutely.

18      Q.  Okay.

19      A.  That helped with demographics.  Part of

20  the problem with the system was it wasn't serving

21  taxpayers of moderate or low-income needs -- or

22  low-income status.  So we need to know if, you

CONFIDENTIAL

1  know, it was having a disproportionate negative

2  effect on them.  So that's how you get that

3  information.

4      Q.  And then, with respect to the Skype, how

5  did the Skype work?  Was that both written and

6  oral, or verbal?

7      A.  Yes.

8      Q.  Okay.  So there was a record of your

9  communications with your team about your work?

10     A.  I don't know if there's a record.

11     Q.  But there was something you wrote at the

12 time through Skype?

13     A.  Yeah.  There's instant messaging,

14 essentially.

15     Q.  Instant messaging.  Right.

16         And the e-mails, of course, was also --

17 you used that to communicate with --

18     A.  Yes.

19     Q.  And did you use written communications

20 frequently with your team?

21     A.  Yes.

22     Q.  And did you speak to them on the phone

CONFIDENTIAL

Page 100

1   quite a bit?

2       A.  Uh-huh.

3       Q.  And you said that you didn't really use

4   text, but did you use text at all to communicate

5   with them?

6       A.  With my team?  You know, text was

7   typically, you know, are you getting on the call,

8   you know, type thing.  It was not about work --

9       Q.  Okay.

10      A.  -- like specifics.

11      Q.  So the work specifics was really Skype

12  and e-mail.

13      A.  Uh-huh.

14      Q.  Anything else --

15      A.  And phone.

16      Q.  And phone.  But --

17      A.  That's it.

18      Q.  Okay.  Let me go through some other names

19  with you.

20          Monnae Markham.  I hope I'm saying her

21  name correctly.

22      A.  Yeah.  She was an analyst, an IRS person

CONFIDENTIAL

Page 101

1    attached to our analytics team.

2         Q.   And she worked for the IRS?

3         A.   She does.

4         Q.   And did you communicate with her

5    frequently?

6         A.   Uh-huh.

7         Q.   And what was her job, exactly?

8         A.   Part of what IRS wanted to do was to

9    train their own data analysts, and so we were

10   helping with that.  And she was given

11   responsibilities that would be similar to the

12   types that we were given.

13        Q.   Similar to the types you were given

14   meaning what?

15        A.   She'd help prepare reports.

16        Q.   And you were there to train her?

17        A.   Uh-huh.

18        Q.   So she was inferior to you in terms of

19   the hierarchy.

20        A.   If I was a senior analyst, she was an

21   analyst.  Yes.

22        Q.   She reported to you?

CONFIDENTIAL

Page 102

1          A.  Hard to say that, though, because how
2     could she report to a consultant?
3          Q.  But functionally, day to day, she --
4          A.  She reported to Paul.
5          Q.  Okay.
6          A.  We just helped.
7          Q.  Did you supervise her work?
8          A.  No.
9          Q.  So you were training her, but you were
10    not supervising her?
11         A.  Can you define that a little bit more --
12         Q.  I mean --
13         A.  I couldn't tell her, you know, you're
14    doing -- I mean, I couldn't tell her she's doing a
15    bad job.
16         Q.  Well, how would you train her, then?
17         A.  I wouldn't use that type of language.
18         Q.  Would you tell her how to do things
19    better than she otherwise might know because she
20    wasn't as --
21         A.  Sure --
22         Q.  -- expert --

CONFIDENTIAL

Page 103

1       A.  -- limited to tasks, you know, that were

2    appropriate.

3       Q.  Okay.

4       A.  We weren't working on her goals or

5    anything.

6       Q.  Okay.  Going back to Paul Wight, you

7    communicated with him frequently?

8       A.  Yes.

9       Q.  By Skype, e-mail, cell?

10      A.  Yeah.

11      Q.  What about Brandi Warren?  Who is she?

12      A.  Similar to Monnae.  Same type of

13   position.

14      Q.  So someone you also were training?

15      A.  Yes.

16      Q.  And as you said, you were a senior

17   analyst and she would be an analyst?

18      A.  That's how I viewed it, but probably

19   wasn't -- absolutely was not officially what it

20   was like.

21      Q.  And did Ms. Warren come to you to get

22   feedback on her work?

CONFIDENTIAL

Page 104

1    A.   Yeah.  Sure.  She --

2    Q.   Was that --

3    A.   -- she was eager to know how to improve.

4    Q.   So you would give her advice?

5    A.   Oh, yeah.

6    Q.   And again, you communicated with her by

7    Skype, e-mail, cell?

8    A.   Correct.

9    Q.   Adrienne Smith.  Who's that?

10   A.   She worked under Paul, but not with me in

11   an analytics capacity.

12   Q.   Okay.  Did you have much communication

13   with her?

14   A.   Occasion -- well, when we had certain

15   tasks we were working on, we would communicate

16   more frequently.  But not as often.

17   Q.   What types of tasks?

18   A.   We introduced a chat bot to help people

19   with the authentication workflow, or secure access

20   workflow, and she was managing that.

21   Q.   Okay.

22   A.   So we -- for that particular task, we

CONFIDENTIAL

Page 105

1    were communicating a bit.

2         Q.  What about Mark Halpin?

3         A.  Yes.  Mark Halpin.  What would you like

4    to know about him?

5         Q.  What was his job, as far as you

6    understood it?

7         A.  He ran a -- he was, like, a

8    contracts-type guy, and he also ran, like, a fraud

9    call with other IRS -- other people at IRS

10   organizations that would get together and talk

11   about fraud, like, on a biweekly basis.

12        Q.  And he was an IRS person?

13        A.  Uh-huh.

14        Q.  Did you communicate with him?

15        A.  Same -- yeah.

16        Q.  Same thing?

17        A.  Same type of thing.

18        Q.  Okay.  And this is all -- all these

19   people, you're communicating with them about your

20   job, correct?

21        A.  Yeah.  And their job.

22        Q.  And their job.  But you were working on

CONFIDENTIAL

Page 106

```
 1    the same team.

 2          A.  That's right.

 3          Q.  Okay.  Cody Thierry.

 4          A.  Yeah.

 5          Q.  Thierry?

 6          A.  Thierry.

 7          Q.  Thierry.  Who was he or she?

 8          A.  He was, or is, kind of like an operations

 9    person, sort of Paul's deputy in a way --

10          Q.  Okay.

11          A.  -- at least for a time.

12          Q.  And again, somebody --

13          A.  So --

14          Q.  -- you communicated with?

15          A.  Yeah.  So he helped manage the backlog of

16    items, work requests for secure access.  So he'd

17    run those calls with IT.  IT would be on there.

18          Q.  Okay.  And IT was part of IRS?

19          A.  That's right, es.

20          Q.  Okay.  Matthew Leibner.

21          A.  Yes.  So Matthew was not in our

22    organization.  He was in online services.  So --
```

CONFIDENTIAL

Page 107

1    but he did a lot of work with us.  He did a lot of

2    stuff.  A lot of stuff.

3         Q.  Can you give us just some examples of the

4    stuff that stands out to you.

5         A.  He was a product owner for Get My Payment

6    Application when that went online during the

7    pandemic, to get the economic impact payment.  So

8    that was -- that was a big part of his work.

9    Also, just -- he was basically the person in

10   online services that dealt with secure access.

11        Q.  Okay.  What about Ashley Kent?

12        A.  I don't recall her.

13        Q.  Don't recall her?  Okay.

14             I'm going to go through a few more names,

15   and then just tell me if you know who they are.

16             Marsha Coleman.

17        A.  Yeah, Marsha.  She was the contract

18   officer.

19        Q.  Again, an IRS employee --

20        A.  She was, like, the COR.

21        Q.  The COR?  What does that mean?

22        A.  It's -- there's a contract officer at IRS

CONFIDENTIAL

Page 108

1    that manages the contract.  The COR is like -- I

2    guess it's the contract officer representative.

3    They are who you'd go to when you need access to

4    certain things or you have questions about the

5    contract or you're dealing with contract-related

6    matters.

7         Q.  Okay.  Alyssa Seiden.

8         A.  The name is --

9         Q.  If you don't remember --

10        A.  -- familiar, but I don't remember what

11   they did.

12        Q.  Okay.  Sandra Jackson?

13        A.  I don't know.  I don't know.  These are

14   names -- I don't know if they were from this

15   particular project --

16        Q.  Okay.

17        A.  -- but I didn't work with them on a

18   day-to-day basis.

19        Q.  Okay.  And then just a few more.

20            Sandy Lin?

21        A.  Sorry.

22        Q.  John Weaver?

Page 109

1          A.   I don't remember.

2          Q.   Rene Schwartzman?

3          A.   Yes.   Rene.   So Rene was the person that

4     was the director of Identity Assurance before

5     Nanette.

6          Q.   And is that somebody you would

7     communicate with while she was --

8          A.   Uh-huh.

9          Q.   -- working there?

10          A.   Yep.

11          Q.   Okay.  By Skype -- usual --

12          A.   Correct.

13          Q.   -- things we talked about.

14               And then what about Mathew Nelker?

15          A.   Familiar, but I don't remember what his

16     role was.

17          Q.   Okay.

18          A.   I'm sorry.

19          Q.   That's all right.

20               So when you started working on this

21     project in 2017, where were you working?

22          A.   Primarily at 1111 Constitution Avenue.

CONFIDENTIAL

Page 110

1     Q.   Which is what?

2     A.   IRS headquarters.

3     Q.   And did you have an office at Booz Allen?

4     A.   Hot desk --

5     Q.   Hot desk?

6     A.   Yes.

7     Q.   But you had an office at the IRS?

8     A.   That's right.

9     Q.   And how many days a week would you be at

10    the IRS headquarters?

11    A.   Four out of the five.

12    Q.   Four out of five.  And the fifth day you

13    could work from home or wherever you wanted to be.

14    A.   Yep.

15    Q.   And you had daily interactions with the

16    people at least that you remembered from the list

17    I went through, like Paul Wight and Monnae

18    Markham?

19    A.   Well -- do you mean virtual or in person?

20    Q.   Either.

21    A.   Definitely virtual.

22    Q.   Right.

CONFIDENTIAL

Page 111

1      A.   Rarely -- not as much in person --

2      Q.   Okay.  But --

3      A.   It was a distributed team.

4      Q.   Distributed team.  So they would be

5    spread out around --

6      A.   The country.

7      Q.   -- the country.  Okay.

8           So they would be spread out around the

9    country, but you had daily communications and

10   contact with the people that you needed to work

11   with every day?

12     A.   Correct.

13     Q.   And you had an IRS e-mail?

14     A.   Correct.

15     Q.   Did you have an IRS laptop?

16     A.   Correct.

17     Q.   And when did you get that IRS laptop?

18   Not exactly a time --

19     A.   February.  Early February 2018.

20     Q.   Okay.  And before that, from

21   October through February, did you not have one?

22     A.   I did not.

CONFIDENTIAL

Page 112

1        Q.  So how were you doing your work from that

2    period?

3        A.  It was quite difficult.

4        Q.  And how -- well, how did you do it?

5        A.  Well, I basically wasn't doing what you

6    even would call analytics work.  I was putting

7    together PowerPoints and such, so basically the

8    work that you give a new hire to do when they

9    don't have real work to do.

10       Q.  Was that part of your interim clearance

11   issue, that you had to get full clearance?

12       A.  No.  This was simply a provisioning of

13   computers, and they -- then the different steps

14   they have involved with that.

15       Q.  Did you understand, when you started back

16   with the IRS, that you would eventually get a

17   laptop from them?

18       A.  Yes.

19       Q.  Because it was necessary for you to do

20   your job.

21       A.  Yes.

22       Q.  Did you request one, or did they just

CONFIDENTIAL

Page 113

1    tell you you're going to get one eventually?

2         A.   I don't understand the distinction.

3         Q.   It doesn't matter.  But the point is that

4    you knew you were going to get one.

5         A.   Yes.

6         Q.   Okay.  And the delay was just how --

7    provisioning laptops?

8         A.   Yes.

9         Q.   Okay.

10        A.   Well-known delay.

11        Q.   So when you -- before you got the laptop,

12   were you able to, in any way, access tax return

13   information?

14        A.   No.

15        Q.   And then when you got it, you were then

16   at that point able to access tax return

17   information.

18        A.   As soon as the provisioning came through

19   for the different systems access.

20        Q.   Okay.  And then when you came back on

21   board the IRS, did you get new training for

22   purposes of handling this sensitive information?

CONFIDENTIAL

Page 114

1          A.   Yes.

2          Q.   What type of training did you get?

3          A.   Similar types.  Essentially --

4          Q.   Similar to what you'd gotten before?

5          A.   Yeah.  UNAX, unauthorized access, 6103.

6     You know, we had that training.  Also Booz Allen

7     training.  There was even a session that was,

8     like, Booz Allen that -- specific IRS, you know,

9     security training session.

10         Q.   And the IRS training was done by IRS

11    personnel?

12         A.   It was computer.

13         Q.   Computer?

14         A.   Yeah.

15         Q.   Okay.  So it wasn't in person; it was by

16    computer that you did --

17         A.   Yeah.

18         Q.   -- the training?

19         A.   That's correct.

20         Q.   Okay.  And then Booz Allen was in person

21    or --

22         A.   Yeah, they had an in-person one.

CONFIDENTIAL

Page 115

1       Q.  Okay.  And was that -- did you have to

2   certify that you had completed the training?

3       A.  They did it on a voluntary basis.  I

4   mean, yes --

5       Q.  "They" being --

6       A.  -- I certified, but -- you know, IRS

7   didn't ask Booz Allen to do this.  They just

8   wanted to go the extra mile.

9       Q.  Let's start with the IRS.  Did you have

10   to certify that you had --

11       A.  Yes.

12       Q.  -- done the IRS training?

13       A.  Yes.

14       Q.  Okay.  And how did you do that?  Was that

15   electronic?

16       A.  Yes.

17       Q.  And as far as you know, did you complete

18   the training?

19       A.  Yes.

20       Q.  And then the Booz Allen was a voluntary

21   training?

22       A.  It was mandatory for us --

CONFIDENTIAL

Page 116

1        Q.   And --

2        A.   -- voluntary for Booz Allen to do it.

3        Q.   I see.   Okay.   And the IRS training,

4    though, was mandatory.

5        A.   Yes.

6        Q.   And did you have to do that on an annual

7    basis?

8        A.   Yes.

9        Q.   And did you do it every year?

10       A.   Yes.

11       Q.   And you completed it every year?

12       A.   Yes.

13       Q.   And just generally, what was the training

14   about with respect to UNAX, for example?

15       A.   Giving examples.   And then you would

16   answer questions related to it.

17       Q.   Okay.

18       A.   You had to meet a certain threshold of

19   answering the questions correctly.

20       Q.   And did you understand that you were

21   meant to maintain the confidentiality of the tax

22   return information that you had access to?

CONFIDENTIAL

Page 117

1        A.  Yes.

2        Q.  Let's talk about, like, a day-to-day type

3  of -- well, how you operated day to day.

4             What was -- when did you start work in

5  the morning?

6        A.  It changed over time, but I'd usually get

7  in between, you know, 7:45, 8:00, 9:00.

8        Q.  So you'd start around 7:45, 8:00, 9:00?

9        A.  Uh-huh.

10       Q.  And that would be in person or remote?

11       A.  Yes.  That's right.

12       Q.  And just take us through -- without

13  getting into, you know, specific --

14       A.  Yeah.

15       Q.  -- tax return information, just take us

16  through what a normal day would look like for you.

17       A.  By the time I rolled off the project, I

18  was in a management role, so a number of meetings

19  a day.  You know, we'd have meetings with --

20  excuse me -- IRS people on a project.  We'd have

21  meetings with IT.  We would -- I'd be checking in

22  with my team members about the different, you

CONFIDENTIAL

Page 118

1    know, tasks I had given them.  We'd have internal

2    team meetings every Monday.  We'd have meetings

3    with our sister project and online services.  And

4    we'd have a Wednesday analytics, like, kind of

5    confab or meeting where all these other teams

6    would kind of listen to us talk about how things

7    have been over the past week in secure access.

8              So we'd be Monday and Tuesday preparing a

9    briefing every week, essentially, for this

10   Wednesday meeting.

11             And -- I don't know.  To the outsider it

12   sounds, I imagine, pretty mundane, but, you know,

13   we -- that's pretty much the content of our work.

14        Q.  And the meetings you were having were

15   with IRS personnel and some -- and Booz Allen

16   people?

17        A.  Correct.

18        Q.  And this was normal for you to be in

19   meetings with the IRS and Booz Allen people on

20   your team?

21        A.  Yeah.  IRS and Booz Allen people.  Yes.

22        Q.  Right.  And you said that you became a

CONFIDENTIAL

Page 119

1    manager eventually?

2         A.  Yes.

3         Q.  Did your day-to-day functions change

4    materially between when you were not a manager and

5    when you were a manager?

6         A.  I was supposed to delegate more.

7         Q.  But you didn't.

8         A.  Not always.  I tried.

9         Q.  Okay.

10        A.  I mean, we had a lot of work to do.

11        Q.  Right.  Did you -- when you first

12   started -- well, let me ask you this:  When did

13   you become a manager, roughly?

14        A.  End of April of 2019.

15        Q.  April of 2019?

16        A.  Yep.

17        Q.  Okay.  And what did --

18        A.  Or May 2019.

19        Q.  May 2019?

20        A.  Oh -- sorry, I want to be correct on

21   this.

22             It was end of April 2019.

CONFIDENTIAL

Page 120

1          Q.  End of April 2019.

2              And how did your functions exact -- how

3     did they change, exactly?

4          A.  It was gradual.  At the time, it was just

5     two people on my task, because we had lost a lot

6     of members.  One was -- a lot of teammates.  One

7     was on maternity leave, another just had -- falled

8     off to join Google.

9              But basically I was -- over time, I had

10    more people who I was charged with, you know,

11    managing, and that meant more meetings with them

12    one on one, more training with them on how to do

13    the type of work we did.

14             So it became less about individual

15    contribution and more about trying to help others

16    succeed.

17         Q.  And you were managing, effectively?

18         A.  Yes.

19         Q.  And you were managing members of your

20    team?

21         A.  Yes.

22         Q.  And that included IRS and Booz Allen

CONFIDENTIAL

1    people?

2         A.  Well, they wouldn't say that.

3         Q.  But what would you say?

4         A.  It felt like I was managing them.

5         Q.  And "them" means IRS personnel?

6         A.  Yes.

7         Q.  From your perspective, they saw you as a

8    boss, manager?

9         A.  Well, that's tricky because certainly

10   they didn't -- I wasn't writing their assessment.

11        Q.  Right.

12        A.  You know, but we would -- I could task

13   them --

14        Q.  You --

15        A.  -- that's accurate.

16        Q.  Functionally, you were acting like a

17   manager for these people --

18        A.  Yes.

19        Q.  -- including IRS people?

20        A.  Yes.

21        Q.  And you were a manager basically until

22   you left in 2021.

CONFIDENTIAL

Page 122

1          A.  Yes.

2          Q.  What -- just in time -- you said that you

3     became a manager at the end of April 2019.

4               When did you first get access to Donald

5     Trump's tax returns?

6          A.  This would have been October 2018.

7          Q.  So you got access before you were a

8     manager?

9          A.  Yes.

10         Q.  And then when did you decide to release

11    them or disclose them to the New York Times?

12         A.  When did I decide or when did I disclose

13    them?

14         Q.  Let's do both.

15              When did you decide you were going to do

16    it?

17         A.  I had --

18              MS. SMITH:  We're just going to object

19    based on 6103 to the extent he's going to start

20    talking about specific tax return information of

21    Donald Trump.

22              MR. BURCK:  I'm just asking when did

CONFIDENTIAL

Page 123

1    he --

2             MS. SMITH:  I just want to make sure --

3             MR. BURCK:  I'm not going to ask him

4    about what's in it.

5             MS. SMITH:  We want to make sure that

6    whatever he accessed or disclosed specific to

7    Donald Trump, he does not testify to.

8             MR. BURCK:  He's not going to -- I'm not

9    going to ask him anything about what he -- other

10   than what's in the New York Times.  But I will

11   not --

12   BY MR. BURCK:

13        Q.  I'm just asking you, when did you decide

14   to disclose it to the New York Times.

15        A.  Specifically the New York Times?

16   May/April time frame 2019.

17        Q.  Okay.  So around the same time you became

18   a manager.

19        A.  Uh-huh.  A lot was going on in my life at

20   that time, though.

21        Q.  Understood.

22             Did you think about other outlets to go

CONFIDENTIAL

Page 124

1    to other than the New York Times?

2         A.  Yeah, I did.

3         Q.  Can you tell us what other outlets?

4         A.  Wall Street Journal, Washington Post.

5         Q.  Okay.  And do you remember when you

6    decided to disclose the wealthy Americans' tax

7    returns?

8         A.  July 2020.

9         Q.  Okay.  So at that point, you'd been a

10   manager for roughly a year, a year and a little

11   bit.

12        A.  Uh-huh.  That's correct.

13        Q.  Okay.  All right.  We'll come back to

14   that.

15            All right.  I'm going to now show you an

16   exhibit -- actually, it's one that's already been

17   introduced.  It's Exhibit 3, which is the plea,

18   the factual basis for the plea.

19            So the last page -- we'll just be very

20   brief on this.  The first paragraph of the

21   defendant's acceptance, you say that the -- or you

22   sign that the preceding statement/summary made for

CONFIDENTIAL

Page 125

1    the purpose of providing the court with the

2    factual basis for my guilty plea to the charge

3    against me.

4          Then you write, It does not include all

5    the facts known to me regarding this offense.

6          Was that accurate, that it did not

7    include everything that you knew about the

8    offense?

9          A.  That's correct.

10         Q.  All right.  We'll go to -- I don't think

11   this has been marked yet -- Exhibit 6, which is --

12   this is the transcript of the sentencing.  Sorry,

13   it's Exhibit 5.

14              (Littlejohn Deposition Exhibit 5 marked

15               for identification and attached to the

16               transcript.)

17   BY MR. BURCK:

18         Q.  So Mr. Littlejohn, I don't know if you've

19   seen this before, but you appeared for sentencing

20   before Judge Reyes on January 29th of 2024,

21   correct?

22         A.  That's right.

Page 126

1      Q.  And that was pursuant to your plea

2  agreement and your plea in October of 2023, right?

3      A.  Correct.

4      Q.  And at that sentencing hearing, the judge

5  spoke, the government spoke, your counsel spoke,

6  and you spoke, correct?

7      A.  Correct.

8      Q.  Okay.  If we can turn to page 25 of

9  Exhibit 5.

10         All right.  At the -- the last -- well,

11  the last paragraph in that page, second sentence.

12  And this is -- if you look earlier, this is a

13  statement from Mr. Jacobson.

14         Do you know that he was one of the

15  prosecutors --

16      A.  Yes --

17      Q.  -- in the case?

18      A.  -- I did.

19      Q.  Okay.  So he's speaking in this part of

20  the transcript.

21         He says -- again, on page 29, line 20 --

22      A.  29?

CONFIDENTIAL

Page 127

1          MS. MANNING:  I thought we were on 25.

2          MR. BURCK:  I'm sorry.  29, line 20.

3          MS. MANNING:  That you.

4    BY MR. BURCK:

5       Q.  He says that the defendant plotted his

6    thefts and disclosures over the course of

7    approximately two full years.  He learned over

8    time to exploit IRS' -- exploit loopholes in IRS'

9    systems.

10          Do you see that?

11      A.  I see it.  Yes.

12      Q.  Is that an accurate statement by

13   Mr. Jacobson?

14      A.  I can add some context to that --

15      Q.  That's going to be --

16      A.  -- if you'd like.

17      Q.  -- my next question.  I was going to ask

18   you --

19      A.  Yeah.

20      ██   ████████████████      ███████████████

21   ████████████████████████████████████

22      ██   █████████

CONFIDENTIAL





CONFIDENTIAL

Page 129

CONFIDENTIAL

Page 130



CONFIDENTIAL

Page 131



CONFIDENTIAL

Page 132



CONFIDENTIAL



Page 133

CONFIDENTIAL



CONFIDENTIAL

Page 135



CONFIDENTIAL

Page 136



CONFIDENTIAL

Page 137



CONFIDENTIAL

Page 138



CONFIDENTIAL

Page 139



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17    Q.   Now, you -- in your plea, you said that

18  you went and you provided information about Donald

19  J. Trump's tax returns to the New York Times,

20  right?

21    A.   Correct.

22    Q.   And roughly, again, when did you do that?

CONFIDENTIAL

Page 140

1          A.   May 2019.

2          Q.   Okay.  So you had identified Mr. Trump's

3     returns before this, correct?

4          A.   Yes.

5          Q.   But for several months, you didn't

6     actually disclose them to anybody who was not

7     authorized to see them.

8          A.   Correct.

9          Q.   Why did you wait that period of time?

10         A.   I had still not settled on who or how,

11    what steps I would take to approach a news

12    organization.

13         Q.   Okay.  And --

14         A.   So...

15         Q.   -- how did you settle on the New York

16    Times eventually?

17         A.   A couple reasons.  They had done

18    previous -- mainly it's because of their previous

19    work with Trump's finances.  And I'd seen a

20    documentary that had delved into their previous

21    story on Fred Trump.

22              So, ultimately, they became the

CONFIDENTIAL

Page 141

1    obvious -- or the choice, and I'd just go with

2    them.

3         Q.  How did you -- once you identified or had

4    access to Mr. Trump's tax return, how did you

5    maintain it?  How did you get it to the New York

6    Times?

7         A.  Those are two separate questions, aren't

8    they?

9         Q.  You're right.  Let's start with maintain

10   it.

11        A.  Well, I had it on flash drives --

12        Q.  Flash drives?

13        A.  Yeah.

14        Q.  So you put it into your laptop, the flash

15   drive in your laptop, and downloaded the tax

16   return?

17        A.  Which laptop are you speaking to?

18        Q.  I'm asking you.  What kind of laptop?  Or

19   how did you do it?

20        Why don't you just take us through step

21   by step how you got the tax return off of the

22   system.

CONFIDENTIAL

Page 142

1      A.   Okay.  That's a very specific question.

2      Q.   Yeah.

3      A.   So as has already been reported, I made

4  use of a private website that I could log into and

5  I could upload the return data and then -- you

6  know, on my IRS computer, I could do that.  And

7  then, on a separate computer, I could log in and

8  download the data.  IRS has -- well, I'll just

9  leave it -- that's how it worked.

10     Q.   IRS has what?  You were about to --

11     A.   Well, you can't access, you know, Dropbox

12 or Google on an IRS network.

13     Q.   So it blocks large, publicly available --

14 or publicly available sites --

15     A.   Yes.

16     Q.   -- Google, Dropbox, things like that.

17          But as far as you understood it, it would

18 not block creating a private website.

19     A.   Yes.

20     Q.   So if it was Google, no, but if it was

21 charleslittlejohn.com, yes.

22     A.   Essentially.

CONFIDENTIAL

Page 143

1      Q.  And how did you know this?

2      A.  I tested it.

3      Q.  And how did you test it?

4      A.  I just uploaded an image file to a

5    website that I had control over, and it worked.

6      Q.  Was that before or after you had

7    identified --

8      A.  Before.

9      Q.  -- Donald Trump's -- before.

10         And was that a test run to see if this

11   would work?

12     A.  Yes.  That was the test run.

13     Q.  Were you surprised that you were able to

14   just substitute a private website for Google or

15   Dropbox to allow you to upload information?

16     A.  No.  "Surprised" is not the word I'd use.

17     Q.  What's the word you'd use?

18     A.  Well, all it took was thinking of -- you

19   know, thinking of this as an option.  You know,

20   it's -- it's not practical to block every website.

21   I mean, you could say that only -- well, that's

22   just -- in my mind, it didn't seem like there

CONFIDENTIAL

Page 144

1    could be some type of way to prevent it.

2         Q.  So you assumed that you could do this

3    even before you did the test run?

4         A.  That was -- yeah.  I thought it was a

5    good chance.

6         Q.  Did you see that as a security issue for

7    the IRS?

8         A.  I don't know.  That's not --

9         Q.  Well, let me ask you this --

10        A.  -- my space to comment on that.

11        Q.  Well, you are -- partially -- part of

12   your job was data security, right?

13        A.  Not internally, no.

14        Q.  Not internally.  Just externally?

15        A.  Yes.

16        Q.  And so how did you know that Google and

17   the rest were blocked?

18        A.  Well known.

19        Q.  Was it something you were told or was it

20   something you knew from practice?

21        A.  I don't recall.

22        Q.  Okay.  But you knew.  You understood --

CONFIDENTIAL

Page 145

1     A.  Yes.

2     Q.  -- that.

3         But you suspected that just putting it on

4  a private website would be fine?

5     A.  Yes.

6     Q.  And it worked.

7     A.  Yes.

8     Q.  So when you accessed Donald Trump's tax

9  returns, how long did it take for you -- or

10 between -- was it an hour?  A day?  How long did

11 it take for you to upload it to your private

12 website?

13    A.  A day.  A few hours.

14    Q.  Were you concerned that the IRS or some

15 investigator might be alerted to the fact that you

16 were downloading information from the laptop?

17    A.  Oh, certainly.

18    Q.  But you were not concerned enough not to

19 do it.  You thought that you could get away with

20 it?

21    A.  No.

22    Q.  At the time?

CONFIDENTIAL

Page 146

1       A.  No, I didn't think I would get away with

2    it.

3       Q.  Did you think that they would come and

4    stop you at the time?

5       A.  I didn't know.

6       Q.  So you tested it to see if it would work?

7       A.  I had tested to see if it worked.  I

8    didn't -- there was no way for me to test to see

9    if it would go undetected.

10      Q.  But as far as you know, it did go

11   undetected until -- for years, correct?

12      A.  That's correct.

13      Q.  So nobody came and knocked on your door

14   or called you and said, what's going on, an hour

15   after you did this.

16      A.  Yes.  But I had no way of knowing.

17      Q.  But that didn't happen, right?

18      A.  Correct.

19      Q.  A month later, they didn't come.

20      A.  Correct.

21      Q.  A year later, they didn't come.

22      A.  That's right.

CONFIDENTIAL

Page 147

1      Q.  Two years later they didn't come.  We're

2  talking 2018 -- right?  2020.

3      A.  Two years later, they didn't come.

4      Q.  2021, did they come?

5      A.  They did.

6      Q.  They did.  All right.  So a few years

7  before they came and asked any questions of you,

8  or tried to; is that right?

9      A.  Are we getting into investigation?

10         MS. MANNING:  It's fine to answer.

11         THE WITNESS:  They first came to me, yes,

12  in 2021.

13  BY MR. BURCK:

14      Q.  2021.  Okay.  So you were successful for

15  several years in uploading this information.  And

16  as far as you know, it was not detected.

17      A.  That's right.

18      Q.  And then when you had it on the private

19  website, did it just sit there?  What were you

20  doing with it?

21      A.  It just -- I just ferried it between.  It

22  didn't live on the private website; it just was

CONFIDENTIAL

Page 148

1    temporary there.

2        Q.  So where did it live?

3        A.  I had it on a flash drive.  Yeah.  I just

4    it had it in my house.

5        Q.  And so you transferred it from the

6    private website to the flash drive.

7        A.  Yeah, essentially.

8        Q.  Okay.  So you had this for a number of

9    months before you went to the New York Times.

10       A.  Yes.

11       Q.  Okay.  And tell us why you decided the

12   New York Times.

13       A.  I -- again, I thought that they had the

14   capability, you know, both to handle this type of

15   story -- they had demonstrated that with their

16   Pulitzer prize for Fred Trump.  They had, you

17   know, data security practices that I thought were

18   sufficient, at least what I understood.

19       Q.  And did you reach out to the New York

20   Times?

21       A.  I did.

22       Q.  Who did you reach out to?

CONFIDENTIAL

Page 149

1      A.  Well, they have a Signal general, like,

2  inbox, basically.  And I asked to be put in touch

3  with Sue Craig, and then they put me in touch with

4  her.

5      Q.  And who is "they"?  Was it automatic or

6  was it some --

7      A.  They have somebody that mans their, you

8  know, general Signal account, I think.

9      Q.  And Signal you mean the app?

10     A.  Yes.

11     Q.  Okay.  So -- and were these on

12  disappearing messages or was it maintained?  Do

13  you know?

14     A.  I don't know if they were on disappearing

15  or not.  I know that that might have been set

16  later.

17     Q.  Did you use your personal cell phone for

18  the Signal -- to Signal with them?

19     A.  Not the -- not my -- not my cell phone,

20  that you say cell phone.

21     Q.  What -- whose cell phone was that?

22     A.  It was a phone that I just had in my

CONFIDENTIAL

Page 150

1    possession --

2         Q.  Was it a burner phone, as it's called?

3         A.  It was an iPhone.

4         Q.  It was an iPhone.

5         A.  A burner iPhone, I guess.

6         Q.  All right.  But you bought it?

7         A.  Yes, I had it.

8         Q.  It was a -- it was another personal

9    device.  Did you use it only for purposes of

10   trying to communicate with the --

11        A.  Yes.

12        Q.  -- New York Times?

13             And you bought it for that -- sorry.

14        A.  I had it from -- it might have been my

15   old phone.  I upgraded my phone, I had this other

16   phone.  So --

17        Q.  All right.

18        A.  -- I could use it for that purpose.

19        Q.  And you used that phone, not your -- the

20   phone you used for work --

21        A.  Correct.

22        Q.  -- because you wanted to go undetected.

CONFIDENTIAL

Page 151

1    A.  I suppose it -- that could be a reason,
2  yeah.  I mean, I just didn't want to mix the two.
3    Q.  All right.  So when you got in touch with
4  Sue Craig, did she reach out to you or did you --
5    A.  Yes, she -- sorry.
6        Yes, she messaged me, and we began a
7  conversation.
8    Q.  And she messaged you on Signal?
9    A.  Correct.
10    Q.  And so what -- in sum, what did she say
11  to you and what did you say to her?
12    A.  I told her that I had material of
13  interest to her reporting on Donald Trump.
14    Q.  And what did she say?
15    A.  Interesting.  Can you be more specific?
16    Q.  And you told her what?
17    A.  I told her I had, you know, X number of
18  years and information that was ultimately
19  published.
20    Q.  X number of years of tax returns?
21    A.  Correct.
22    Q.  And did she want to verify that?

CONFIDENTIAL

Page 152

1          A.   Yes.

2          Q.   And how did you go about verifying that

3    for her?

4          A.   We met in person.

5          Q.   Okay.  Where did you meet?

6          A.   Kellogg Business Center.  It's on the

7    campus of Galludet University, near where I lived

8    at the time.

9          Q.   And why did you or she choose that

10   location?

11         A.   Convenience, and it had a big enough

12   space for us to sit down --

13         Q.   So you --

14         A.   It was just a hotel room.

15         Q.   It was a hotel room?

16         A.   Yeah.

17         Q.   Did you rent the hotel or did the

18   New York Times?

19         A.   They did.

20         Q.   And was anybody else there other than Sue

21   Craig?

22         A.   Russ Buettner.

CONFIDENTIAL

Page 153

1       Q.  Who is that?

2       A.  Another reporter.

3       Q.  Did you identify yourself to them when

4   you met with them?

5       A.  Only that I was the one they were

6   communicating with.

7       Q.  Okay.  Did you --

8       A.  They didn't have my name or anything.

9       Q.  Did you show them any of the tax returns

10  at that point?

11      A.  I wasn't sure if I was going to, but I

12  did give them a peek at it, yes.

13      Q.  And how did you give them a peek?  Did

14  you have it printed out or did you show it to them

15  electronically?

16      A.  Electronically.

17      Q.  Did you put it into an iPad or a

18  laptop --

19      A.  A laptop.

20      Q.  Your own or theirs?

21      A.  My own.

22      Q.  And you showed them what you had?

CONFIDENTIAL

Page 154

1          A.   Uh-huh.

2          Q.   And what was their reaction?

3          A.   They were intrigued.  I mean, they had no

4     idea whether it was, you know, verifiable or

5     authentic.  But...

6          Q.   Did they ask you how you came into

7     possession of these?

8          A.   Uh-huh.

9          Q.   What did you tell them?

10          A.   I was an IRS contractor.

11          Q.   So you didn't identify yourself by name,

12     but you said that you were an IRS contractor.

13          A.   Yep.

14          Q.   Did they ask for you to prove that?

15          A.   I showed them my badge, but I had my name

16     with tape over it.

17          Q.   I see.  So they couldn't see your name,

18     but they could see your face, obviously present,

19     and they could see a badge.

20               And did they ask for any other proof that

21     you worked for the IRS?

22          A.   No.

CONFIDENTIAL

Page 155

1      Q.  So after this meeting, did you meet with

2   them again?

3      A.  Yes.

4      Q.  And when did you meet with them again?

5      A.  There may have been another meeting in

6   D.C. -- I'm not entirely sure if there was -- but

7   I know that there was a meeting at the beginning

8   of July 2019 in New York City.

9      Q.  Okay.

10     A.  I was up in New York on a pleasure

11  trip -- on a trip, and I had just mentioned it out

12  of the blue to them that I could meet.  And so we

13  set up and -- they have some type of -- I don't

14  know what you'd call it, a safehouse, and we just

15  met, and I met with their editor.

16     Q.  Okay.  And was it the editor and the two

17  of them?

18     A.  Yes.

19     Q.  Were there others there?

20     A.  No.

21     Q.  And the safehouse was in New York City?

22     A.  Yes.

CONFIDENTIAL

Page 156

1      Q.  In between those meetings, had you

2   provided the tax returns --

3      A.  No.

4      Q.  -- to the reporters?

5          So why were you meeting with the editor,

6   then?

7      A.  Well, he wanted to suss me out.

8      Q.  So he was trying to vet you?

9      A.  Yes.

10     Q.  Did he want to know who you were?

11     A.  Not at the time.  He didn't need to know.

12     Q.  Okay.  So he was -- so what did he do to

13  try to suss you out?

14     A.  He asked a lot of questions.

15     Q.  Like what?

16     A.  Similar to these types of questions about

17  my work history, about what did the returns look

18  like, how did I, you know, extract them, what my

19  motivations were, that sort of thing.

20     Q.  He didn't offer you any money or

21  anything.

22     A.  No.

CONFIDENTIAL

Page 157

1          Q.  Did he offer you anything to get these

2     tax returns?

3          A.  No.

4          Q.  Did anybody from the New York Times offer

5     you anything of value --

6          A.  They --

7          Q.  -- money --

8          A.  -- offered me -- sorry.

9               They offered me a cookie.  I didn't even

10    take it.

11         Q.  So after this meeting where he sussed you

12    out, what were your next steps before you actually

13    provided it to the New York Times?

14         A.  Well, they wanted to move along fast.

15    You know, I still was vetting, I guess.

16         Q.  Vetting them?

17         A.  Yeah.

18         Q.  For what?

19         A.  You know, we were talking about how the

20    story would be and, you know, how many people

21    they'd assign to it.  I just wanted to understand

22    more about -- you know, this is a -- I wanted to

CONFIDENTIAL

Page 158

1  understand what type of resources they'd put

2  towards it, what type of security they'd, you

3  know, deploy.

4          And -- so the next step was in August.

5  You know, they wanted to start, and so I was like,

6  okay, what we'll do is we'll put together a single

7  year of data that I could share with them, and

8  they could start working on understanding that, a

9  year that corresponded to publicly available

10  information so that it's not something that they

11  could possibly make a story out of.

12          That was in August.

13          And then it must have been a couple of

14  months later when, you know, we met again and I

15  actually shared all of that, all of what, you

16  know, I had collected.

17     Q.  So before you did that, you had come to

18  the conclusion that the New York Times was going

19  to put a lot of resources into this.

20     A.  Yes.

21     Q.  And they were going to make it a

22  significant story.

CONFIDENTIAL

Page 159

1          A.   Yes.

2          Q.   And that gave you comfort that it was the

3     right outlet to go to?

4          A.   Yes.

5          Q.   How --

6          A.   Because part of this was I had, at the

7     time, wanted to syndicate it beyond the New York

8     Times.  Even -- not, like, immediately, but I was

9     working with them to understand, you know, could

10    I -- could it go to other outlets?  And of course,

11    the Pentagon Papers went to The Times and to the

12    Washington Post and to all over the country.

13         Q.   Right.

14         A.   But eventually, that seemed to be less

15    important to me over time.  But at the time, you

16    know, we were still talking about it, I -- that

17    was an interest of mine.

18         Q.   The Times wanted it to be an exclusive.

19         A.   Yes.

20         Q.   They made that clear to you.

21         A.   Yeah.  But they did say that, you know,

22    that eventually we could be open to -- you know,

CONFIDENTIAL

Page 160

1    they were, like, let's do exclusive first; you can

2    do what you want after that.

3          But then later, you know, they convinced

4    me not to share it with anyone else.

5          Q.  Okay.  And did you eventually identify

6    yourself by name to them?

7          A.  I did.

8          Q.  And when was that?

9          A.  January 2020.

10         Q.  January 2020.  And put that in time for

11   me as to when -- was that after or before you had

12   actually provided them the tax return information?

13         A.  After.

14         Q.  So you provided them the tax return

15   information when, again?

16         A.  October 2019.

17         Q.  And how did you do that?  How did you get

18   it to them?

19         A.  Had it on a flash drive that they put

20   into their computer, and then I took the flash

21   drive back.

22         Q.  Okay.  So they made a copy of it.

CONFIDENTIAL

Page 161

```
 1        A.   Yeah.

 2        Q.   Was it the same flash drive that you --

 3        A.   Different one.

 4        Q.   Different one.  So you transferred it

 5   between flash drives.

 6             And did you have -- did you maintain the

 7   prior flash drive?  Did you still have it?  At the

 8   time.

 9        A.   At the time, yes.

10        Q.   Did you destroy any of the flash drives

11   at the time?

12        A.   Not at the time.

13        Q.   So now The Times has it --

14        A.   Uh-huh.

15        Q.   -- they've downloaded it, and they're

16   going to write their story.

17        A.   Uh-huh.

18        Q.   Did you maintain contact with them while

19   they were writing their story?

20        A.   Yes.

21        Q.   Did they ask you questions about the tax

22   return information that you had provided?
```

CONFIDENTIAL

Page 162

```
1          A.   Yes.

2          Q.   Did you give them answers?

3          A.   To the best of my ability.

4          Q.   Did you do additional queries in the

5     system to assist them with getting additional

6     information?

7          A.   They didn't know that I was doing that.

8          Q.   But did you do that?

9          A.   Yes.

10         Q.   So they had asked you questions.  If you

11    didn't know the answer and you thought that you

12    could help by going to the system and running

13    additional queries, you would do that?

14         A.   Yes.

15         Q.   And then you'd provide them information

16    as a result of the questions?

17         A.   No.

18         Q.   So what would you do?

19         A.   They'd ask a question.  I'd say, I don't

20    know.  You know, sometime later I did, without

21    their knowing, procure another set of data for

22    them, additional data.
```

CONFIDENTIAL

Page 163

1          And at the meeting where I disclosed my

2    name, you know, I asked them -- I told them that I

3    have additional data for you.  If you feel, like,

4    it is, you know, within your legal right to accept

5    it, here it is.

6          Q.  And why did you ask them if it was within

7    their legal right to accept it?

8          A.  I understand that they can't solicit from

9    individuals illegal actions.  And they didn't.

10   They never asked me to do anything like that.

11         Q.  Okay.

12         A.  They just were trying to understand.  And

13   I gave them answers that never necessitated or

14   never even related to I need to get more

15   information.  They were basically, like, we're not

16   seeing this particular publicly available

17   document, a return; why is that?  You know, and

18   I'd be, like, oh, well, it looks, like, the social

19   security number is mistyped in the one that is

20   publicly available.

21              So one of the things that I went back and

22   did was include a fudge that kind of was able to

CONFIDENTIAL

Page 164

1    capture stuff that wasn't included in the first

2    data run.

3         Q.  And you said they didn't solicit

4    information, but they had asked questions where

5    they saw there were gaps, for example.

6         A.  Uh-huh.  Yeah.

7         Q.  And they never asked you at that point,

8    can you go fill these gaps?

9         A.  Correct.

10        Q.  Did you infer that that was something

11   they'd want to do -- they'd want you to do?

12        A.  No.

13        Q.  So they would just ask questions, and

14   then you would I'll help them fill in the gaps.

15        A.  If I knew any way to do it.

16        Q.  And sometimes you did.

17        A.  Yeah.

18        Q.  And then you went to see them in

19   January of 2020.

20        A.  Uh-huh.

21        Q.  You provided them additional information.

22        A.  Uh-huh.

CONFIDENTIAL

Page 165

1      Q.  And how did you do that?

2      A.  This case I believe it wasn't with the

3  flash drive.  I had -- I had an e-mail account

4  that -- you know, I put it into a draft, and then

5  they were able to get it from the draft because

6  they had the login information.

7      Q.  How did you get that information off of

8  the IRS system?

9      A.  Same way.

10     Q.  Same way.  So you took -- you -- private

11 website?

12     A.  Yeah.

13     Q.  And then you used your flash drive to

14 upload it?

15     A.  Uh-huh.

16     Q.  Or download it, I guess?

17     A.  Yeah, in this case I didn't need a flash

18 drive.

19     Q.  You didn't need a flash drive.  Okay.

20 But then how did you get it to the e-mail?

21     A.  Just download it on my computer, upload

22 it to the e-mail.

CONFIDENTIAL

Page 166

```
 1        Q.  I see.  And then you'd share a draft of
 2   that -- a draft in e-mail form to -- with the
 3   New York Times.
 4        A.  Yes.
 5        Q.  And so -- and you sent that to them or
 6   did they --
 7        A.  They just logged in.
 8        Q.  Logged in.
 9            And they made a copy, as far as you know?
10        A.  Yes.  And then I deleted it.
11        Q.  Okay.  And then you deleted it.
12            And would -- you met with them in person
13   in January.
14        A.  Uh-huh.
15        Q.  Why did you tell them your name in
16   January of 2020?
17        A.  I don't know.  I don't know if -- I don't
18   think they asked me.  I don't remember.  I just --
19   I thought it would be -- you know, we'd built some
20   trust.
21        Q.  Had they promised you that they would
22   maintain your -- the confidentiality of your
```

CONFIDENTIAL

Page 167

```
 1    identity?

 2         A.  Yes.  I asked them not to Google me.

 3         Q.  Okay.  Did they seem surprised when

 4    they -- when you told them your name?

 5         A.  I don't know why they would be.

 6         Q.  Did they seem to know who you were

 7    already?

 8         A.  No.

 9         Q.  Who was at that meeting in January?

10         A.  It was all three of them.

11         Q.  All three of them?

12         A.  Yeah.

13         Q.  And was it at the safehouse again?

14         A.  No.  We only went there once.

15         Q.  Where was it this time?

16         A.  This was also Kellogg Business Center.

17         Q.  So the editor came to D.C.?

18         A.  Yes.

19         Q.  Okay.  Are the other two reporters, do

20    you know, are they based in D.C. or are they in

21    New York?

22         A.  New York.
```

CONFIDENTIAL

Page 168

1      Q.  So they all came to D.C.?

2      A.  Uh-huh.

3      Q.  All right.  So then when -- do you

4  remember when the New York Times actually

5  published the article?

6      A.  September 27th, 2020.

7      Q.  During that January through

8  September period --

9      A.  Yes.

10      Q.  -- did you have ongoing communications

11  with the New York Times?

12      A.  Yes.

13      Q.  Did you meet with them?

14      A.  Yes.

15      Q.  Roughly how often?

16      A.  Probably two more times --

17      Q.  Two more times --

18      A.  Well, no, I didn't meet with them because

19  of the coronavirus pandemic.  We didn't meet at

20  all.

21          Might have been one more meeting and that

22  was it.

CONFIDENTIAL

Page 169

1     Q.  Okay.  And when was that meeting?

2     A.  It might have been -- maybe February,

3  maybe March.  I'm not sure.

4     Q.  But you communicated with them over

5  Signal?

6     A.  Yes.

7     Q.  And phone?

8     A.  Yes.

9     Q.  And you understood they were working on

10  an article.

11     A.  A few.

12     Q.  A few articles.  Right.

13         Did they ask you additional -- like they

14  had before, ask you questions about what they were

15  reviewing?

16     A.  Uh-huh.

17     Q.  And --

18     A.  Yes, they did.

19     Q.  And did you go -- did you do additional

20  queries on the system to fill in gaps or answer

21  questions or fix issues that you saw arising?

22     A.  I -- there were certain problems that I

CONFIDENTIAL

Page 170

1  was trying to understand the solution to, yes.

2  But the queries, they were generalized for the

3  most part.

4          There was stuff -- I did provide them

5  with additional set of data, unprompted again,

6  related to audit information.

7      Q.  Okay.  And when did you do that?

8      A.  Over the summer sometime.  Maybe it was

9  May 2020.

10      Q.  So you were providing additional

11  information based on questions they were asking,

12  even though they weren't soliciting the

13  information?

14      A.  No.  The audit information wasn't based

15  on anything they asked for.

16      Q.  That was your own --

17      A.  Yeah.

18      Q.  You decided to do that?

19      A.  Yes.

20      Q.  Why did you decide to do that?

21      A.  Well, it seemed like an important piece

22  of the puzzle.

CONFIDENTIAL

Page 171

1          Q.   Okay.

2          A.   And it did end up being one.

3          Q.   And so -- and each time you were getting

4     information from the IRS system, you were using

5     the same methodology of uploading to your private

6     website --

7          A.   Uh-huh.  Yes.

8          Q.   -- using a flash drive.  You might put it

9     on an e-mail or you might have them copy it,

10    correct?

11         A.   Correct.

12         Q.   And during none of that time, as far as

13    you know, were you detected by the IRS.

14         A.   As far as I know, I was not.

15         Q.   No one knocked on your door.

16         A.   No.

17         Q.   So when the articles came out in

18    September of 2020 -- 2020, right?

19         A.   2020.

20         Q.   -- did you know they were coming at that

21    point in time?  Had you been warned by them?

22         A.   Not the specific date, but I did know

Page 172

1    they were coming within a couple of weeks.

2        Q.  Okay.  Were you concerned that these

3    articles were going to come out and they'd be big

4    news, obviously?

5        A.  I expected it to be big news.

6        Q.  Were you concerned that the IRS would be

7    suspicious that somebody had leaked tax return

8    information for Donald Trump?

9        A.  It was not reported that it came from the

10   IRS, so I was not as concerned.

11       Q.  Okay.

12       A.  Certainly was a theory at the time, one

13   possible source.  But it was a week or maybe -- it

14   was less than two weeks after the disclosures that

15   the Commissioner stated that an investigation

16   found that it did not come from the IRS.

17           And after that, you know, I didn't know

18   what to think.

19       Q.  Okay.  So you referenced the Commissioner

20   stated that it did not come from the IRS about a

21   week after the articles?

22       A.  I think so, yeah.  It was in October.

CONFIDENTIAL

Page 173

1       Q.  Okay.  So were you surprised by that
2    statement?
3       A.  I think, given that it was so soon that
4    the statement came out -- I'm surprised that they
5    were so certain that it didn't come from the IRS.
6    I don't know what -- what prompted that.  But...
7       Q.  But no one in the IRS had come to you to
8    interview you, for example --
9       A.  No, no one had --
10      Q.  -- or from the Department of Justice.
11          Nobody had contacted you to ask you did
12   you leak this stuff before the Commissioner said
13   this?
14      A.  No one contacted me.
15      Q.  And as far as you know, did anybody on
16   your team -- were they contacted by anybody on the
17   investigative team?
18      A.  They were not.
19          MR. BURCK:  I wanted to ask you, when did
20   you want to do the lunch break?  It's up to you.
21          MS. MANNING:  I mean, we can keep --
22   whenever you feel like you have a natural break,

CONFIDENTIAL

Page 174

```
1   but I'm --
2           MR. BURCK:  This is a fairly natural
3   break.  Yeah.
4           MS. MANNING:  Is this good for you?
5           THE WITNESS:  That's fine.
6           VIDEO TECHNICIAN:  The time is 12:07 p.m.
7   This ends unit 2.  We're off the record.
8           (A recess was taken.)
9           VIDEO TECHNICIAN:  The time is 12:54 p.m.
10  This begins unit number 3.  We're on the record.
11  BY MR. BURCK:
12
13
14
15
16
17
18
19
20
21
22
```

CONFIDENTIAL

Page 175



CONFIDENTIAL

Page 176



CONFIDENTIAL



Page 177

CONFIDENTIAL



CONFIDENTIAL

Page 179



CONFIDENTIAL

Page 180

1          A.  So a tax form might have a hundred or

2     maybe even -- maybe 200 or even as few as 20 or --

3     fields, which represent each of the entry -- data

4     entry values, and they're just labeled.

5          Q.  And when you transferred this information

6     to the New York Times, did you have to assist them

7     in understanding what they were looking at?

8          A.  Yes.

9          Q.  Okay.  Because they wouldn't -- they

10    weren't tax experts, as far as you know.

11         A.  Well, they didn't know what all the

12    labels meant.

13         Q.  Right.

14         A.  They were fairly well versed in tax

15    affairs.

16         Q.  Okay.  But they didn't understand what

17    the forms looked like and what they were looking

18    at; they needed your help, to some extent.

19         A.  They understood what the forms were.

20    They just needed to match up, okay, this is the,

21    you know, interest income; what is that called in

22    the CSV?  Okay.  What's that?  What does it mean?

CONFIDENTIAL

Page 181

1      Q.   Okay.  And you helped them with that?

2      A.   Uh-huh.  I did.

3      Q.   Okay.  And back to the New York Times.

4  So I think we were in -- the article has been

5  published in September.  The Commissioner had said

6  that they had conducted an investigation; it

7  didn't come from the IRS.

8           I think you also testified that no one

9  had talked to you or, to your knowledge, any

10  members of your team about the leak.

11          So that brings us to October of 20 --

12     A.   20.

13     Q.   -- '20.

14          And at this point it's obviously in the

15  middle of COVID, right?

16     A.   Correct.

17     Q.   And so you weren't working at the office,

18  I assume.

19     A.   I was not.

20     Q.   You were working remotely.

21     A.   I was.

22     Q.   But you're still -- your job remained --

CONFIDENTIAL

Page 182

1    you were now a manager, and your job remained the

2    same as it had been prior to COVID.

3        A.  Yes.

4        Q.  Okay.  Once the articles were published

5    in the New York Times, did you have ongoing

6    communications with the New York Times reporters

7    about the articles or about the information you

8    provided?

9        A.  No.  We ceased communication before the

10   articles published.

11       Q.  And why did you do that?

12       A.  I disposed of my electronic device that I

13   used to communicate with them, so I didn't, you

14   know, have any means of getting in touch with

15   them.

16       Q.  And how did you dispose of it?

17       A.  I wiped it clean and then threw it out in

18   a garbage can at a local park.

19       Q.  And you did that in order to conceal the

20   fact that you'd been having communications with

21   them?

22       A.  Yes.

CONFIDENTIAL

Page 183

1      Q.  And did The Times -- anybody at The Times

2  advise you to cease communication with them?

3      A.  No.  No.  I just said -- you know, this

4  is beforehand -- makes sense to get rid of the

5  stuff that we were using, you know, as a

6  precaution.

7      Q.  And you told them that you were going to

8  get rid of the stuff you were using?

9      A.  Yes.

10     Q.  Did they ask you to do that?

11     A.  No.

12     Q.  But you informed them?

13     A.  I informed them that I was going to cease

14  communication.  I didn't tell them how or what I

15  was going to do to dispose of my devices.

16     Q.  Okay.  I think you testified that -- I

17  just said this is -- so you said, I just said this

18  is beforehand, it makes sense to get rid of the

19  stuff that we were using, you know, as a

20  precaution.

21          And you told them you were going to get

22  rid of the stuff you were using?

CONFIDENTIAL

Page 184

1          You said yes.

2      A.  Well, I guess my memory is faulty on

3  this -- this piece.

4      Q.  You don't remember one way or the other

5  or --

6      A.  I don't recall.

7      Q.  Okay.  So you don't remember if you told

8  them or not?

9      A.  Correct.

10      Q.  Did they make any efforts to reach you

11  now that they know your name --

12      A.  No.

13      Q.  -- after?

14          And you obviously knew who they were, so

15  you could have reached out to them some other way,

16  even without that phone.

17      A.  That's right.

18      Q.  So the last time you had any contact with

19  The Times was --

20      A.  Well, we got in touch again in

21  February of 2021 just to have a debrief.  I told

22  them, you know, why don't we get in touch again on

Page 185

1   the 2nd.  And that's what we did.

2      Q.  How did you get -- how did you reach out

3   to them?

4      A.  Same way I reached out to them

5   originally.  I just said I have something for Sue

6   Craig related to Trump.

7      Q.  Did you get another phone to do it?

8      A.  I did, yeah.

9      Q.  So you bought a new phone?

10      A.  I -- yeah, I bought a new phone, and I

11   was communicating with them.  We had a discussion.

12      Q.  And did you use Signal again?

13      A.  I did.  Yes.

14      Q.  Okay.  And so when you -- did you meet

15   with them or speak to them --

16      A.  Just spoke.

17      Q.  You spoke on -- just on the cell phone?

18      A.  They had a videoconference.

19      Q.  Okay.  It was, like, a Signal video?

20      A.  Yeah.

21      Q.  Was it all three of them or was --

22      A.  Yeah.  They recently added that feature.

CONFIDENTIAL

Page 186

```
 1        Q.   Okay.  And it was all three people from
 2   The Times?
 3        A.   Correct.
 4        Q.   And, I'm sorry.  What was your
 5   discussion?  Your discussion was you had more
 6   information about Trump?
 7        A.   That's just how I got in touch with them.
 8   I didn't --
 9        Q.   I see.
10        A.   -- actually have more information.  I
11   just was going to congratulate them on their
12   reporting.
13        Q.   Okay.  So that's what you did, correct?
14        A.   That's right.
15        Q.   What was their reaction?
16        A.   You know, they were happy to speak with
17   me.  They -- I didn't have any specific memory of
18   this, but they felt like I had, you know,
19   predicted things that would happen and they
20   actually happened.
21        Q.   Like what?
22        A.   I think just how upset Trump would be
```

CONFIDENTIAL

Page 187

1    about losing.

2         Q.  Losing the election.

3         A.  Yeah.

4         Q.  Right.  Did they ask you for any

5    additional information?

6         A.  No.

7         Q.  Did you offer them any additional

8    information?

9         A.  No.

10        Q.  And was that the last time you spoke to

11   them or had communication with them?

12        A.  The last time was probably May of 2021,

13   because we just kept an ongoing kind of chat.

14   Occasionally I'd read an article I'd share with

15   them.  That sort of thing.

16        Q.  And that was on the phone you bought

17   after the other phone that you had --

18        A.  That's right.

19        Q.  -- disposed of.  Okay.

20            Did you maintain that phone?

21        A.  No, I disposed of that one as well.

22        Q.  When did you get rid of that one?

CONFIDENTIAL

Page 188

1         A.  This must have been before the ProPublica

2    report came out.

3         Q.  Okay.  So May '21 was the last time you

4    recall having contact with The Times reporters?

5         A.  That's right.

6         Q.  And since then, they didn't try to reach

7    out to you.

8         A.  No.

9         Q.  Okay.  Let's turn to ProPublica.

10             So obviously, in your plea and at the

11   sentencing, there was a lot of discussion of your

12   disclosure of taxpayer returns -- or taxpayer

13   returns for a much larger group of people than one

14   person --

15        A.  Correct.

16        Q.  -- right?

17             And I think you admitted that you had

18   disclosed tax return information for people who

19   were ultra-net worth or ultra-wealthy Americans,

20   correct?

21        A.  Correct.

22        Q.  Can you tell us when you first starting

CONFIDENTIAL

Page 189

1   to think you wanted to do that?

2        A.   This would have been July 2020.



CONFIDENTIAL

Page 190



CONFIDENTIAL

Page 191



CONFIDENTIAL

Page 192



CONFIDENTIAL

Page 193

13        A.   I'm not sure how much I can say about

14    what I saw.  But suffice it to say the reporting

15    on the matter suggests that there are numerous

16    ways in which people of means can reduce their tax

17    bill.

18        Q.   Okay.  But your opinion, when you saw

19    this stuff, your view was that you saw people with

20    very large incomes or tax returns, and you saw

21    that their taxes they were paying was lower than

22    you thought it should be.

CONFIDENTIAL

Page 194

1      A.  That, or low income but high net worth.

2  Knowing -- just know who this person is.  And then

3  that explains it, explains their low taxes,

4  because they have low income.

5      Q.  And what concerned you about that?

6      A.  I thought that people would be concerned.

7      Q.  Why?

8      A.  Because there's a conventional wisdom

9  that, you know, the rich can get away with

10  paying -- you know, without paying taxes, without

11  paying their fair share, whatever that might mean.

12  But nobody really, like, examined it in a way that

13  was comprehensive.

14        And that's where I thought there could be

15  some -- it could be newsworthy, essentially.

16      Q.  And where were you getting the impression

17  that there was a public perception that the rich

18  were getting away without paying taxes?

19      A.  Through the culture.

20      Q.  Through the culture.  Anything specific?

21      A.  You know, many people -- many prominent

22  people have called attention to this issue.

CONFIDENTIAL

Page 195

1          Q.  Like President Biden?

2          A.  He wasn't President at the time.

3          Q.  Okay.

4          A.  So --

5          Q.  Who are the prominent people you're

6     thinking of?

7          A.  Well, I'm thinking -- you know, Bernie

8     Sanders for one.  But you, you know, go back to

9     Leona Helmsley even in the '80s.  Situations where

10    we have a few data points here of low taxes paid

11    by the wealthy.

12         Q.  Okay.  I think President Biden was

13    President as of January 2021, right?

14         A.  Not when I made my decision.  Not --

15         Q.  Not --

16         A.  -- when I worked on this.

17         Q.  Not when you were investigating it?

18         A.  Yes.

19         Q.  Okay.  He was President, though, when you

20    decided to disclose the information publicly,

21    though, right?

22         A.  No.

CONFIDENTIAL

Page 196

1     Q.  No?  When did you decide to do that?

2     A.  Before the New York Times published --

3     Q.  Okay.

4     A.  -- their articles.

5     Q.  Okay.  So tell me -- first, how did you

6  identify the group of people that you ended up

7  disclosing the tax information for?

8     A.  It was basically a set of queries that

9  would pick out people who had high income over the

10 course of 15, 16 years in any particular year.  So

11 it would grab these people.  That's their high --

12 you know, these are the high-income people in a

13 particular year.  And then look at all the years

14 that we have data for, see years where maybe they

15 didn't have high income or whatnot.

16       And just did that for 500 people each

17 year and just combined that all into a data set.

18    Q.  What income level did you choose?

19    A.  It wasn't a level; it was just a rank

20 order.

21    Q.  A rank order.  So tell us what the rank

22 order was.

CONFIDENTIAL

Page 197

1          A.   Ranked by total income, descending order

2     by year for the years available.

3          Q.   What was the floor?

4          A.   There wasn't a floor; it was just top

5     500.

6          Q.   Top 500, okay.  So you were able to pull

7     from the system who were the top 500 people in a

8     particular year by income?

9          A.   Yeah.  That's right.

10         Q.   And how far back did -- were you able to

11    access that information?

12         A.   I think 16 years, maybe.

13         Q.   16 years?  Okay.

14              And what type of income was it?

15         A.   Any.  Any type.  This was just total, all

16    combinations.

17         Q.   Is it adjusted gross income?

18         A.   No.  This was before any deductions.

19         Q.   Okay.  So this is before any deductions.

20    Okay.

21              So that's -- so the 500 people were based

22    on, before any deductions, total income, all sorts

CONFIDENTIAL

Page 198

1    of income?

2         A.   That's correct.

3         Q.   And basically what you're limiting was

4    500 --

5         A.   Yes.

6         Q.   -- top 500?

7         A.   Now, there could be people that appear in

8    multiple years --

9         Q.   Right.

10        A.   -- so the total -- I mean -- 7500, I

11   think, was the guesstimate, the upper limit of

12   what I was thinking was being included in this.

13   ████   █████   ████████████████████████████

14   ███████████████████████████████████

15   ███████████████████████████████████

16   ███████████

17   ████   ███████████████████████████████████

18   █████████████████████████████████████

19   █████████████████████████████████████

20   ████████████

21   ████   █████████████████████████████████

22   ████████████████████████████████

CONFIDENTIAL

Page 199



17    Q.   Okay.  And as before -- go ahead.

18    A.   Trump included business information, as

19  was reported.  That's --

20         MR. BURCK:  I'm sorry, I have to listen

21  to the question [sic].

22

CONFIDENTIAL

Page 200

1    BY MR. BURCK:

2         Q.  I'm sorry.  Can you repeat that?

3         A.  The Trump information included all

4    businesses that he had owned.

5         Q.  Right.

6         A.  So that inflated his --

7              MS. SMITH:  We're going to object to

8    continuing this line of questioning about what

9    exactly he --

10             MR. BURCK:  I didn't ask.  He's answering

11   a question --

12             MS. SMITH:  Well, we're going to object

13   on 6103.  We don't want to get into the specifics

14   of what you took.

15             THE WITNESS:  Okay.

16             MR. BURCK:  That's fine.

17   BY MR. BURCK:

18        Q.  But on the 500 -- the 7500 people

19   total --

20        A.  Yeah.

21        Q.  -- you were able to identify -- select

22   their information and to upload it to a private

CONFIDENTIAL

Page 201

1   website as you had with Trump, correct?

2        A.  Yes.

3        Q.  And then you used a flash drive to take

4   the information from the private website onto a

5   flash drive.

6        A.   Correct.

7   ███  ████████████████████████████

8   █████████████████████████████████

9   ████████████████████

10  ███  ██████████████████

11  ███  ██████████████████████████████████

12  █████████████████████████

13  ███  █████████████   █████████████████████

14  ███  ███████████████████████████████████████

15  █████████████

16  ███  █████████████

17        Q.  So let's talk about ProPublica.

18             So there was overlap between the point

19  that you were talking to the New York Times and

20  you were thinking about whether or not to disclose

21  this information regarding those 7500 taxpayers,

22  right?

CONFIDENTIAL

Page 202

1    A.  Correct.

2    Q.  When did you upload the information about

3 the 7500?

4    A.  Must have been August or September 2020.

5    Q.  Okay.  So this is shortly before the

6 New York Times publishes the article about Trump?

7    A.  Correct.

8    Q.  Did you tell the New York Times that you

9 had done this with the 7500 people?

10    A.  I didn't tell them.

11    Q.  Why didn't you tell them?

12    A.  Not germane.

13    Q.  Well, you had given The Times the Trump

14 information.  You didn't think they would

15 appropriate for this information?

16    A.  I didn't.

17    Q.  Why?

18    A.  I didn't think it's something they would

19 be interested in, to be honest.

20    Q.  And why did you believe that?

21    A.  It -- it just didn't match with what they

22 had reported previously.  I felt that ProPublica

CONFIDENTIAL

Page 203

1    had done work that better aligned them to the

2    story.  And, as I mentioned before, I didn't want

3    to just -- you know, my original idea was to

4    syndicate.  So for me, this was an obvious case

5    where, you know, okay, I had done this thing with

6    the New York Times; let's, you know, work with

7    another organization now.

8        Q.  Okay.  And you -- I think you just

9    testified that ProPublica had done work that

10   seemed to be more --

11       A.  Yeah.

12       Q.  -- in tune with this issue.

13           What type of things had you read in

14   ProPublica that led you to believe that?

15       A.  I was impressed with their work on audits

16   of individuals receiving the earned income tax

17   credit and how they were higher in proportion to

18   those of the very wealthy and how the resource

19   constraints of the IRS meant that, you know, on a

20   per-case basis, it was more efficient to audit

21   earned income tax fraud, or just anybody, really,

22   that takes the earned income tax credit that meets

CONFIDENTIAL

1    for qualification for audit over, you know, people

2    of more means that can fight back.

3         Q.  Okay.  So you basically thought that

4    ProPublica was -- would be interested in a story

5    like this.

6         A.  Yes.  I thought they might be.

7         Q.  Did you consider anybody else?  Any other

8    outlets --

9         A.  Not seriously, no.

10        Q.  How about unseriously [sic]?  Did you

11   think of anybody else?

12        A.  No.

13        Q.  Were you a subscriber to ProPublica?

14        A.  No.  They're a free website.

15        Q.  They're a free website.  So you just --

16   it was a website you follow.

17        A.  Yes.  And I work at the IRS.

18        Q.  Right.

19        A.  You know, they have people that write

20   about the IRS.  It's up my alley.

21        Q.  Okay.  How did you -- did you reach out

22   to ProPublica?

CONFIDENTIAL

Page 205

1      A.  That's right.

2      Q.  How did you do that --

3      A.  Signal.

4      Q.  -- firstly?  Signal.

5          And tell us -- just walk us through, how

6   did that work?

7      A.  I just -- I look at the page on the

8   website with -- for Jesse Eisinger, has his

9   Signal, text him on Signal and, you know, ask if

10  we could set up a time to talk, basically.

11     Q.  And you identified Mr. Eisinger because

12  he had written about the issues you just talked

13  about with tax --

14     A.  Yeah, him and Paul Kiel.

15     Q.  Okay.  So you just went to the website,

16  clicked on the Signal, and then you contacted

17  them?

18     A.  Yes.

19     Q.  What did you say to him?  Not exact

20  words, just --

21     A.  I told him, you know, what I had in my

22  possession.  He was shocked and said, if what you

CONFIDENTIAL

1    say is true, this could be a monumental story.

2    More or less, if what you say is false, then we

3    won't be talking again.  That sort of thing.

4         Q.  Did you send this by, like, a written

5    communication or was it by phone?

6         A.  We had a phone call over Signal.

7         Q.  Okay.  So you -- you originally reached

8    out to him in written communication; then you have

9    a phone call.

10        A.  Yes.

11        Q.  And the conversation you just testified

12   about, that was a phone call?

13        A.  Yes.

14        Q.  All right.  And this was roughly in,

15   what, September?

16        A.  Must have been -- yeah, must have been

17   September, early September.

18        Q.  So this is before the New York Times

19   article had come out?

20        A.  Yes, it was.

21        Q.  And did Mr. Eisinberg [sic], he expressed

22   interest --

CONFIDENTIAL

Page 207

1          A.  Eisinger.

2          Q.  Eisinger.  Excuse me.

3              Eisinger.  Did he express interest in

4      meeting?

5          A.  No.

6          Q.  All right.  So what did he tell you?

7          A.  Oh, I told him I can send it to him if

8      he's interested.

9          Q.  So you were just going to send it to him?

10         A.  Yeah.

11         Q.  Now, at The Times, you had taken, I

12     think, months and months before you decided --

13         A.  Yeah.

14         Q.  -- to give them the information.

15         A.  That's right.

16         Q.  I think you'd met with them at least once

17     or twice before you gave it to them.

18             But with Mr. Eisinger, you decided that

19     you would just send it to him if he asked for it.

20         A.  I was going to send it

21     password-protected, so without the password, he

22     wouldn't have any means of accessing it.

CONFIDENTIAL

1    My timeline was such that I had this idea

2   to do this pretty late into The Times reporting,

3   and I had reason to believe that, you know, my

4   access to this data, this information, might be

5   curtailed or I'd be apprehended after The Times

6   stories came out.  So I -- that's why it was

7   scheduled the way it was.

8       Q.  So you were concerned that when the

9   New York Times article came out later that month,

10  there may be a crackdown by the IRS or an

11  investigation to figure out who's doing this, if

12  it's somebody in the IRS.

13      A.  Yes.

14      Q.  So time was of the essence, effectively?

15      A.  Yes.

16      Q.  And how long between when you contacted

17  Mr. Eisinger and when you sent it to him?

18      A.  It might have been a week or less.

19      Q.  Okay.  Or less.

20      A.  We had a conversation of some length.

21      Q.  And how did you send it to him?

22      A.  I put it in a padded envelope on a flash

CONFIDENTIAL

Page 209

1    drive addressed to his home.

2        Q.  So you just mailed it to his home?

3        A.  That's right.

4        Q.  And he gave you his home address?

5        A.  Yes, under the condition that I not show

6    up and murder him.

7        Q.  Okay.  So -- did you ever tell

8    Mr. Eisinger who you were?

9        A.  No, I didn't.

10       Q.  Did you -- you mentioned that you were

11   comfortable -- you testified about The Times

12   earlier -- you were comfortable with The Times

13   because you thought the data security issues

14   and -- you thought they would maintain this.

15           Did you do anything like that with

16   ProPublica?

17       A.  I asked about it.

18       Q.  And what did you ask him?

19       A.  And he provided assurances, you know,

20   that they would buy these laptops that were -- you

21   know, get air-gapped from all other

22   communications; that's what they'd be on, and that

CONFIDENTIAL

Page 210

1    they would do this big investment and everything.

2    You know, and I received -- you know, he talked to

3    people at ProPublica.  They got back to me on

4    several questions, of which I can't quite recall.

5    And then that's when I sent it to him password

6    protected with, you know, a delay.  He wouldn't

7    get the password until early 2021.  So he was,

8    like, why is this delayed?  And I -- I just wanted

9    time to, you know, consider what I was about to

10   do, I guess.

11        Q.  Okay.  So you sent him the file on a

12   flash drive sent to his home.

13            It sounds like Mr. Eisinger didn't

14   actually want to meet with him because he was

15   worried that you'd kill him -- or he'd kill you --

16   you'd kill him, excuse me.

17        A.  Well, I mean --

18        Q.  I know he was being facetious.

19        A.  -- because he gave me his home address --

20        Q.  I know he was being facetious.

21        A.  -- I think was -- yes.  But, you know, it

22   was still COVID, so I wasn't even -- I wasn't

CONFIDENTIAL

Page 211

1    going to travel up to New York, you know.

2        Q.   Okay.

3        A.   And he wasn't going to -- yeah.

4        Q.   Did he ask -- did he say, I'd like to

5    meet you, at that point?

6        A.   He didn't.

7        Q.   Did anybody from ProPublica contact you

8    and say, we'd like to meet you?

9        A.   No.

10        Q.   Did they try to reach out to you through

11    any other way to figure out who you were?

12        A.   No.

13        Q.   So you just had a Signal conversation,

14    maybe some Signal communications, and then, within

15    a week, you sent him 7500 people's -- or

16    taxpayers' information.

17        A.   Correct.

18        Q.   And you put a password on it.

19        A.   Correct.

20        Q.   And so -- but did you tell him beforehand

21    you were going to put a password on it?

22        A.   Yes.

CONFIDENTIAL

Page 212

1       Q.  But you mentioned before, he said, what

2    is this password?  Why is this -- what's going on

3    with it?

4           When did he figure out that it was a

5    months-long password?

6       A.  Oh, immediately.  I told him before I

7    sent it to him.

8       Q.  Okay.

9       A.  I also didn't want -- I mean, we had the

10   presidential election and everything like that.

11   Like, I wanted to give it space, you know, in

12   terms of the story; it's not relevant to the

13   presidential election.  So...

14      Q.  So fair to say you wanted to send this

15   out immediately, as fast as you could, before the

16   New York Times article came out because you were

17   worried that you might be detected at that point?

18      A.  Correct.

19      Q.  But you wanted to have a little space so

20   that -- from when the publication actually

21   occurred into 2021?

22      A.  Yes.

CONFIDENTIAL

Page 213

1      Q.  And what -- when was the date the

2   password would become effective?

3      A.  The 2nd of February --

4      Q.  How --

5      A.  -- 2021.

6      Q.  And between the time that you sent

7   Mr. Eisinger the files -- or the flash drive, I

8   should say, and when the password became

9   effective, did you communicate with Mr. Eisinger?

10     A.  Yes.  In fact, I decided that, instead of

11  making him wait until February, I would tell him

12  in November.  So I did reach out to him and we --

13  I gave him the password orally.  And then that was

14  that.

15     Q.  So then why did you change your mind?

16     A.  I guess I had felt comfortable enough to

17  move forward with it and with him.

18     Q.  Did you have conversations with him

19  between September and November that made you

20  comfortable?  Or communications?

21     A.  I -- it was -- before I communicated with

22  him or told him the password, I'm sure I reached

CONFIDENTIAL

Page 214

1   out and we talked a little bit more, but I don't

2   recall the specifics.

3        Q.  Did he ask you to give him the password

4   early?

5        A.  I don't recall.

6        Q.  When you first contacted him and you told

7   him what you had, did he ask you to send it to

8   him?

9        A.  I contacted him because I was -- I wanted

10  to send it to him.

11       Q.  Understood.  But did he ask you to send

12  it to him?

13       A.  Not that I recall.

14       Q.  Okay.  So you offered it to him and he

15  said, I'll take it.

16       A.  Exactly.

17       Q.  And in that period of time before you

18  gave him the password, you had at least one

19  additional conversation with him or communication

20  with him.

21       A.  Correct.

22       Q.  And did he ask you to -- can I get this

CONFIDENTIAL

Page 215

1    password earlier?

2         A.  I don't recall.

3         Q.  All right.  So you don't remember one way

4    or the other?

5         A.  Right.

6         Q.  So you had mentioned before that you'd

7    want a little space initially because of the

8    election.

9         A.  Yeah.

10        Q.  November was the election, right?

11        A.  Yes.

12        Q.  What changed for you that the election

13   was no longer a barrier to giving him the

14   password?

15        A.  The election was over.

16        Q.  Okay.  So the -- so it happened the

17   latter half of November?

18        A.  Yes.

19        Q.  And so you thought, with the election

20   over now, you can give him the password?

21        A.  Yeah.  And this is more media strategy

22   than anything else.

CONFIDENTIAL

Page 216

1       Q.  Right.  And what was the media strategy?

2       A.  There's a lot of, you know, competing

3   stories ahead of a presidential election, and it

4   would be a waste to drop something and have it get

5   outcompeted and it not getting any news or press.

6       Q.  Understood.  But I think, even after the

7   election and Biden won the election, there was a

8   lot of controversy --

9       A.  Yeah.

10      Q.  -- about who won the election, right?

11      A.  Yeah.

12      Q.  So that didn't concern you, that the

13  story of the day was --

14      A.  That -- I mean, that came a little bit

15  later.  I mean, we're talking -- when I say after

16  the election, it was about a week after it was

17  called that I gave him the password.

18          And of course, to report a story of this

19  mag -- this size, it's going to take some time

20  anyways.  So...

21      Q.  When you spoke to Eisinger, did he ask

22  you how you had gotten this material?

CONFIDENTIAL

Page 217

1      A.  I told him that I worked at the IRS.

2      Q.  Did he ask for any proof that you worked

3  at the IRS?

4      A.  No.  I didn't show him my badge or

5  anything of that nature.

6      Q.  So he took it on your word that you

7  worked there?

8      A.  That's right.  But I had, you know,

9  provided him with -- well, I guess there's no way

10  for him to know, really.  I provided him with this

11  data, obviously, but also documents which helped

12  him understand the different fields which, you

13  know, it would be hard to fabricate, I suppose.

14  But you -- you know, he's got to go with what he

15  can prove and what he feels like he can

16  corroborate.

17          And my understanding was, and with the

18  New York Times case, there's some publicly

19  available information that can be used to

20  corroborate some of this.

21      Q.  Okay.

22      A.  Court cases and such.

CONFIDENTIAL

Page 218

1      Q.   Okay.  So you sent him additional data

2   other than the initial flash drive?

3      A.   No.



CONFIDENTIAL

Page 219

1      Q.  And you included that on the flash drive?

2      A.  Yes.

3      Q.  So -- after you gave him the password in

4  November of 2020, did you have further

5  communications with him?

6      A.  Yes, I did.

7      Q.  And how did you do that?  By -- in

8  writing?

9      A.  Signal.

10      Q.  Signal?

11      A.  Yeah.

12      Q.  Phone and writing?

13      A.  Yes.  Correct.

14      Q.  What did you guys discuss?

15      A.  We didn't have as many discussions as

16  with The Times.  It was similar nature:  Is this

17  thing in here?  You know, what does this mean?

18  You know, why is there some weird character in

19  this line of the file?  That sort of thing.

20      Q.  Did you do something similar to what you

21  did with The Times, which was -- do you go back to

22  the database and --

CONFIDENTIAL

Page 220

1      A.  I didn't.

2      Q.  -- see if there was additional

3  information?

4      A.  I didn't.

5      Q.  Why didn't you?

6      A.  I had, you know, taken such a risk doing

7  this, I just said, you know, to hell with it, let

8  him deal with what I gave him.

9      Q.  So when he had questions that -- about

10  the data you'd sent him --

11      A.  I could answer questions, you know, but

12  not, like, can you go back and get something else?

13  Which -- he didn't ask but, you know, it was not

14  something I was going to do even if he had asked.

15      Q.  Other than the questions you mentioned

16  before, were there any other types of questions

17  that stand out in your mind that he asked you?

18      A.  He was curious about, you know, what

19  stories I thought could be in there.  And I helped

20  kind of give him my thoughts, I guess.

21      Q.  And what did you think the stories were?

22      A.  I had -- I thought that it would be

CONFIDENTIAL

Page 221

1    useful to just, you know, take the Forbes list

2    and, you know, see how much these individuals paid

3    in taxes, which is what they ended up doing.

4            You know, the timing of stock trades

5    might be interesting, I thought.

6            There were others that I don't recall.

7        Q.  Was it your idea to have ProPublica check

8    Forbes and then look at how much they were paying

9    in taxes?

10       A.  Yes.  But it's not a hard idea to come

11   to.

12       Q.  But it was your idea?

13       A.  I suggested it, yeah.

14       Q.  And that's what they did, ultimately?

15       A.  They did some variation on that, yes.

16       Q.  Did you receive assurances from

17   Mr. Eisinger that the data would be maintained

18   securely?

19       A.  Yes.

20       Q.  And what did he say they would do?

21       A.  They were creating, again, special

22   access -- you know, special provisioning of

CONFIDENTIAL

Page 222

1    machines, and they would keep a tight circle

2    around who would have that kind of access.

3         Q.  Okay.  Did you do anything to verify

4    that?

5         A.  I -- what might you suggest?

6         Q.  No, I'm asking you.  Is there any --

7         A.  I took his word --

8         Q.  Okay.  You took his word.

9         A.  -- you know, as a journalist.

10        Q.  I mean, at The Times, you met with the

11   editor.

12        A.  Yeah.

13        Q.  Here, you didn't meet with an editor,

14   right?

15        A.  I didn't meet with an editor in this

16   case, no.

17        Q.  Did you ever meet Mr. Eisinger?

18        A.  I've never met him.

19        Q.  Did you ever meet anybody at ProPublica?

20        A.  Paul Kiel appeared at the sentencing

21   hearing.

22        Q.  Okay.  Other than the -- let's say before

CONFIDENTIAL

Page 223

1   the discovery or the -- that you had been

2   responsible for this.

3       A.  I didn't, no.

4       Q.  Okay.  So in the -- after he got the

5   password, how frequently would you say you had

6   contact with him to answer questions or to talk to

7   him?

8       A.  Less -- maybe -- less than half a dozen

9   times.  Really just -- it was probably, like,

10  three or four times in terms of having a meeting

11  or something.  Because he had a data person that

12  we talked to once.  And I don't recall his name.

13      Q.  Data person from ProPublica?

14      A.  Yes.  They had -- they had somebody

15  that -- so one of the things that they maintained

16  that also gave me assurances of their capabilities

17  is they have this tax return database for

18  non-profits that they, you know, upload with

19  publicly available information.

20          And so I believe one of the people that

21  has -- was responsible for doing that was involved

22  in this reporting.

CONFIDENTIAL

Page 224

```
 1        Q.  Okay.  And the files that you had put on

 2   the flash drive, they were a similar format as the

 3   files that were for Trump?

 4        A.  Correct.

 5        Q.  All right.  And then when did the -- when

 6   did ProPublica start publishing articles about the

 7   information that you had provided?

 8        A.  June?

 9        Q.  Of 2021?

10        A.  '21 --

11        Q.  Okay.

12        A.  -- I believe.  June 6th.

13        Q.  Okay.  So between the point that you

14   provided him the password, which was in

15   November of 2020, and June 6th, 2021, when he

16   started -- when they started publishing articles,

17   you had a handful of communications with him?

18        A.  Correct.

19        Q.  So it wasn't very frequent.

20        A.  No.

21        Q.  And during that period of time, did he

22   ever solicit any information from you?
```

CONFIDENTIAL

Page 225

1      A.  Can you elaborate?

2      Q.  Did he ever ask you for information?

3      A.  Of what sort?

4      Q.  Any sort.  About the information you

5  provided him.

6      A.  Would questions about the nature of the

7  information qualify under that?

8      Q.  Sure.

9      A.  Then yes.  I don't know the specifics or

10  recall the specifics.

11      Q.  Okay.  But he asked you to explain some

12  of the data that he didn't understand?

13      A.  So I had prepared a lot more

14  documentation for this ahead of time, which is --

15  like the files I was describing because -- and I

16  had this, you know, automated password thing that

17  was going to send him the password, because I

18  didn't know if I was going to be, you know,

19  detained.

20          And so my expectation was there was some

21  chance I was going to be detained after the Trump

22  stories ran, so he would have to do everything --

CONFIDENTIAL

Page 226

1    you know, they would have to do everything on

2    their own, meaning that there were fewer

3    questions.  You know, I had already -- everything

4    that had been asked in a general sense about the

5    data from, you know, the New York Times I had

6    prepared in a file in a general sense to describe

7    the data in question.

8           So they were already prepped, so there

9    were fewer questions that needed to occur.

10        Q.  Okay.  So you were concerned about being

11   detained, but you -- but you'd also had the

12   experience with the New York Times; you kind of

13   anticipated what the questions would be and how to

14   present this to the reporter in a way that would

15   make it easier for him to understand?

16        A.  Correct.

17        Q.  So the first articles come out in June of

18   2021.

19           Did you have any communications with

20   Mr. Eisinger or anybody at ProPublica once the

21   articles came out?

22        A.  No.

CONFIDENTIAL

Page 227

1      Q.  So you never spoke to them again after

2  the articles came out?

3      A.  Not --

4      Q.  Other than the sentencing.  I don't know

5  if --

6      A.  Other than -- no.

7      Q.  Okay.  What did you do with -- you had

8  another phone to communicate with Mr. Eisinger.

9          What did you do with that phone?

10      A.  It was disposed of.  I disposed of it.

11      Q.  How did you dispose of it?

12      A.  I wiped it, threw it in a trashcan that

13  was at a gas station along the highway back to

14  St. Louis.

15      Q.  Okay.  And did you do that because you

16  were concerned about being --

17      A.  Yes.

18      Q.  -- apprehended.

19      A.  Correct.

20      Q.  Did you tell Mr. Eisinger that you were

21  going to do that?

22      A.  No.

CONFIDENTIAL

Page 228

1    Q.  To your --

2    A.  I just -- you know, I said, this is it,

3  goodbye, good luck, that sort of thing.

4    Q.  That was sometime between November 2020

5  and June 6th?

6    A.  Correct.

7    Q.  And he didn't ask you to --

8    A.  No.

9    Q.  -- dispose of it?

10        When the articles came out in June -- or

11  when the first article came out in June of 2021,

12  do you recall if the IRS made any kind of

13  statement about those articles?

14    A.  Yes.  They certainly were more alert this

15  time around.

16    Q.  And what do you mean by that?

17    A.  Well, articles were called the Secret IRS

18  Files, so it was pretty obvious that it came from

19  them.

20    Q.  So ProPublica actually identified them as

21  having come from the IRS?

22    A.  Yes.  They made intonations that that

CONFIDENTIAL

Page 229

1    might not have to happen, but I had a feeling it

2    was going to be what they decided to do in the

3    first place -- in the end.

4         Q.  Had you asked them not to identify it as

5    IRS source?

6         A.  I didn't ask explicitly because I knew

7    that wasn't something they could reasonably

8    fulfill, you know, because they're going to do

9    what the story requires.

10        Q.  Well, I think the New York Times, they

11   didn't identify it, right, as IRS source?

12        A.  Yeah, they didn't need to.

13        Q.  And that's -- why didn't they need to?

14        A.  The range of sources is much smaller on a

15   leak of that magnitude.

16        Q.  Right.

17        A.  You know...

18        Q.  How you -- the idea is, basically, how

19   are you going to find 500 -- or 7500 people's tax

20   returns --

21        A.  If not --

22        Q.  Right.  Okay.  So you anticipated that

CONFIDENTIAL

Page 230

1    the IRS would be the most likely source; that's

2    the way the public would perceive it?

3         A.  Correct.

4         Q.  And it was clear to you that ProPublica

5    was going to -- or not clear to you, but you

6    suspected they would have to identify that as a

7    source?

8         A.  Correct.

9         Q.  So what do you recall the IRS said when

10   the articles started coming out in ProPublica?

11        A.  I don't have a specific recollection.  I

12   do remember down the line they would issue a

13   statement like, we're investigating, we don't know

14   for sure if it came from us.  And everybody mocked

15   them for that.

16        Q.  Were people -- let me ask you about

17   people inside your team.

18             What was the reaction inside the team

19   when these articles started coming out?

20        A.  I didn't speak to the team about this.

21        Q.  No one mentioned that this article about

22   the IRS being the source of all this information

CONFIDENTIAL

Page 231

1    was shocking?

2         A.  By this point, I was no longer at

3    Booz Allen.  So, you know, if we did have

4    communication with the team, it was on unrelated

5    matters.

6         Q.  When did you -- can you remind me, when

7    you leave the IRS?

8         A.  March 2021.

9         Q.  Okay.  So this is after you had left.  So

10   you didn't talk to anybody about this at the  IRS?

11        A.    Correct.

12            VIDEO TECHNICIAN:  Counsel, you're

13   covering the microphone.

14            MR. BURCK:  Oh, I'm sorry.  Is that

15   better?

16   BY MR. BURCK:

17        Q.  And why did you leave in March of 2021?

18        A.  I wanted to work on a new project.  It

19   was a board game.  So -- and the task that I was

20   on was transitioning a bit.  Instead of working on

21   secure access, it would be merely supporting a

22   third-party vendor who was going to be taking

CONFIDENTIAL

Page 232

1    over.

2           And I admit to a certain amount of

3    disinterest in just starting on a whole new, you

4    know, requirement for that.  I had spent all this

5    time trying to help improve the system, and now

6    the system was going to be sunset.  And it seemed

7    like a good time to try other projects.

8         Q.  So when you left the IRS in March of

9    2021, you had to give back your laptop.

10        A.  Yes.

11        Q.  Were you concerned that they might check

12   your laptop or be able to see any evidence of you

13   download- -- or uploading information?

14        A.  I knew they would check it, I mean, if

15   they needed to.  You know, so it wasn't something

16   I could really do anything about.

17        Q.  So you thought there was a possibility?

18        A.  Correct.

19        Q.  And then when you left the IRS in March,

20   did you hear from them in April or May or June or

21   July about your laptop -- they were concerned

22   about anything on your laptop?

CONFIDENTIAL

Page 233

1      A.  No.

2      Q.  When did you first hear from

3  investigators?

4      A.  November 1st, 2021.

5      Q.  And who was that?

6      A.  Two investigators from TIGTA showed up at

7  my doors and they wanted to know about my queries.

8      Q.  And what did they ask you?

9      A.  We'd like to, you know, speak with you

10 about the queries you ran.  They started talking

11 about some of them.

12          And that -- that was what they said in

13 their approach.

14     Q.  So they showed up unannounced in

15 November?

16     A.  That's right.

17     Q.  And they came to your home address?

18     A.  Yes.

19     Q.  And at this point, you'd been out of IRS

20 for five months, six months?

21     A.  Yeah.  That's about right.  No --

22     Q.  Seven --

CONFIDENTIAL

Page 234

1        A.   Seven months.

2        Q.   Seven months.

3        A.   Yeah.

4        Q.   Were you surprised that they were there?

5        A.   You know, it was not what I was hoping

6    for, I guess.  I didn't -- I didn't expect them to

7    come that day, you know, of any day, so that's a

8    surprise.

9             But I knew what I had done was not going

10   to just be ignored, if that's what you're asking.

11       Q.   When you said that they -- you testified

12   that they had asked you about the queries you ran.

13       A.   Yes.

14       Q.   What did they say about the queries?

15       A.   Well, they said stuff -- they described

16   pieces of the queries.  Select stars is I remember

17   one thing they said, which just means select all

18   the fields.  And that was about it.

19       Q.   And what did you say to them?

20       A.   I said I'm -- you know -- I said, you're

21   police, right?  They said, yes, essentially.  And

22   I said, well, I'm not going to talk to police

CONFIDENTIAL

Page 235

1    without an attorney present.

2           And that's how things got started with

3    the investigation, from my perspective.

4       Q.   How long were they there, the two agents?

5       A.   Ten minutes, if that.

6       Q.   And they did the talking, and you said, I

7    wasn't going to talk to you unless I have a

8    lawyer?

9       A.   Yes.

10      Q.   And then they left?

11      A.   Yes.  They gave me their card.  You know,

12   I told them I was going on a trip; do I need to

13   cancel the trip?  They said, no, that's fine.

14          Went on the trip, secured counsel, got

15   back in touch with them.

16      Q.   And was that Ms. Manning?

17      A.   Yes.

18      Q.   So you secured -- you hired Ms. Manning

19   in November or December of 2021?

20      A.   November.

21      Q.   November.  So shortly after.

22      A.   Yeah.

CONFIDENTIAL

Page 236

1      Q.  And you went on your trip.

2      A.  Uh-huh.

3      Q.  And I'm not going to ask you about any of

4  your conversations with Ms. Manning.

5          When was the next time you heard from

6  investigators?

7      A.  Through Ms. Manning?

8      Q.  Through Ms. Manning or directly.

9      A.  I mean, Ms. Manning spoke with

10 investigators, you know, so I heard from what they

11 told her.

12     Q.  Did you inform the TIGTA agents that you

13 had, in fact, collected this material, downloaded

14 the material, uploaded the material and disclosed

15 it at that time?

16     A.  No.

17     Q.  What did --

18     A.  I didn't say anything to them.

19     Q.  Your counsel was in communication with

20 the investigators at that time, though, right?

21     A.  Correct.

22     Q.  And from your perspective, having,

CONFIDENTIAL

Page 237

1    again -- I don't want to know anything about your

2    communications with her.

3            How long did this -- communications

4    between your counsel and the investigators last?

5    You said it started November or December 2021.

6    How long did it go on?

7        A.  Well, it essentially lasted in different

8    forms until October of last year.

9        Q.  So during the course of -- you pled

10   guilty, I believe, in October of 2023, correct?

11       A.  Uh-huh.

12       Q.  So your counsel first had contact with

13   TIGTA and you had contact with TIGTA in

14   November of 2021, right?

15       A.  Correct.

16       Q.  So in 2022, was it your understanding

17   that, during that year, your counsel was in

18   contact with the investigators?

19       A.  Yeah, I know when she was in contact with

20   them.  Yes.

21       Q.  Was that frequent or infrequent?

22       A.  Starts and stops.

CONFIDENTIAL

Page 238

1       Q.  Starts and stops.

2           And did you ever receive a subpoena?

3       A.  Yes.

4       Q.  When did you receive the subpoena?

5       A.  December or January.

6       Q.  Of 2021?

7       A.  Yeah.

8       Q.  What did they ask you for?  Just in

9   general.  I don't need the --

10      A.  Grand jury --

11          MS. MANNING:  May we take a brief break?

12          MR. BURCK:  Sure.  Sure.

13          VIDEO TECHNICIAN:  The time is 1:53 p.m.

14  We're off the record.

15          (A recess was taken.)

16          VIDEO TECHNICIAN:  The time is 2:03 p.m.

17  This begins unit number 4.  We're on the record.

18  BY MR. BURCK:

19      Q.  Mr. Littlejohn, before we broke, I was

20  asking about the timing of receiving a subpoena,

21  and you had said December or January of 2021.

22          Do you recall that?

CONFIDENTIAL

Page 239

```
 1        A.   Correct.

 2        Q.   Was this a subpoena from TIGTA?  Or do

 3   you know?

 4        A.   It was a subpoena from the Justice

 5   Department.

 6        Q.   From the Justice Department?  Okay.

 7        A.   Yeah.

 8        Q.   So was it a grand jury subpoena?

 9        A.   Yeah.

10        Q.   And was it the same office that

11   ultimately ended up prosecuting you?

12        A.   Different location, but the same people

13   were involved.

14        Q.   Oh, okay.  Which location was it?  Do you

15   remember?

16        A.   Utah.

17        Q.   Utah.  But the same people who were

18   ultimately involved in the plea and the

19   sentencing?

20        A.   Correct.

21        Q.   Okay.  And this grand jury subpoena, just

22   generally, what did it request?
```

CONFIDENTIAL

Page 240

1        A.  Appearance to answer questions.

2        Q.  So -- and this was in the December,

3    January --

4        A.  That was -- yeah, that first appearance

5    was to be January 17th or something --

6        Q.  Of 2022?

7        A.  2022.

8        Q.  Right.  Okay.

9        A.  And then it was canceled because somebody

10   on the grand jury had COVID.  And then we -- it

11   was rescheduled for early March, like March 2nd, I

12   think, of 2022.

13       Q.  Was it a grand jury in Utah or was it

14   here?

15       A.  Utah.

16       Q.  In Utah.  So you had to -- you were

17   supposed to go out to Utah to appear?

18       A.  Yes.

19       Q.  And it was for testimony and documents or

20   just testimony?

21       A.  Testimony.

22       Q.  Just testimony.  Okay.

CONFIDENTIAL

Page 241

1          And you said that the first time -- the

2    first appearance was supposed to have been on

3    January 17th?

4          A.  That's my recollection.

5          Q.  And then it was -- it was postponed

6    because of an illness; is that --

7          A.  Somebody on the grand jury was sick.

8          Q.  Was sick.  Right.  And then it was

9    rescheduled for March.

10         A.  Yes.

11         Q.  March of 2022.

12         A.  Yes.

13         Q.  Did you go to Utah for this appearance?

14         A.  Both times, yes.

15         Q.  All right.  So you went the first time

16   and then they canceled?

17         A.  The morning of.

18         Q.  I apologize for that.

19              And then in March you go and the grand

20   jury is going to convene?

21         A.  That's correct.

22         Q.  And you went into the grand jury room --

CONFIDENTIAL

Page 242

1    your lawyer was with you up until you go into the

2    grand jury, correct?

3         A.  Yes.

4         Q.  And then you go in by yourself --

5         A.  Yes.

6         Q.  -- or with the prosecutors, correct?

7         A.  Yes.

8         Q.  And your lawyer is not allowed in the

9    room, correct?

10        A.  The lawyer is not allowed in the room.

11        Q.  And there are 23 citizens from Utah in

12   the room?

13        A.  Correct.

14        Q.  And then the prosecutors are in the room.

15        A.  Yes.

16        Q.  And did they start asking you questions

17   about the unauthorized disclosure of Mr. Trump's,

18   as well as the 7500 people's, taxpayers', returns?

19        A.  I don't recall all the specific

20   questions.  They definitely were asking about

21   ProPublica.

22        Q.  ProPublica.

CONFIDENTIAL

Page 243

1      A.  And I just answered by pleading the 5th.

2      Q.  You took the 5th?

3      A.  I took the 5th.

4      Q.  And you understand that to mean what?

5      A.  I have a right to not incriminate myself

6   before a court.

7      Q.  And this was in March of 2022.

8      A.  That's right.

9      Q.  And the questions that you took the 5th

10  to -- you answered your name.

11     A.  I answered my name, answered I worked at

12  Booz Allen, that sort of thing.

13     Q.  And you answered basic biographical

14  information, job description?

15     A.  That's right.

16     Q.  But any question that they asked that

17  would tend to incriminate you about the disclosure

18  of the information to ProPublica, you took the

19  5th?

20     A.  That's right.

21     Q.  And was it a series of answers where you

22  took the 5th --

CONFIDENTIAL

Page 244

1      A.  Yes.  Each --

2      Q.  -- or was it one time?

3      A.  -- question that -- I answered what I

4  felt like I could and then I responded with the

5  5th on the others.

6      Q.  Did they show you any documents in that

7  grand jury appearance?

8      A.  No.

9      Q.  And roughly how long were you there?

10     A.  20 minutes.

11     Q.  20 minutes.  Did they ask you about the

12  New York Times?

13     A.  I don't recall.

14     Q.  Okay.  But definitely ProPublica.

15     A.  Yeah.

16     Q.  All right.  So it was over in 20 minutes.

17  You left with your lawyer.

18     A.  That's right.

19     Q.  And then after that, that grand jury

20  appearance, did they subpoena you again?

21     A.  Well, they tried to say that I didn't

22  have a right to take the 5th on these issues, and

CONFIDENTIAL

Page 245

1    then the judge in Utah said, no, actually, that's

2    the right that he has and maintains and used

3    correctly.  And then that was all I heard for a

4    while.

5         Q.  So when you said that they tried to say

6    you didn't have the right to take the 5th --

7         A.  That's right.

8         Q.  -- there was litigation about this?

9         A.  Yes.

10        Q.  And the litigation was in Utah?

11        A.  Yes.

12        Q.  And the government's position was you

13   didn't have the right to take the 5th because of

14   what?

15        A.  I don't know.  I thought it was open and

16   shut.

17        Q.  Okay.

18        A.  And the judge agreed.

19        Q.  And do you remember what their argument

20   was?  I know you're not a lawyer, but you're

21   obviously very smart.

22        A.  Just say -- just compelled; you know, we

CONFIDENTIAL

Page 246

1    should compel him because -- I don't know.

2         Q.  Were they trying to immunize you?

3         A.  No.

4         Q.  Okay.  I confess, I don't know what their

5    argument would be either.

6         A.  You should see some of the stuff.

7         Q.  So there's litigation.  The judge hears

8    your side through Ms. Manning.  They hear the

9    government through the government's lawyers.

10   Judge decides you're right --

11        A.  Yeah.

12        Q.  -- you can take the 5th.

13        A.  Yeah.

14        Q.  And this happens, like, March, April, May

15   time frame?

16        A.  March.

17        Q.  March.  Oh, it was all --

18        A.  I think all in March.

19        Q.  Same time?

20            THE WITNESS:  Sorry.

21            MR. BURCK:  Sorry, we apologize.

22

CONFIDENTIAL

Page 247

1    BY MR. BURCK:

2        Q.  So it all happens in March?

3        A.  It does.

4        Q.  Did they -- did the government try to

5    litigate the issue while you were still in Utah?

6        A.  No.

7        Q.  Okay.  So it was sometime after, but it

8    was shortly after?

9        A.  I had a flight to catch.

10       Q.  Okay.  And do you know if those arguments

11   were under seal?

12       A.  I don't know.

13       Q.  Do you know if it was called In Re: Grand

14   Jury?

15       A.  I've never heard the term.

16       Q.  Okay.  All right.  So then you said that

17   you didn't hear from the government for a while

18   after that.

19       A.  That's right.

20       Q.  How long before you heard from them

21   again, to your knowledge?

22       A.  I don't think we heard from them until

CONFIDENTIAL

Page 248

1    they came to my house again, prepared.

2         Q.  They came to your house again?

3         A.  Yes.

4         Q.  When did they come to your house again?

5         A.  January 7th -- no, sorry.  July 7th,

6    2023.

7         Q.  So about a year and a few months -- four

8    months -- later, they came back.

9             So you didn't hear from them for a year

10   and four months?

11        A.  That's right.

12        Q.  And that was after they litigated and

13   lost --

14        A.  Yep.

15        Q.  And they came to your door to ask you

16   questions?

17        A.  No, they didn't need to ask me any

18   questions.

19        Q.  Why didn't they need to ask you

20   questions?

21        A.  They had a warrant.

22        Q.  Okay.  So they had a search warrant?

CONFIDENTIAL

Page 249

1      A.   That's right.

2      Q.   And how many agents showed up?

3      A.   20, 30.

4      Q.   And they were, what, IRS agents?  FBI?

5      A.   They were mostly TIGTA agents.  Yes.

6      Q.   Mostly TIGTA?  Okay.

7           And it was at your home here in the DMV?

8      A.   Yes.  At my domicile.

9      Q.   At your domicile.  Okay.

10           Were you living with anyone at the time?

11      A.   Yes.

12      Q.   With your girlfriend?

13      A.   Yes.

14      Q.   All right.

15      A.   But she had been called in to work that

16   day.

17      Q.   Okay.  And she also -- she worked at the

18   IRS or --

19      A.   As a contractor.  Yes.

20      Q.   As a contractor.  Okay.

21           So I assume -- without telling me what

22   you said, you contacted your attorney when they

CONFIDENTIAL

Page 250

1    showed up with a search warrant?

2         A.  Yes.

3         Q.  All right.  And they proceeded to search

4    your home?

5         A.  Yes.

6         Q.  What did they take, as far as you know?

7         A.  They took devices, all electronic

8    devices, basically, phones, iPods [sic],

9    PlayStations, computers.

10        Q.  Did they -- they showed you what was

11   listed as the items they were allowed to take?

12        A.  There was a -- they didn't have a list of

13   specific items; they just said that we can take

14   these items, and then they gave me a list of what

15   they took.

16        Q.  Okay.

17        A.  Because they didn't know everything that

18   they were going to get.  They took, you know, my

19   girlfriend's stuff, too.

20        Q.  Okay.  And did you speak to any of the

21   agents other than just, you know -- I'm talking

22   about substantively speak to them --

CONFIDENTIAL

Page 251

1      A.  No.

2      Q.  -- about the case.

3          Okay.  They didn't ask you any questions?

4      A.  Huh-uh.

5      Q.  Okay.

6      A.  Well, I was, like, am I being arrested?

7          They said no.

8      Q.  Right.  Did Ms. Manning come to your

9  home?

10     A.  No, we just -- I met up with her.

11     Q.  Okay.  How long were they there?

12     A.  Three hours, at least.  Four, maybe.

13     Q.  And they take all -- they take the

14  devices, the stuff that they said they had a right

15  to take --

16     A.  Yep.

17     Q.  -- and then they exit?

18     A.  Uh-huh.

19     Q.  At that point, were you concerned that

20  the devices that were taken by them would have

21  information on them that would link you to the

22  disclosures of the tax return information?

CONFIDENTIAL

Page 252

1      A.  I didn't know what to think.  I didn't

2   think at the time that, you know, anything had

3   been on the devices that were in my possession.

4   So yeah, that was my -- but I still, you know, was

5   concerned by what had happened, because you can

6   never be too sure.

7      Q.  Right.  When was the next time that you

8   are aware the government reached out to you or

9   your lawyer, without telling me anything your

10  lawyer said?

11     A.  I mean, immediately after.

12     Q.  Immediately after?

13          And what was your under- -- unless your

14  lawyer told you, what -- did you have an

15  understanding, independent of your lawyer, of what

16  they wanted to talk to you about?

17     A.  I don't -- the timeline is becoming a

18  little jumbled for me.  I'm not sure what, you

19  know, happened immediately after with respect to

20  what they wanted to ask me about.  I don't think

21  they wanted to ask me anything.

22     Q.  Okay.  Did you go back to the grand jury?

CONFIDENTIAL

Page 253

1          A.   No.

2          Q.   Did you get any kind of additional

3     subpoena?

4          A.   No.

5          Q.   At some point, did you meet with the

6     government?

7          A.   Yes.

8          Q.   And you met with them twice, I think,

9     right?

10         A.   Yes.

11         Q.   The first time, just so we don't have to

12    do a memory test -- well, I don't know if this is

13    the actual date, but September 13, 2023; is

14    that --

15         A.   That sounds about right.

16         Q.   And you were meeting with prosecutors and

17    TIGTA --

18         A.   Correct.

19         Q.   -- agents?

20         A.   Yes.

21         Q.   And how many were present?  Just roughly.

22         A.   Five?

CONFIDENTIAL

Page 254

1        Q.  And your counsel was present?

2        A.  Yep.

3        Q.  And what was the purpose of that meeting?

4        A.  It was a proffer session.

5        Q.  What's a proffer session?

6        A.  That's where you go in and tell them what

7    you know.

8        Q.  Do you know if you had a proffer

9    agreement?

10       A.  Yes.

11       Q.  Okay.  And what's a proffer agreement?

12       A.  Well, you write it up.  And my

13   understanding is that if whatever plea deal falls

14   through, the proffer session is not going to be

15   used to, you know, incriminate you in a court of

16   law.

17       Q.  So the -- you had decided at this point

18   to talk to the prosecutors and to the agents --

19       A.  Correct.

20       Q.  -- as opposed to the grand jury, where

21   you had taken the 5th.

22       A.  Correct.

CONFIDENTIAL

Page 255

1        Q.  And can you tell us -- again, without

2    disclosing any advice you received from your

3    lawyer -- why you decided to do that?  If you

4    can't without disclosing advice you received from

5    your lawyer, don't tell me anything.

6        A.  They had the upper hand.

7        Q.  Why do you say that?

8        A.  I don't know how much more I can go into

9    it.

10       Q.  If it's advice -- if it's anything --

11   communication just from your lawyer, do not tell

12   me.

13           THE WITNESS:  Can we take a little break?

14           MR. BURCK:  Sure.  Sure.

15           THE WITNESS:  Thanks.

16           VIDEO TECHNICIAN:  The time is 2:16 p.m.

17   We're off the record.

18           (A recess was taken.)

19           VIDEO TECHNICIAN:  The time is 2:21 p.m.

20   We're on the record.

21   BY MR. BURCK:

22       Q.  Mr. Littlejohn, before we took a break I

CONFIDENTIAL

Page 256

1    asked you why you decided to talk to the

2    prosecutors in September of 2023, and you answered

3    they had the upper hand.

4          Then I asked you, without going into

5    advice you received from your lawyer, can you tell

6    us your motivation for deciding to talk to them at

7    that point.

8          A.   Primarily, I wanted to come clean, take

9    responsibility for my actions.  I, at the outset,

10   objected to the government's characterization that

11   I thought I was above the law.  I never thought I

12   was above the law.  And at this point, I was ready

13   to take responsibility.

14         Q.   Okay.  How long, roughly, was that first

15   meeting, that first proffer?

16         A.   It was long.  All day, essentially.

17         Q.   All day.  Okay.  And without telling me

18   everything you talked to them about, just tell

19   me -- generally summarize what your discussion was

20   with them.  What did they ask you about?  What did

21   you say?  In very high-level terms.

22         A.   It was questions similar to the ones that

CONFIDENTIAL

Page 257

1    we've been going over with you today.  And they --

2    in addition, we did walk through the code and

3    queries that I had put together.  The agent had an

4    understanding --

5            MS. SMITH:  So we're just going to object

6    to the extent that this is getting into stuff that

7    is protected by the law enforcement investigative

8    privilege.  To the extent he's going to talk about

9    questions that TIGTA agents asked him about codes

10   and data queries, that starts to get into

11   privileged information.

12           MR. BURCK:  Without conceding that the

13   privilege applies, I'll only ask him what his

14   answers were.

15           MS. SMITH:  Okay.

16   BY MR. BURCK:

17       Q.  So, yeah, just tell us -- without telling

18   us what they asked you specifically, can you just

19   tell us what you discussed?  Which I think you've

20   already answered to some extent, but whatever

21   detail you can give us.

22       A.  We discussed the execution of the crime

CONFIDENTIAL

Page 258

1    in specific detail as it relates to code and IRS

2    systems.

3         Q.  Okay.  And you talked about ProPublica

4    and you talked about New York Times?

5         A.  Yes.

6         Q.  Did they show you any documents during

7    this meeting?

8         A.  The only things I remember seeing were

9    code, my own code.  They showed me that.

10        Q.  And where did that code come from, as far

11   as you know?

12        A.  From the IRS systems that I was using.

13        Q.  And so this was the code that they were

14   able to recover --

15        A.  Correct.

16        Q.  -- from their investigation of your

17   laptop and your access?

18        A.  Not from the laptop but from other IRS --

19        Q.  Other IRS --

20        A.  -- systems.  Yeah.

21        Q.  -- systems.

22             Did you admit that you had access to this

CONFIDENTIAL

Page 259

1    information and then disclosed it to the New York

2    Times and to ProPublica?

3         A.  Yes.

4         Q.  Sand that was on September 13th, 2023.

5              And I believe end of that month you

6    pleaded guilty?

7         A.  Correct.

8         Q.  And so your counsel and the government

9    worked out a plea agreement, correct?

10        A.  Yes.

11        Q.  And then you appeared in front of Judge

12    Reyes?

13        A.  Yes.

14        Q.  And you pleaded guilty?

15        A.  Yes.

16        Q.  And I believe that you pleaded guilty to

17    one count -- one felony count.

18        A.  Correct.

19        Q.  You then had another proffer with the

20    government in December, correct?

21        A.  Correct.

22        Q.  Can you tell us what that was about?

CONFIDENTIAL

Page 260

1      A.  It was basically more detail around any

2  pending technical questions.  So I helped them

3  better understand some of the processes that, you

4  know, I went through.

5      Q.  You're saying technical issues around the

6  way that you accessed the information?

7      A.  They went through -- yeah --

8      Q.  Don't tell me what they asked you --

9      A.  Yeah.

10     Q.  -- just give me what you -- I know it's

11 hard to do that, but just give me what you

12 answered.

13     A.  They just wanted to know more about the

14 commission of the crime, essentially.  They asked

15 more detailed questions.

16     Q.  Right.  They wanted to know how you did

17 it.

18     A.  Yes.

19     Q.  In greater technical detail.

20     A.  Yes.

21     Q.  And you gave them that information.

22     A.  Yes.

CONFIDENTIAL

Page 261

1      Q.  And it was what you had told us today,

2    that you accessed the database from your laptop,

3    you uploaded it to a private website, and then you

4    put it on a flash drive?

5      A.  Yes.

6      Q.  Did they ask you anything else about that

7    process beyond -- or let me ask it this way.

8           Did you tell them anything else about the

9    process that you did not tell us today?

10     A.  Not about that process, no.  It's more

11   like, you know, when did this happen, when were

12   these communications, what did you do here and

13   there?

14          And insofar as I've explained in great

15   detail to you what and how things were done, it

16   roughly matches up.

17     Q.  Right.

18     A.  But I can't speak to all the specifics.

19     Q.  Understood.

20          And did they show you documents,

21   communications, or anything else that you had with

22   ProPublica or others?

CONFIDENTIAL

Page 262

1        A.  They did.  Yes.

2        Q.  Did they show you documents with anybody

3    inside the IRS?  Any communications with people

4    inside the IRS?

5        A.  No, they didn't, I don't believe.

6        Q.  So it was with ProPublica and New York

7    Times --

8        A.  Yes.

9        Q.  -- principally?

10        Did they show you any documents or

11    communications you had with anyone other than

12    New York Times or ProPublica reporters?

13        A.  Not that I recall.

14        Q.  Did they ask you about -- I think that

15    the government said at the sentencing that you had

16    provided information for them on how to improve

17    the security systems of the IRS.

18        A.  These were --

19        Q.  Do you recall --

20        A.  -- my opinions.

21        Q.  But you recall the government said that

22    at the sentencing?

CONFIDENTIAL

Page 263

1          A.   Uh-huh.

2          Q.   And that was --

3          A.   Yes.

4          Q.   -- true?

5          A.   Yes.

6          Q.   And that was -- they -- without telling

7     me what they asked you, did they request

8     information like that from you?

9          A.   Yes.  Well, I was ready to offer it,

10    whether they requested it or not.

11         Q.   Okay.  So --

12         A.   They seemed --

13         Q.   Go ahead.

14         A.   They seemed to have already made strides

15    at that point, so -- I don't know how much I

16    added, besides my opinion.

17         Q.   Okay.  And what was your opinion that you

18    expressed to them about improving the security

19    systems at the IRS?

20         A.   Mostly about being aware of when people

21    are -- you know, when trusted personnel are

22    working, what work hours they are supposed to be

CONFIDENTIAL

Page 264

1  working versus the ones they actually are working.

2      Q.  Is that because you had been working

3  outside of normal hours when you uploaded the

4  material?

5      A.  Yes.

6      Q.  Okay.

7      A.  The job was a full-time job.

8      Q.  Okay.

9      A.  So I very well couldn't do it during the

10  job.

11      Q.  Right.  Because it took effort to

12  compress it and to upload it and everything.

13      A.  Correct.

14      Q.  Okay.  Did you have any other

15  recommendations that you made to them?

16      A.  None that are anything but my own

17  opinion.

18      Q.  What -- but what was your opinion -- what

19  did you express to them?  What was your opinion

20  that you told them?

21      A.  Well, I opined on the risks of

22  contractors versus salaried employees.

CONFIDENTIAL

Page 265

1       Q.   Okay.  And what else did you tell them?

2       A.   That's about it.

3       Q.   And going back to the point about

4    watching out for people working outside of --

5       A.   Yeah.

6       Q.   -- normal business hours, what were

7    normal business hours?  9:00 to 5:00?  Is that --

8    or --

9       A.   That's right.

10      Q.   -- 8:00 to 5:00 --

11      A.   And, you know, of course, we had people,

12   Paul Wight, manager, three time zones away.  So

13   overlapping with him in different respects, you

14   know, would extend it or not extend it, you know.

15      Q.   And did you give them any recommendations

16   on how they would go about doing that, to monitor

17   whether or not people were working outside of

18   normal business hours?

19      A.   None beyond, you know, just the

20   suggestion that it would have been -- or -- there

21   was one more thing.  I'm remembering.  Can I speak

22   to that?

CONFIDENTIAL

Page 266

1        Q.  Of course, yeah.

2        A.  One thing that they, I think, had already

3    decided to do, which I was in agreeance [sic]

4    that -- I mean, they said something that they had

5    taken as a security precaution, which I said,

6    yeah, that would have been a -- that would have

7    made me think twice about, you know, this whole

8    thing, was basically randomly auditing people's

9    activity.  And just, you know, that threat of

10   having to describe what they're doing as -- would

11   have been difficult for me to deal with.

12       Q.  So just so I understand, that -- your

13   understanding was that it was a good practice to

14   randomly audit or let people know that there would

15   be random audits to deter people from accessing

16   information the way that you did and then

17   disclosing it?

18       A.  Correct.

19       Q.  Did you express any views yourself about

20   how to do that, to audit people?

21       A.  No.  I mean, it -- they know their own

22   systems.  They can figure it out.

CONFIDENTIAL

Page 267

1      Q.  Any other recommendations that you made?

2      A.  Not that I can recall at this point.

3      Q.  Did you ask your views on any other

4  features or security improvements that they were

5  considering or that they had made?

6      A.  No.  But I think that the mere

7  description of events and, you know, how I went

8  about the crime gave them enough to work with to,

9  you know, try to prevent similar things in the

10 future.  Certainly some way to prevent private

11 websites, you know, from being used to facilitate

12 exfiltration of data is now on their radar, if not

13 already solved as a problem.

14     Q.  Okay.  And that meeting, was that all

15 day, too, or was that less time?

16     A.  I'm mixing and matching between the two

17 meetings.

18     Q.  Okay.  Got it.

19     A.  Sorry.

20     Q.  All right.  The second meeting, how long

21 was it, roughly?

22     A.  It was also long.  It was dark by the

CONFIDENTIAL

Page 268

1    time I got out.

2         Q.  Okay.  And did you see any of the agents

3    taking notes while -- or typing?

4         A.  Yes.

5         Q.  Okay.  Have you ever seen any of those

6    notes?  Not your lawyer's notes.  Their notes.

7         A.  I've seen some of their notes.  I mean,

8    I've seen what they put together.  I don't know --

9    I mean, what we did see -- so, yeah, this were,

10   like, that is what you've said; look it over, make

11   sure it's correct.

12        Q.  Okay.

13        A.  More or less.  So a few points where I

14   said, actually, this is what I meant by this.

15        Q.  Did they do that at the meeting or did

16   they do it afterwards or both?

17        A.  This was afterwards.  I think this -- I'm

18   trying to recall if there was -- if it was at the

19   second meeting that they had -- they were asking

20   questions, basically, about the first meeting,

21   essentially.

22        Q.  Okay.

CONFIDENTIAL

Page 269

1          A.   And so that involved a transcript of the

2      first meeting.   I was able to respond to some

3      things.

4          Q.   Okay.   And then I guess we come to your

5      sentencing.

6               And your sentencing is in end of

7      January of this year, January 29th.

8          A.   Correct.

9          Q.   Did you have any other meetings with the

10     government other than the two that you referenced?

11         A.   No.

12         Q.   And I think that the judge imposed a

13     five-year sentence on you.

14         A.   Correct.

15         Q.   And --

16         A.   Plus three years of --

17         Q.   Of supervised --

18         A.   -- supervised release, and a fine.

19         Q.   And when do you have to report for -- or

20     self-surrender?

21         A.   May 1st.

22         Q.   May 1st?   Okay.

CONFIDENTIAL

Page 270

1          Okay.  I'm going to move on to a couple

2    more topics.  We're kind of getting toward the

3    end, at least of my questioning, just to give you

4    some orientation.

5          I'm going to ask you about some documents

6    that I wanted to see if you are aware of.  And I'm

7    going to have to just describe them in general to

8    you.

9          Are you aware of screen shots that the

10   government has between you and reporters at

11   ProPublica?

12        A.  Yes.

13        Q.  Did they show them to you?

14        A.  Yes.

15        Q.  And they were -- they were authentic.

16   You had actually written those or received those.

17        A.  Correct.

18        Q.  And you had a Twitter account that you

19   used to communicate with ProPublica?

20        A.  That was the afore-mentioned automated

21   dissemination of the password was the Twitter

22   account.

CONFIDENTIAL

Page 271

1     Q.  I see.  Okay.  So that's how you had

2   initially transferred the password for originally

3   a February --

4     A.  Yes.

5     Q.  -- but you gave it to them orally in

6   November.

7     A.  Yes.

8     Q.  Okay.  Did you use the Twitter account

9   for anything other than the password?

10    A.  No.

11    Q.  Did they show any documents to you about

12  the Twitter account when you met with them?

13    A.  No.

14    Q.  And you're aware that -- your counsel, of

15  course, was in communication with the government,

16  correct?

17    A.  Yes.

18    Q.  And are you aware that your counsel

19  communicated with them in writing by e-mail?

20    A.  I can only imagine.

21    Q.  Did you use any other online service

22  accounts to communicate with anybody about the

CONFIDENTIAL

Page 272

1   topics we've discussed today?  ProPublica,

2   New York Times disclosures.

3        A.  Proton Mail.

4        Q.  Proton Mail?

5        A.  Yeah.

6        Q.  And what did you use that for?

7        A.  That was the -- putting the data files in

8   the drafts folder.  And it's also -- I think

9   that's primarily what it was used for.  Yeah.

10        Q.  Okay.

11        A.  Also it was -- I think it -- it was,

12  like, the account that was connected to the phone.

13  The phone needed an e-mail account.

14        Q.  To your phone?  Okay.

15             And I think you mentioned also that you

16  had -- they had -- or actually, I'm sorry, the

17  government said, I think, at the sentencing that

18  you had provided access -- no, I'm sorry.  You had

19  said, through your counsel at sentencing, that you

20  had provided them devices they otherwise would not

21  have been able to get.

22        A.  Correct.

CONFIDENTIAL

Page 273

1        Q.   What were those devices?

2        A.   There was a flash drive, a hidden flash

3   drive, that, you know, contained the records that

4   were shared with both news outlets.  And, you

5   know, we thought that knowing that part of the

6   cleanup from this would be involved -- would -- on

7   the IRS side, they'd have to notify people,

8   essentially.  I thought this might be helpful to

9   them.

10       Q.   And they didn't discover the flash drives

11  in the search of your house?

12       A.   It wasn't -- they weren't in my house.

13       Q.   Where did you keep them?

14       A.   In the lining of a box that contained an

15  ornamental camel.

16       Q.   I'm sorry, a what?

17       A.   It was a box with a camel --

18       Q.   With a camel?  Okay.

19       A.   -- inside that had been in -- up until a

20  few weeks -- a few days before we had notified the

21  investigators of the existence of this camel box,

22  it had been in a house that I had used to rent a

CONFIDENTIAL

Page 274

1   room in, it had since been sold to a woman in

2   Pennsylvania, but they were able to track down

3   this woman and retrieve the box and --

4       Q.   So the --

5       A.   -- a subsequent flash drive.

6       Q.   So the box was now with the woman who had

7   bought the house --

8       A.   No, just bought the box.

9       Q.   Just bought the box?

10      A.   Yes.

11      Q.   I see.  And so then you retrieved it --

12          MS. MANNING:  The day prior, on Facebook

13  Marketplace.

14          MR. BURCK:  Ah.  Okay.

15  BY MR. BURCK:

16      Q.   The day prior -- so the day prior on

17  Facebook Marketplace, you retrieved it from her --

18      A.   No.  It was sold to her by somebody that

19  was living in the house.

20      Q.   I see.

21      A.   We didn't know that that was going to

22  happen.  And then investigators locate her and

CONFIDENTIAL

1    tracked down the camel in the box --

2         Q.  I see.  You told the investigators --

3    because it was --

4         A.  I said I thought it was in the house.

5         Q.  Right.

6         A.  Wasn't in the house --

7         Q.  And they found her.

8         A.  They found her.

9         Q.  Okay.  And they got it back and they

10   confirmed to you that they had retrieved the flash

11   drive.

12        A.  Correct.

13        Q.  Any other devices that you think they

14   would not have found but for your assistance?

15        A.  There was another flash drive that had

16   additional -- it had information on it from just

17   after the Trump -- just from the Trump data pull,

18   the initial one, that we were able to tell them

19   the location.

20        Q.  Okay.  And that was not also in the

21   house.  That was someplace else.

22        A.  Someplace else.

CONFIDENTIAL

Page 276

1      Q.  And they retrieved it.

2      A.  They did.

3      Q.  There's also some reference in some of

4  the filings in court that you had a journal?

5      A.  Yes.  This was also on the flash drive

6  within the box.

7      Q.  Okay.  And the journal was your private

8  thoughts about your life?

9      A.  Correct.  And mostly this case --

10      Q.  Oh, and mostly this case?

11      A.  This stuff, yeah.

12      Q.  And when did you start keeping the

13  journal?

14      A.  It was 2020 January.  So there's a large

15  amount of time that's not covered by it --

16      Q.  All right.

17      A.  -- or wasn't covered by it.  But it

18  basically documented the time from January to

19  September of that year, 2020.

20      Q.  So it was only from January to December

21  of that year, 2020?

22      A.  September.

CONFIDENTIAL

Page 277

1          Q.  September of that year?

2          A.  Yes.

3          Q.  And just remind me -- I'm sorry, the

4     dates are -- January of 2020 was when the -- when

5     you had met with the New York Times --

6          A.  Yes.

7          Q.  -- again, right?

8          A.  Yes.

9          Q.  Okay.  And then September is when they

10    published?

11         A.  Yes.

12         Q.  Why did you start keeping a journal then?

13         A.  I had read a book recently that was a

14    collection of journal entries, essentially, and I

15    really enjoyed the book.  I thought it would be

16    useful to just keep journal entries, you know, for

17    the future.

18         Q.  Okay.  But you wanted it to be -- it was

19    specifically -- well, about what had happened with

20    the New York Times and ProPublica?

21         A.  Yes.  For some portion of that time.

22         Q.  Okay.  And I'm sorry, which flash drive

CONFIDENTIAL

Page 278

1   was that on?

2        A.   The one inside the ornamental camel box.

3        Q.   Okay.  Did you remember, when you told

4   them that -- to go look for it, that the journal

5   was on that?

6        A.   Yes.  I --

7        Q.   Did you -- go ahead.  I'm sorry.

8        A.   I also wanted to demonstrate, you know,

9   honesty, I think, to them.  You know, if I'm

10  coming forward, I'm saying all these things, how

11  do they know to trust me?  Well, here's this, you

12  know, flash drive with all my most private

13  thoughts; you can take a look at it; it's fine.

14       Q.   Right.  Okay.  But it ended in

15  September of 2020.

16       A.   That's right.

17       Q.   Did you keep any other journals after

18  that?

19       A.   No.

20       Q.   Is there any other devices or any other

21  information that you told them about that they

22  didn't recover from the search?

CONFIDENTIAL

1     A.  No.

2     Q.  So did you know who Ken Griffin was

3  before you started investigating high-net-worth

4  Americans?

5     A.  I've thought about this question.  I read

6  the Business Press.  You know, I'm sure I came

7  across his name.

8         But it wasn't until the media around the

9  GameStop stuff that I -- you know, okay, that's

10  the Citadel guy.

11     Q.  That was early 2021?

12     A.  That's right.

13     Q.  And that was before, I think, ProPublica

14  had published its articles about the 7500 people,

15  correct?

16     A.  Correct.

17     Q.  When you first heard -- or kind of -- you

18  came -- you know, you knew who Ken Griffin was,

19  through GameStop, did you think that he was

20  probably in that group of people that you had

21  provided information to ProPublica about?

22     A.  I actually didn't know because, you know,

CONFIDENTIAL

Page 280

1    the first article didn't -- I don't recall it

2    containing his name.  I might be wrong.  But it

3    really wasn't until later that I became aware that

4    he was, you know, in this set of reporting.

5    Because I didn't read any additional articles past

6    the first two.

7            So it really -- reading a news report

8    about him suing the IRS was the first time I

9    realized that he was, you know, in this

10   disclosure.

11       Q.  You anticipated my next question.  I was

12   going to ask when did you first learn about the

13   lawsuit?

14       A.  Like I said, whenever it happened.  I

15   don't know the exact date.

16       Q.  Okay.  I don't remember exactly myself,

17   but I think it was in 2022.

18       A.  Okay.  That sounds about right.

19       Q.  Late 2022.  Okay.

20            And you read about it in the newspaper?

21       A.  Uh-huh.

22       Q.  And -- so at that point, did you believe

CONFIDENTIAL

Page 281

1    that his information had been disclosed to

2    ProPublica?

3        A.  Yeah, I could only imagine it would have

4    been in there.

5        Q.  And that -- so the lawsuit was filed in

6    December of 2022.

7        A.  That's what I recall.

8        Q.  Right.  And so at that point, just to

9    orient myself in time, this was -- this was after

10   you had been in the grand jury --

11       A.  Yes.

12       Q.  -- and you'd taken the 5th on the topics

13   relating to ProPublica and the New York Times, but

14   before you had heard anything from TIGTA after

15   that --

16       A.  Correct.

17       Q.  -- period.  Okay.

18           Now, when you met with the government in

19   those two proffer sessions, did they say anything

20   to you about the lawsuit?

21       A.  Not to me directly, no.  I don't -- it

22   was not a topic of conversation.

CONFIDENTIAL

Page 282

1      Q.  Okay.  When you say not directly, what do

2   you mean?

3      A.  We had our session, you know, and I don't

4   think there were any specific questions about Ken

5   Griffin in the session.

6           And I can't speak to, you know, things

7   that were said outside the session or during the

8   breaks.

9      Q.  Did you have a direct -- without -- no

10  conversations between you and your lawyer alone,

11  but did you have any conversations with the

12  government on breaks, outside the session, where

13  they mentioned Ken Griffin's lawsuit?

14     A.  No.

15     Q.  You did say that you -- that -- well,

16  when you said indirectly -- you used the

17  word "indirectly" -- was there any kind of

18  indirect reference to --

19     A.  I was not -- these were not conversations

20  that I was a part of, so I don't -- I don't recall

21  specifics.

22     Q.  Okay.  Did you hear about any

CONFIDENTIAL

Page 283

1   conversations from someone other than your lawyer?

2       A.  I don't recall specifics.  And I don't

3   recall it being a subject of conversation.

4       Q.  Okay.

5       A.  That's what I remember.

6       Q.  Okay.  Leading up to your sentencing,

7   there were, I think, six victim statements.

8           Do you recall that?

9       A.  Yes.

10      Q.  And I think Senator Scott stood up as a

11  victim and said some words to the court.

12          Do you remember that?

13      A.  Yes.  We spoke after.

14      Q.  In the context of the victim -- again,

15  without discussing anything that you had with

16  your -- any discussions you had with your lawyer,

17  were there any discussions of the victims,

18  including Ken Griffin, with the government or

19  anybody who wasn't your lawyer?

20      A.  No.  You mean at sentencing?

21      Q.  Or before.

22      A.  Not that I recall.

CONFIDENTIAL

Page 284

1      Q.  Okay.

2           MR. BURCK:  Give me one second.

3           All right.  I'm just going to -- we're

4      coming even closer to the end.

5      BY MR. BURCK:

6      Q.  I just want to talk briefly about the

7      Government Exhibit -- I'm sorry, Plaintiff's

8      Exhibit 5, which is the transcript of the

9      sentencing.  And I'm going to ask you to turn to

10     page 26.

11          So actually, let's start on page 25, very

12     bottom of page 25.

13          So again, this is a transcript of the

14     sentencing that happened on January 29th.

15          Mr. Jacobson is one of the prosecutors,

16     as we talked about earlier.  I'm just going to

17     read some of what he wrote here -- or he said here

18     that was transcribed:  So over the course of two

19     years, the defendant, who is an experienced and

20     successful professional, was entrusted with access

21     to Americans' unmasked taxpayer data.

22          And the next sentence is, He repeatedly

CONFIDENTIAL

Page 285

1    abused that trust by stealing and disclosing

2    thousands of citizens' tax returns and return

3    information.  The disclosures were intended to

4    damage his victims' reputations, and through that

5    criminal damage, he sought to influence an

6    election and to reshape our nation's political

7    discourse and political process.

8            Do you agree with that last sentence?

9       A.  I don't think damaging the victims'

10   reputation was really ever a primary goal.

11       Q.  Was it a goal, even if it was a minor

12   one?

13       A.  No.  Because, A, I -- I mean, really, in

14   both cases, I didn't have -- I didn't know what

15   was the contents of, you know, these tax returns

16   or tax return information.  And especially in the

17   case of the 7500 individuals, I don't think

18   anybody could be faulted for trying to pay, you

19   know, the least amount of money to the IRS.  This

20   is the code.  This is the law.  If anything,

21   it's -- this is about Congress' responsibility.

22   It has nothing to do with the victims, except

CONFIDENTIAL

Page 286

1  insofar as it breached their privacy, which I

2  freely admit that I did.

3      Q.  And to that point, I think on -- if you

4  go down to line 18 on the same page, Mr. Jacobson

5  says, But the harm wasn't even limited to the

6  victims whose data the defendant stole.  The

7  damage is more extensive.  All Americans are

8  obligated to provide an enormous amount of

9  financial information about their private lives to

10  the IRS -- to the government.  And in exchange, in

11  turn, what we expect from the government and what

12  we expect from the IRS is that they will secure

13  the data.  They will protect the data.  The

14  defendant's crime undermined that faith.  It

15  undermined that trust.

16      Do you agree with that?

17      A.  Absolutely.

18      Q.  Okay.

19      A.  As I said in my statement.

20      Q.  All right.  If we go to page 52.

21  Actually, let's start on page 51.  This is your

22  statement.  This is after the court has asked

CONFIDENTIAL

1   you -- has invited you to speak, if you so wished,

2   and you do.

3          On line 23 you say, I felt that the

4   American people should have the opportunity to see

5   the tax returns of the sitting President before

6   they decided on how they were going to vote.

7          Does that remain your view of how you

8   felt?

9          A.  That's how I felt.  Yes.

10         Q.  I also felt that taxpayers, as a whole,

11  deserve to know just how easy it was for the

12  wealthiest amongst us to avoid paying into our

13  system.

14         Is that also an accurate reflection of

15  how you felt then and how you feel now?

16         A.  That's how I felt then.

17         Q.  Then your last sentence is, I also

18  understand in [sic] my actions, despite being

19  driven by a desire for transparency, were illegal

20  and have caused significant harm.

21         Is that still how you feel?

22         A.  Yes.

CONFIDENTIAL

Page 288

1      Q.  And what is the significant harm that you
2  believe that your actions caused?
3      A.  That people's privacy was violated in a
4  way that they should not have any expectation of
5  it being violated by a government they have a
6  legal obligation to entrust with their private
7  information.
8          And, you know, I -- I was never under any
9  presumption that what I was doing wasn't wrong.  I
10 mean, it's against the law, it was wrong, it was
11 sneaking around.  People don't do those things if
12 they're doing virtuous things.  All I thought was
13 that it served a public interest, which -- I don't
14 know.  I don't know how I feel now about it.
15     Q.  And -- but you also believe that it
16 caused harm?
17     A.  Yes.
18     Q.  And then I'm just going to ask you if
19 you'd turn to page 53.  And this is -- just to
20 orient you, this is -- the Court is speaking after
21 she has heard from the government, from your
22 counsel, from you.

CONFIDENTIAL

Page 289

```
1              And on page 57, the Judge said, The
2    nature of this offense -- this is at the top of
3    the page.  The nature of this offense was an
4    intolerable attack on our constitutional
5    democracy, declaring open season on the private
6    lives of our highest elected officials.
7    Mr. Littlejohn's targeting of a sitting President
8    of the United States is part of a three-year
9    criminal scheme, including working with reporters
10   to help him understand the tax returns, deciding
11   again and again and again to take the law into his
12   own hands.  Disclosing the tax returns of
13   thousands of individuals, violating their privacy,
14   making them live in fear of other harms that may
15   occur to them or their families in the future
16   supports an upward variance here.
17              Did I read that accurately?
18        A.  Yes.
19        Q.  And the upward variance, of course,
20   refers to the fact that the judge gave you a
21   higher sentence than the guidelines would have
22   called for otherwise?
```

CONFIDENTIAL

Page 290

1        A.  Correct.

2        Q.  Putting aside -- I know you didn't agree

3    with the upward variance, of course --

4        A.  No, actually, we did.

5        Q.  You did?

6        A.  Not the specific amount, but we --

7        Q.  You agreed with the concept of the upward

8    variance --

9        A.  Correct.

10        Q.  -- but not the 60 months.

11            Do you agree with the judge about the

12    fact that she believed that disclosing the tax

13    returns of thousands of individuals, violating

14    their privacy and making them live in fear of

15    other harms that may occur to them or their

16    families in the future -- do you believe that was

17    a fair statement by the Judge?

18        A.  Yes.  Though I will qualify it.  I was

19    intentional, insofar as I could be, to not release

20    this information publicly without going through a

21    reputable news outlet.  I think that journalistic

22    integrity would prevent posting home addresses,

CONFIDENTIAL

Page 291

1    prevent posting other significantly identifiable

2    information.

3            And I did take steps to scrub the data

4    that was shared of sensitive financial

5    information, some, that had no journalistic

6    purpose.

7            That being said, you know, I can't in any

8    way make up for people's individual private fear.

9    None of that, you know, discounts their

10   experience.  So I really -- I don't have anything

11   aside from that to say or to justify my actions.

12       Q.  Okay.  And then just -- last thing I

13   wanted to raise with you that the Judge said --

14   this is on page 72 of the sentencing transcript --

15   and to some extent it goes to the last point you

16   were making.  And it's line 17:  Despite what

17   Mr. Littlejohn argues, I find it implausible that

18   he did not intend to harm at least some taxpayers.

19   Indeed, he provided the returns to the New York

20   Times and ProPublica so that they could write

21   articles about Mr. Trump and wealthy individuals.

22   Any sophisticated and experienced consultant, like

CONFIDENTIAL

Page 292

1    Mr. Littlejohn, knew what type of information tax

2    returns contained and how its unauthorized

3    disclosure would cause considerable harm to its

4    victims.

5         I think that you've kind of addressed

6    that point, but do you disagree with the judge on

7    that?

8         A.  I think there's a difference between

9    caused harm and intended to harm.  Yes.

10        Q.  So you disagree with the judge because

11   she says that you --

12        A.  Well, then, as I do now, as written here,

13   we argued that we did not intend to cause harm.

14        Q.  Okay.  All right.

15        A.  "We" meaning myself.

16        Q.  "We" you mean yourself.  I was going to

17   ask you that.  We --

18        A.  We -- I mean, maybe you could consider

19   ProPublica and the New York Times as part of the

20   "we."  But really, me, and of course Ms. Manning

21   who put together the sentencing memo, that's part

22   of the "we."

CONFIDENTIAL

Page 293

1      Q.  Understood.

2          So -- in preparing for today, you met

3   with your counsel?

4      A.  Yes.

5      Q.  And I assume she showed you some

6   documents to prepare you.

7      A.  No.

8      Q.  Did you meet with the government?

9      A.  No.

10     Q.  Have you had any meetings with the

11  lawyers from the government or the IRS, either the

12  DOJ or IRS, in preparation for this meeting?

13     A.  No.

14     Q.  Have you had any meetings with the

15  government outside of the two proffers that we

16  discussed?

17     A.  No.

18         MR. BURCK:  Just give me a second.  May

19  we go on, like, a two-minute break?

20         MS. MANNING:  Of course.

21         VIDEO TECHNICIAN:  The time is 3:01 p.m.

22  We're off the record.

CONFIDENTIAL

Page 294

1            (A recess was taken.)

2            VIDEO TECHNICIAN:  The time is 3:11 p.m.

3    This begins unit number 5.  We're on the record.

4    BY MR. BURCK:

5        Q.  Mr. Littlejohn, just -- earlier, before

6    this break, I asked you about screen shots of

7    messages between yourself and reporters of

8    ProPublica that the government showed you at one

9    of the proffers.

10       A.  Correct.

11       Q.  Do you know if those were messages that

12   the government received from you voluntarily, or

13   was it something they got from the search warrant?

14       A.  It was voluntary.

15       Q.  And do you remember approximately when

16   you authorized -- I assume your counsel -- to

17   provide it to them?

18       A.  It was ahead of -- it was the same day as

19   the proffer.

20       Q.  Same day as the proffer.  So when --

21           THE WITNESS:  Wait --

22           No.

CONFIDENTIAL

Page 295

1              MR. BURCK:  No?

2              MS. MANNING:  Do we have to go off the

3      record or may I clarify?

4              MR. BURCK:  You can clarify.

5              MS. MANNING:  Those messages were on the

6      USB drive --

7              MR. BURCK:  The camel --

8              MS. MANNING:  The camel drive.

9              MR. BURCK:  Okay.

10             MS. MANNING:  And so I'm not sure the

11     authority -- they may have had a separate search

12     warrant or seizure warrant to actually seize it

13     from the woman who had purchased it the day before

14     on Facebook Marketplace.

15             MR. BURCK:  I understand.

16             MS. MANNING:  But it was -- we assisted

17     in the recovery, but it was ultimately tracked

18     down by federal agents and then taken into their

19     custody.

20             MR. BURCK:  Understood.

21     BY MR. BURCK:

22         Q.  But Mr. Littlejohn, you identified the

CONFIDENTIAL

Page 296

1   camel -- the box, camel, for the government in

2   order to assist them, correct?

3        A.  Correct.

4        Q.  Okay.  I'm going to go through a series

5   of questions here, a little bit of backtracking,

6   not on terms of substance, but just in terms of

7   time, and then we'll be finished for now.

8   ███████████████████████████

9   ███

10  █   ██

11  █   ████████████████████████████

12  ████████████

13  █   ███   █████████████████

14  ██████████████████████████████

15  ████████████████████████

16  ████████   ████████████████

17  ███████████████████████   ███

18  ████████████████████████   ███

19  █████████████████

20      ████████████████████

21  ██

22      █   ████   ████████

CONFIDENTIAL

Page 297

1    ███   █████████   ████████████████████

2    ████████████████████████████

3         Q.  Okay.  I think earlier you testified that

4    you were involved in the creation of filters to

5    prevent the filing of fraudulent tax returns?

6         A.  That's right.

7         Q.  Can you just tell us a little bit more

8    about your involvement in the creation of those

9    filters?

10        A.  Yes.  So it was not my primary activity.

11   As I've mentioned before, a lot of what I was

12   doing was developing reports.  But some of the

13   stuff that I got involved in a little bit later

14   was -- you know, there were specific kinds of

15   filters that were being developed by the team that

16   had various statistical characteristics.  Some

17   were basically just targeting specific schemes.

18   And I would do back-testing of these potential

19   filters to identify whether or not it would

20   capture suspected fraudulent returns.

21        Q.  Okay.  We talked a little bit about your

22   training.

CONFIDENTIAL

Page 298

1        Did somebody keep track of your training

2    at the IRS?

3        A.  I'm sure it's in their automated -- some

4    system I'm sure tracks it.  Probably the COR also

5    is responsible for it, too.

6        Q.  The COR.  And that's a person?

7        A.  Martha Coleman.

8        Q.  Martha Coleman.  Okay.

9        A.  Or Marsha.

10        Q.  Marsha Coleman.  Okay.

11        Do you know who set the curriculum for

12    the training at the IRS?

13        A.  No.

14        Q.  Did you ever miss completing a data

15    security training on time?

16        A.  No.

17        Q.  Did you have an understanding of what

18    would happen if you did miss to complete a

19    training on time?

20        A.  Well, I never expected to miss that, so I

21    don't know the exact repercussions for it.

22        Q.  Okay.  Going back to 2017 when you

CONFIDENTIAL

Page 299

1   returned to the IRS, I think you mentioned that

2   you had had a confab meeting on Wednesdays?

3           A.   Yes.

4           Q.   Can you tell us what that means?

5           A.   Oh, it's just a meeting that included a

6   bunch of different teams that got to listen to us

7   talk about the previous week in secure access

8   analytics.  So we would discuss -- you know, we'd

9   basically put together a report that talks about,

10  you know, how many people came through, what's the

11  success rate, what are various ways to slice and

12  dice the data.  Anything new, special reports that

13  we put together.

14          Q.   Okay.  And earlier you testified that --

15  about the overcorrection that had happened with --

16  that made it more difficult for --

17          A.   Yes.

18          Q.   -- even legitimate taxpayers to get

19  access to information.

20               Part of your job was to monitor the

21  system that was meant to fix this problem, right?

22          A.   There was no system, as such.

CONFIDENTIAL

Page 300

1          Q.  Well...

2          A.  The only system I'd say is just our

3    activity in investigating the secure access.

4          Q.  If there was too high a level of

5    rejection, you would try to fix it?

6          A.  Oh, certainly.  Yeah.

7          Q.  So were you also responsible -- you,

8    amongst others -- with fixing or troubleshooting

9    issues as they arose?

10         A.  Some, yes.  But many that you'd might

11   imagine were not subject to our involvement.  You

12   know, maybe -- secure access goes down because of

13   some issue with the servers, that's not really

14   related to what we did.

15         Q.  Okay.  Your work at the IRS, particularly

16   from 2017 through 2021, would you say that the IRS

17   directed your work?

18             Putting aside the criminal issues --

19         A.  Yeah, I don't --

20         Q.  -- so your normal day-to-day --

21         A.  Can you give me a few examples of what

22   you might consider directed?

CONFIDENTIAL

Page 301

1        Q.  Did you know when you had to report in to

2    the office, for example?

3        A.  Generally, yes.

4        Q.  Okay.  Paul Wight was your direct report.

5    Or you reported to him?

6        A.  Yes.

7        Q.  Would you consider him to be someone who

8    could direct your work?

9        A.  Yes.

10        Q.  And he worked for the IRS?

11        A.  Yes.

12        Q.  Were there other people like Paul Wight

13    who were employees of the IRS that had a similar

14    job as you?

15        A.  Other people that had a similar job that

16    worked at the IRS?  Not exactly, no.  I mean,

17    like, I don't know everybody that worked at the

18    IRS, so it's hard to say.

19        Q.  Okay.

20        A.  Maybe you could elaborate.

21        Q.  No, that's fine.  That's...

22    ███████████████████████████████████████

CONFIDENTIAL

Page 302



11 Q. So we've talked about this before, but I

12 just want to be more specific.

13   For individual tax returns, you had

14 access to all of the reporting fields on the

15 individuals' tax returns, right?

16 A. Correct.

17 Q. So that would include deductions,

18 dependent information, social security numbers,

19 claimed losses, individual deductions, charitable

20 contributions?

21 A. Yes.

22 Q. And I think you testified that, at least

CONFIDENTIAL

Page 303

1    on some occasions, you had actually scrubbed some

2    people's tax returns before you disclosed it to

3    either -- or I guess the -- ProPublica.

4        A.  Correct.

5        Q.  And you also say that you had access to

6    tax returns, I think, going back 16 years?

7        A.  15 or 16.

8        Q.  And in your view, was a claimed loss by a

9    taxpayer on a tax return filed over ten years ago,

10   was that used to validate a taxpayer?

11       A.  Not that I know of.  I don't know.

12       Q.  Was the amount --

13       A.  What do you mean -- by whom, I'm sorry?

14       Q.  By the IRS or by you.

15       A.  I don't know what you're speaking to,

16   sorry.

17       Q.  You probably don't know the answer to

18   this either, but I'll ask anyway.

19            Was the amount of a -- taxpayer

20   charitable contributions reported on a tax return

21   ten years ago, was that used to validate

22   taxpayers?

CONFIDENTIAL

Page 304

1          A.   I don't know what you mean by validate,

2     to be honest.

3          Q.   Okay.  Understood.  And what about

4     capital losses?  Also validate -- you don't know

5     what I'm talking about when I ask you about

6     validation?

7          A.   I'm sorry, I don't.

8          Q.   That's fine.

9               You also had audit information, right?

10    You had access to audit information?

11         A.   Limited.

12         Q.   Limited?

13         A.   Yes.

14         Q.   And how was it limited?

15         A.   It didn't contain any notes.

16         Q.   What are the notes?

17         A.   I don't know.  Notes you'd expect from an

18    audit.

19         Q.   Okay.  But you knew that an audit had

20    occurred with somebody?  Is that how --

21         A.   Yes.

22         Q.   Okay.  I think we talked about this, but

CONFIDENTIAL

Page 305

 1    when you accessed Donald Trump's tax returns, you

 2    didn't hear from the IRS or investigators for

 3    several years, correct?

 4         A.  Correct.

 5         Q.  And with respect to ProPublica, it was a

 6    year or so.

 7         A.  No, less than that.

 8         Q.  Less than that?

 9         A.  Well, from when?

10         Q.  From when you actually --

11         A.  Oh, correct.

12         Q.  -- took the information --

13         A.  It was over a year.

14         Q.  -- it was over a year later.

15              So at the time, you had no reason to

16    believe that the IRS would actually know that you

17    had accessed a specific taxpayer's or group of

18    taxpayers' tax returns.

19         A.  No, I didn't know.

20         Q.  Now, you testified that access to

21    taxpayer return information was necessary for your

22    job, right?

CONFIDENTIAL

Page 306

1         A.   Correct.

2         Q.   Do you know who at the IRS made that

3    determination?

4         A.   It would be whoever signed off on my --

5    whatever the -- 50 -- 5081 is what it's called.

6    It's the approval for system access at the IRS.

7         Q.   Do you know who that person is?

8         A.   Paul Wight approves.

9         Q.   Paul Wight approves.  Anybody else?

10        A.   Yeah, there was one other person that --

11   I kept on getting switched back and forth between

12   them as a manager, but he did not manage me.  It

13   was -- I don't recall his name.

14        Q.   Okay.

15             MR. BURCK:  Thank you very much,

16   Mr. Littlejohn.  That will conclude my questions

17   for the moment.  And I think I'll hand it over to

18   the Department of Justice.

19             THE WITNESS:  Very well.

20             EXAMINATION BY COUNSEL FOR DEFENDANTS

21   BY MS. SMITH:

22        Q.   Good afternoon, Mr. Littlejohn.  I am

CONFIDENTIAL

Page 307

1    going to be asking questions a little bit all over

2    the place, so I apologize in advance, but I want

3    to follow up on some of your testimony earlier

4    today.

5          One thing that you mentioned during your

6    testimony was that you had views about the risks

7    that the IRS should consider between contractors

8    and employees.

9          A.  Correct.

10         Q.  What did you mean by that?

11         A.  I think that there's always going to be a

12   bit more of a risk with a contractor than with an

13   employee, is really what it came down to.  You

14   know, if you're an employee that's gone through

15   the extensive process to get hired by a government

16   institution, you have some allegiance to that

17   institution; whereas, you know, whoever hired me,

18   I mean, I don't -- it's just a little different.

19         So that's my opinion only.  I mean, of

20   course we sign the same nondisclosure agreements,

21   so by law, there's no difference.

22         Q.  Okay.  And did you have the same type of

CONFIDENTIAL

Page 308

1  training regarding 6103 and protecting taxpayer

2  return information as employees?

3       A.  I can only assume it was the same because

4  it didn't have any specific connotation that this

5  was just for contractors.

6       Q.  Okay.

7       A.  But I was not an employee, so I don't

8  know what they see.

9       Q.  Right.  You were not ever an employee of

10  the IRS, correct?

11       A.  Never.

12       Q.  Okay.  Have you ever been an employee of

13  the United States?

14       A.  No.

15       Q.  Okay.  If you turn to Exhibit 2.  And you

16  were asked about the description in your resume

17  where you say you are a senior analyst with the

18  IRS Identity Assurance Office's analytics

19  division.

20           Do you see that?

21       A.  Yes.

22       Q.  And that senior analyst title, that's a

CONFIDENTIAL

Page 309

1    description that you gave yourself?

2         A.  Yes.  This is an internal Booz Allen

3    resume intended to communicate to other Booz Allen

4    projects your capabilities.

5         Q.  Okay.  So Booz Allen instructed you to

6    provide a resume that they could provide to

7    others?

8         A.  Within Booz Allen, correct.

9         Q.  Within Booz Allen.  Okay.

10        A.  So this was my attempt to be descriptive.

11        Q.  Okay.  And in 2017, what was your title

12   at Booz Allen?

13        A.  It was associate.

14        Q.  Associate.  Did it stay associate

15   throughout 2017 to 2021?

16        A.  No.  I was promoted.

17        Q.  Okay.  And when were you promoted?

18        A.  I don't recall.  I think it was 2019

19   or -- probably 2019.

20        Q.  And when you were promoted, what was the

21   title you were given?

22        A.  Lead associate.

CONFIDENTIAL

Page 310

1     Q.   Who gave you that title?

2     A.   It was my manager.

3     Q.   Your manager at Booz Allen?

4     A.   Is that the question?

5     Q.   Yes.

6     A.   Bob Fischer.

7     Q.   Is -- when you say your manager gave you

8  that title, are you talking about Bob Fischer at

9  Booz Allen?

10    A.   Lead associate?

11    Q.   Yes.

12    A.   I mean, I'm not sure if he could -- he

13  doesn't have the authority to give me that title.

14  It's simply a promotion.

15    Q.   Well, who --

16    A.   I don't know what --

17    Q.   Who gave you the promotion?  How did you

18  know you were promoted?

19    A.   I was told by Bob that I was promoted.

20  I'm sure it went before a committee of some kind.

21    Q.   Okay.  So someone at -- a committee or

22  someone at Booz Allen decided you should be

CONFIDENTIAL

Page 311

1    promoted in 2019.  They gave you a promotion, and

2    then Mr. Fischer informed you of that.

3         A.  Correct.

4         Q.  Did you receive any other promotions

5    between 2017 to 2021?

6         A.  No.

7         Q.  Okay.  Did you receive paychecks during

8    the 2017 to 2021 time frame?

9         A.  Yes.

10        Q.  Who gave you those paychecks?

11        A.  Booz Allen Hamilton.

12        Q.  Okay.  Did you receive any bonuses during

13   that time frame?

14        A.  Not what you'd call bonuses.  Team

15   awards.

16        Q.  Okay.

17        A.  That sort of thing.

18        Q.  And --

19        A.  That had monetary value.

20        Q.  And who gave you those team awards?

21        A.  My task -- my -- the person who managed

22   me on the project that I was on with IRS, who was

CONFIDENTIAL

Page 312

1    a Booz Allen employee.

2         Q.   And what was that person's name?

3         A.   Sheetal Maithel.

4         Q.   Okay.  Did you have -- you, personally --

5    have performance evaluations during the 2017 to

6    2021 time frame?

7         A.   Yes.

8         Q.   And who gave you those evaluations?

9         A.   Robert Fischer.

10        Q.   From Booz Allen?

11        A.   Yes.

12        Q.   Did the IRS sit down and give you a

13   performance evaluation during that time frame?

14        A.   No.

15        Q.   Did you receive vacation days, sick days,

16   things like that, while you were working at

17   Booz Allen?

18        A.   Yes.

19        Q.   And if you wanted to take a sick day, how

20   would you do that?

21        A.   I would inform the team ahead of time,

22   IRS as well, and then I'd schedule it.

CONFIDENTIAL

Page 313

1      Q.  Okay.  And did you have to schedule that

2   with Booz Allen?

3      A.  Both, IRS and Booz Allen.

4      Q.  Okay.

5      A.  There's a calendar.

6      Q.  Okay.  And did you have to, like, submit

7   anything else?  Submit any request showing that

8   you're taking leave?

9      A.  Not aside from -- well, typically, I

10  would not -- let me backtrack for a second.  If

11  I'm taking leave, like if I'm going on a vacation,

12  I actually wouldn't need to really tell

13  Booz Allen -- like my manager.  So the way this

14  works is you have a manager that's like --

15  oversees your career development.  That's how Bob

16  and I, you know, related.  And then you also have

17  the manager on your task, your contract.  And

18  that's who you would deal with -- your time or

19  your vacation schedule, that sort of thing.

20        And, you know, I wouldn't necessarily

21  tell Bob I'm going on vacation unless we were just

22  talking and...

CONFIDENTIAL

Page 314

1      Q.  And who's the manager on the contract?

2   Is that an IRS employee or a Booz Allen employee?

3      A.  That's a Booz Allen employee.

4      Q.  Okay.

5      A.  Oh, but there's a system, too -- they've

6   changed it a few times over the years in

7   Booz Allen -- where you could put in your expected

8   leave, and then your task manager on the contract

9   would approve it.

10     Q.  And when you're saying managers, you're

11  referring to Booz Allen managers.

12     A.  Yes.

13     Q.  Okay.

14         MS. SMITH:  I'm going to just continue

15  with the numbering.  Are we on 6?

16         (Littlejohn Deposition Exhibit 6 marked

17         for identification and attached to the

18         transcript.)

19  BY MS. SMITH:

20     Q.  I'm going to show you what's been marked

21  as Exhibit 6.  And this is a document, you'll see

22  in the bottom right-hand corner, that has Bates

CONFIDENTIAL

1    labels.  It starts with BAH.Griffin 168 and goes

2    to BAH.Griffin 169.

3           Do you see that?

4       A.  Yes.

5       Q.  And what is this document?  Do you

6    recognize it?

7       A.  This is an offer letter of some kind.

8       Q.  Have you seen this document before?

9       A.  Yep, I have.

10      Q.  And this is an offer letter from

11   Booz Allen to you?

12      A.  Yes.  To me from Booz Allen.

13      Q.  From September 2017?

14      A.  Correct.

15      Q.  And in this letter they -- it's redacted,

16   but they set your salary, right?

17      A.  Correct.

18      Q.  Okay.  And they gave you -- they

19   identified a career manager, Robert Fischer --

20      A.  Correct.

21      Q.  -- for you, and he works at Booz Allen?

22      A.  Yes.

CONFIDENTIAL

Page 316

1        Q.   And then it listed some requirements and

2    contingencies for the offer; is that right?

3        A.   Yes.

4        Q.   And did you accept this offer?

5        A.   I did.

6        Q.   Okay.  And did you remain a Booz Allen

7    employee from 2017 through 2021?

8        A.   That's right.

9             (Littlejohn Deposition Exhibit 7 marked

10            for identification and attached to the

11            transcript.)

12   BY MS. SMITH:

13       Q.   I'm going to hand you a document that's

14   been marked Exhibit 7.  It's Bates stamped

15   BAH.Griffin 208.

16            Do you recognize this document?

17       A.   Yes.

18       Q.   What is it?

19       A.   It's a time reporting document.

20       Q.   For Booz Allen?

21       A.   Yes.

22       Q.   And would you have to record your time

CONFIDENTIAL

Page 317

```
 1   with Booz Allen?  You were talking before if you
 2   had to take leave or things like that -- would you
 3   report that to Booz Allen?
 4        A.  Yes.
 5        Q.  Is this the program that you would use,
 6   TimeOnline?
 7        A.  It is.  This is -- there was a separate
 8   one when I was there that you could forecast your
 9   leave in advance.  But, you know, this is
10   specifically when you put in time off or time on
11   the contract, internal or whatever, you would
12   report your time.
13             (Littlejohn Deposition Exhibit 8 marked
14             for identification and attached to the
15             transcript.)
16   BY MS. SMITH:
17        Q.  I'm going to hand you what's been marked
18   as Exhibit 8.  It's labeled USA Griffin 2457, and
19   it goes to USA Griffin 2470.
20             Do you recognize this document?
21        A.  This is an integrated talent management
22   learning history.
```

CONFIDENTIAL

Page 318

1      Q.  Do you recognize it?

2      A.  It appears to record the briefings that I

3  completed.

4          I've not seen this specific document, no,

5  but maybe it's some sort of printoff from an

6  internal system.

7      Q.  Okay.  You testified that you had

8  training requirements at the IRS and at

9  Booz Allen?

10     A.  Correct.

11     Q.  And you completed all of those

12  requirements?

13     A.  It appears to be so.

14     Q.  Are there any trainings in here that you

15  don't recognize or you don't believe that you

16  completed?

17     A.  No.

18     Q.  Okay.  Was the IRS a client or a customer

19  of Booz Allen Hamilton under the contracts that

20  you were working under?

21     A.  They were a client.

22     Q.  A client.  And when counsel referenced

Page 319

1   several times that you were, quote/unquote,

2   working for the IRS, do you mean you were working

3   with Booz Allen's client or customer, the IRS?

4        A.  Correct.

5        Q.  You were never employed by the IRS.

6        A.  Correct.

7        Q.  And Paul Wight was a point of contact at

8   the IRS that you worked with?

9        A.  Oh, he's more than just a point of

10  contact.

11       Q.  Okay.  And how would you describe him?

12       A.  He was my manager in the IRS system.

13       Q.  And what would he manage?

14       A.  He was the client, essentially, for us,

15  our main point of contact.  So he would give us

16  feedback on our work and tell us what he thought

17  we should be doing.

18       Q.  Would he tell you how to do your job, or

19  would he tell you what he wanted the product to

20  look like?

21       A.  The latter.  He didn't tell us how to do

22  our job.

CONFIDENTIAL

Page 320

1        Q.  Okay.  Do you know if Paul Wight knew how

2    to do your job?

3        A.  He could do some of it, but not all.

4        Q.  Okay.  And the IRS entered into a

5    contract with Booz Allen Hamilton because Booz

6    Allen Hamilton had the expertise, right, to do the

7    projects that the IRS wanted?

8        A.  Correct.

9        Q.  Okay.  I think there was a reference of

10   you training IRS analysts.

11           Do you remember that testimony?

12       A.  Yes.

13       Q.  By that do you mean you were training the

14   IRS analysts how to do what you were doing under

15   the contract?

16       A.  Correct.

17       Q.  And the purpose of that training was so

18   that the IRS could bring this in house and not

19   have contractors doing this?

20       A.  That was someone's hope, I think, in some

21   way.

22       Q.  Okay.  But the training that you were

CONFIDENTIAL

Page 321

1    giving was the expertise you had that you were

2    trying to impart onto the IRS.

3         A.  Yes.

4         Q.  Would you consider yourself a manager of

5    IRS employees?

6         A.  No, I think that's too far.

7         Q.  Okay.  Because you didn't provide, like,

8    performance evaluations for IRS employees.

9         A.  Exactly.  I never did that.

10        Q.  You didn't hire or fire IRS employees.

11        A.  I could not do that.

12        Q.  You didn't approve leave requests from

13   IRS employees.

14        A.  No.

15        Q.  Okay.  At sentencing, you made the

16   comment, I alone am responsible for this crime.

17             Do you remember that?

18        A.  Yes.

19        Q.  Do you agree with that statement?

20        A.  Wholeheartedly.

21        Q.  Was there anyone at the IRS that you

22   spoke to in 2018, '19, early 2020 -- I'm sorry,

CONFIDENTIAL

Page 322

1    2018, 2019, 2020, early 2021, about what you were

2    doing with the New York Times and ProPublica?

3        A.  No, I did not [sic].

4        Q.  Did you discuss with anyone at Booz Allen

5    Hamilton what you were doing in 2018, '19, '20, or

6    early 2021 regarding the New York Times and

7    ProPublica and disclosing taxpayer return

8    information?

9        A.  No.

10       Q.  You were testifying about pulling data

11   for about 7500 high-net-worth or high-income

12   taxpayers, correct?

13       A.  Correct.

14       Q.  How many times did you pull that

15   information?  Was it once or multiple times?

16       A.  For the same people?

17       Q.  Well, let's talk about Mr. Griffin, since

18   he's the plaintiff in this case.

19           How many times did you access his

20   information?

21       A.  Well, these queries were set up to access

22   multiple data tables in IRS systems.  Each table

CONFIDENTIAL

Page 323

1   contains a different form or schedule, so each

2   table will have information for each of the people

3   involved.

4          So you tell me the number of tables that

5   were accessed; that's the number of times his

6   information was touched.

7      Q.  Okay.  And do you have an idea as to

8   how -- how many tables were accessed for

9   Mr. Griffin?

10      A.  I don't have a specific number.  If I

11   were to guess, it would be under a hundred.

12      Q.  Did you target Mr. Griffin when you

13   started gathering this information?

14      A.  No.

15      Q.  Did you inspect the infor- --

16   Mr. Griffin's information before turning it over

17   to ProPublica?

18      A.  No.

19      Q.  And how many times did you disclose

20   Mr. Griffin's information to ProPublica?

21      A.  Just once.

22      Q.  Did you give Mr. Griffin's return

CONFIDENTIAL

Page 324

1    information to any other sources?

2         A.   No.

3             MS. SMITH:   I think if we can just take a

4    couple of minutes, see if there's anything else.

5             MR. BURCK:   Sure.

6             VIDEO TECHNICIAN:   The time is 3:44 p.m.

7    We're off the record.

8             (A recess was taken.)

9             VIDEO TECHNICIAN:   The time is 3:56 p.m.

10   We're on the record.

11   BY MS. SMITH:

12        Q.   Mr. Littlejohn, when we were at the

13   break, there was a discussion about you not

14   knowing the identities of the taxpayers'

15   information who you gave to ProPublica; is that

16   right?

17        A.   Correct.

18        Q.   Is there something else you wanted to

19   clarify about that or expound upon?

20        A.   As stated before, the queries were of a

21   set parameter, let's get the top 500 people each

22   year by total positive income.  You know, I had no

CONFIDENTIAL

Page 325

1    idea what that would return, so -- but I did want

2    to ensure that it was accurate, at least insofar

3    as I should expect some, you know, people that I'm

4    familiar with to show up on this.

5           But I did not, you know, review the

6    extent of who was in there and it was not targeted

7    towards specific individuals.

8           And, you know, I can state that I did not

9    see Mr. Griffin's, you know, name in there prior

10   to sharing it to ProPublica.

11   Q.   Okay.  You were asked earlier about

12   Nanette Downing.

13          Do you remember that?

14   A.   Yes.

15   Q.   And she was Paul Wight's boss; is that

16   correct?

17   A.   Correct.

18   Q.   And she wasn't your boss, correct?

19   A.   No, but she was probably what you would

20   consider the client.

21   Q.   She was the client?

22   A.   She was the client.  Yes.

CONFIDENTIAL

Page 326

1      Q.  And when -- you said you had communicated

2   with her by e-mail?

3      A.  Yes.  And in person.

4      Q.  And in person.

5          And when you were communicating by

6   e-mail, would you include Mr. Wight on those

7   e-mail communications?

8      A.  Almost always.

9      Q.  Can you recall any time where you

10  communicated with Ms. Downing without including

11  Mr. Wight on an e-mail?

12     A.  It may have happened, but I don't recall

13  it.

14     Q.  Okay.  Did you meet with Mr. Griffin's

15  counsel at any point before today?

16     A.  No.

17     Q.  Did you meet with them today before the

18  deposition?

19     A.  No.

20     Q.  Have you had any communications with

21  Mr. Griffin's counsel?

22     A.  I have not.

CONFIDENTIAL

Page 327

1          Q.   Okay.

2               MS. SMITH:   Okay.   That concludes our

3     questioning.   Again, we just want to reiterate

4     that the entire deposition transcript be marked

5     confidential, consistent with the stipulated

6     protective order so that each page of the

7     transcript is marked confidential.

8               MR. BURCK:   I have no further questions

9     for you today, Mr. Littlejohn.   I want to thank

10    you very much for coming and spending these hours

11    with us.

12              There are some outstanding discovery

13    disputes and other disputes with the government

14    and the IRS that may require us to request that

15    you appear for another deposition.

16              So for the moment, we are suspending the

17    deposition -- we're not closing it -- but that's

18    because of these outstanding issues that we have

19    to deal with with the other side.

20              THE WITNESS:   Will I get another $40?

21              MR. BURCK:   I'm sure you will.

22              So thank you again very much.   Appreciate

CONFIDENTIAL

Page 328

1    it.

2              THE WITNESS:  Thank you.

3              VIDEO TECHNICIAN:  The time is 4:00 p.m.

4    We're off the record.

5              (Whereupon, at 4:00 p.m., the

6              confidential videotaped deposition of

7              CHARLES E. LITTLEJOHN was concluded.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

CONFIDENTIAL

Page 329

```
 1              CERTIFICATE OF NOTARY PUBLIC

 2              I, CHRISTINA S. HOTSKO, the officer before

 3    whom the foregoing deposition was taken, do hereby

 4    certify that the witness whose testimony appears in

 5    the foregoing deposition was duly sworn by me; that

 6    the testimony of said witness was taken by me in

 7    stenotypy and thereafter reduced to typewriting under

 8    my direction; that said statement is a true record of

 9    the proceedings; that I am neither counsel for,

10    related to, nor employed by any of the parties to the

11    action in which this statement was taken; and,

12    further, that I am not a relative or employee of any

13    counsel or attorney employed by the parties hereto,

14    nor financially or otherwise interested in the

15    outcome of this action.

16

17

18              CHRISTINA S. HOTSKO

19              Notary Public in and for the

20              District of Columbia

21    My commission expires:

22    1 January 2027
```

CONFIDENTIAL

Page 330

1   Lisa Manning, Esquire

    lmanning@schertlerlaw.com

2

3                     March 20, 2024

4   RE: Kenneth C. Griffin vs. Internal Revenue Service

      Job No. FLA6463139

5    3/19/2024 Deposition of Charles E. Littlejohn

6    The above-referenced transcript is available for

7  review.

8    The witness should read the testimony to

9  verify its accuracy. If there are any changes,

10  the witness should note those with the reason

11  on the attached Errata Sheet.

12    The witness should, please, date and sign the

13  Errata Sheet and email to the deposing attorney as well as

14  to Veritext at Transcripts-fl@veritext.com and copies will

15  be emailed to all ordering parties.

16    It is suggested that the completed errata be returned 30

17  days from receipt of testimony, as considered reasonable

18  under Federal rules*, however, there is no Florida statute

19  to this regard.

20    If the witness fails to do so, the transcript may be used

21  as if signed.

22             Yours,

23             Veritext Legal Solutions

24

   *Federal Civil Procedure Rule 30(e)/Florida Civil Procedure

25   Rule 1.310(e).

CONFIDENTIAL

Page 331

1   RE: Kenneth C. Griffin vs. Internal Revenue Service

        Job No. FLA6463139

2       3/19/2024 Deposition of Charles E. Littlejohn

3                E R R A T A   S H E E T

4   PAGE_____ LINE_____ CHANGE_____

5   _____

6   REASON_____

7   PAGE_____ LINE_____ CHANGE_____

8   _____

9   REASON_____

10  PAGE_____ LINE_____ CHANGE_____

11  _____

12  REASON_____

13  PAGE_____ LINE_____ CHANGE_____

14  _____

15  REASON_____

16  PAGE_____ LINE_____ CHANGE_____

17  _____

18  REASON_____

19

20  Under penalties of perjury, I declare that I have

    read the foregoing document and that the facts

21  stated in it are true.

22

23  _____     _____

        Charles E. Littlejohn                     DATE

24

25

CONFIDENTIAL

Page 332

1      KENNETH GRIFFIN vs. INTERNAL REVENUE SERVICE and

            U.S. DEPARTMENT OF THE TREASURY

2

            CHARLES E. LITTLEJOHN

3

4

5           ACKNOWLEDGMENT OF DEPONENT

6

7   I, _____, do hereby certify that I

8   have read the foregoing pages and that the same is a

9   correct transcription of the answers given by me to

10  the questions therein propounded,except for the

11  corrections or changes in form or substance, if any,

12  noted in the attached

13  Errata Sheet.

14

15

16

17  _____                    _____

18  DATE                           SIGNATURE

19

20

21

22  Job FLA 6463139



















































































Federal Rules of Civil Procedure

Rule 30


(e)  Review  By  the  Witness;  Changes.

(1)  Review;  Statement  of  Changes.  On  request  by  the
deponent  or  a  party  before  the  deposition  is
completed,  the  deponent  must  be  allowed  30  days
after  being  notified  by  the  officer  that  the
transcript  or  recording  is  available  in  which:

(A)  to  review  the  transcript  or  recording;  and

(B)  if  there  are  changes  in  form  or  substance,  to
sign  a  statement  listing  the  changes  and  the
reasons  for  making  them.

(2)  Changes  Indicated  in  the  Officer's  Certificate.
The  officer  must  note  in  the  certificate  prescribed
by  Rule  30(f)(1)  whether  a  review  was  requested
and,  if  so,  must  attach  any  changes  the  deponent
makes  during  the  30-day  period.



DISCLAIMER:  THE  FOREGOING  FEDERAL  PROCEDURE  RULES
ARE  PROVIDED  FOR  INFORMATIONAL  PURPOSES  ONLY.
THE  ABOVE  RULES  ARE  CURRENT  AS  OF  APRIL  1,
2019.  PLEASE  REFER  TO  THE  APPLICABLE  FEDERAL  RULES
OF  CIVIL  PROCEDURE  FOR  UP-TO-DATE  INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.